## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | ) | **CHAPTER 11** |
| | ) | |
| **NEXXLINX CORPORATION, INC., et al.,** | ) | **PROPOSED** |
| | ) | **Jointly Administered Under** |
| Debtors. | ) | **CASE NO. 16-61225-pmb** |
| | ) | |

## MOTION FOR AN INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN FINANCING, GRANT SECURITY INTERESTS AND ACCORD PRIORITY STATUS; (2) AUTHORIZING DEBTORS TO USE CASH COLLATERAL; (3) GIVING NOTICE OF FINAL HEARING; AND (4) MODIFYING AUTOMATIC STAY

COME NOW NexxLinx Corporation, Inc. ("**NexxLinx**"); NexxLinx Global, Inc. ("**NGI**"); NexxLinx of New York, Inc. ("**NNY**"); NexxLinx of Texas, Inc. ("**NTX**"); CustomerLinx of North Carolina, Inc. ("**CNC**"); and Microdyne Outsourcing Inc. ("**MOI**"), debtors and debtors-in-possession (collectively, the "**Debtors**") in the above-styled proposed jointly administered case (the "**Case**"), by and through its undersigned counsel, and make and file this Motion For An Interim Order (1) Authorizing Debtor-In-Possession To Obtain Financing, Grant Security Interests And Accord Priority Status; (2) Authorizing Debtor To Use Cash Collateral; (3) Giving Notice Of Final Hearing; And (4) Modifying Automatic Stay (the "**DIP Motion**") and hereby move this Court, pursuant to Sections 105, 361, 362, 363 and 364 of Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* as amended (the "**Bankruptcy Code**"), and Rules 2002, 4001(b)(2) and 4001(c)(2) and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") for entry of an order in a form substantially similar to **Exhibit A** attached hereto (the "**Interim Order**"), *inter ali,* (1) authorizing the Debtors to obtain post-petition credit from Action Capital Corporation ("**Action**") under the terms set forth in a Factoring and Security Agreement (the "**Factoring Agreement**") and an

Earned and Unbilled Revenue Line of Credit Agreement (the "**Line of Credit Agreement**" together with the Factoring Agreement together with all related notes, schedules, exhibits and annexes thereto, and as at any time amended or restated, the "**DIP Credit Agreement**") attached hereto as **Exhibit B**; (2) authorizing the Debtor to use cash collateral within the meaning of Bankruptcy Code § 363(a); (3) authorizing the Debtor to grant Action a super-priority claim over any and all administrative expenses other than as set forth in any order granting the DIP Motion; (4) scheduling a final hearing ("**Final Hearing**") for approval of the proposed post-petition financing and entry of a final order granting the DIP Motion (the "**Final Order**"); and (5) granting related relief, including, without limitation, modification of the automatic stay pursuant to Section 362 of the Bankruptcy Code.  Any capitalized terms not defined herein shall have the meanings ascribed to such term in the DIP Credit Agreement.

I.      **BANKRUPTCY RULE 4001(c)(1)(B) STATEMENT OF RELIEF REQUESTED**

   A.  **Summary of Material Terms of DIP Credit Agreement**

   The following summarizes the material terms and conditions of the proposed DIP Credit Agreement in accordance with Bankruptcy Rule 4001(c)(1)(B).  In the event of any conflict or inconsistency between the language of this summary and the DIP Credit Agreement, the provisions of the DIP Credit Agreement shall govern.

   1.  **General Overview**

   As of the Petition Date, the Debtors were indebted to Action in the approximate amount of $3,320,000.00, exclusive of any accrued but unpaid interest, fees, costs and expenses, under a pre-petition Factoring and Security Agreement and an Earned and Unbilled Revenue Line of Credit Agreement, and related documents and agreements (collectively, the "**Pre-Petition Credit Agreement**").  The proposed DIP Credit Agreement makes certain amendments to the Pre-Petition Credit Agreement, but essentially continues the same financing arrangement in place under the Pre-Petition Credit Agreement as of the Petition Date.

   As security for the Debtors' indebtedness to Action under the Pre-Petition Credit Agreement, Action contends that the Debtors granted security interests in and liens upon, *inter alia*, all acquired accounts, accounts receivable, earned but unbilled revenue, contract rights,

inventory, chattel paper, documents, instruments, general intangibles, reserves, reserve accounts, rebates and all books and records (including without limitation customer lists, computer programs, print outs, and other computer material and records) pertaining to the foregoing and all proceeds of the foregoing property (all such property owned by Debtors, as the same existed on or at any time prior to the Petition Date, together with all cash and non-cash proceeds thereof, being hereinafter referred to as the "**Pre-Petition Collateral**").

In addition to liens and security interests in favor of Action and statutory liens for taxes, Debtors have granted liens and security interests in favor of Branch Banking & Trust Company ("**BB&T**").  Pursuant to an Intercreditor Agreement dated as of October 18, 2015, between Action and BB&T, BB&T has agreed to subordinate its liens and security interests in favor of liens and security interests granted by Debtors in favor of Action.

2.  **Material Terms**

a.      **Transaction Type:**   (i) Factoring of eligible accounts receivable, and (ii) revolving line of credit for earned but unbilled revenue.

b.      **Summary of Rates, Fees and Charges for DIP Facility:**   The proposed DIP Credit Agreement provides for interest to accrue on all unpaid principal amounts of the loans (the "**DIP Loans**") at the Prime Rate Prime plus 2%, plus a monthly fee equal to (i) sixty-five one hundredths of one percent (.65%) of the average outstanding balance under the Factoring Agreement or (ii) eighty-five one hundredths of a percent (.85%) of the outstanding advances under the Revolving Line of Credit Agreement.  Action shall be entitled to reimbursement of all costs incurred by Action, including bank fees for wire transfers, lien search fees, lien recording fees, and reasonable legal expenses.  See Factoring Agreement Section 4.5; Line of Credit Agreement Section(s) 2.6; $850,000 Promissory Note dated October 7, 2015 (the "**$850,000 Note**"); and $1,350,000 Promissory Note dated June 14, 2016 (the "**$1,350,000 Note**").

c.      **Advance Rates:**   90% of eligible accounts receivable, and 85% of eligible earned and unbilled revenue. See Factoring Agreement Section(s) 4.4 and 4.7; Line of Credit Agreement Section(s) 1.3.

d.      **Repayment**:  The principal amount of the DIP Loans shall be paid by Debtors to Action in accordance with the DIP Credit Agreement and the Interim and Final Orders upon (a) each receipt by Action or Debtor of any proceeds of any of the Collateral, to the extent of such proceeds, unless and to the extent such proceeds are authorized to be used by Debtor pursuant to the Interim Order and/or Final Order, and (b) the Termination Date.  Interest accrued on each DIP Loan shall be due and payable on the first calendar day of each month (for the immediately preceding month), computed through the last calendar day of the preceding month, as provided in the DIP Credit Agreement.  All accrued interest shall also be paid on the Termination Date. See Interim Order at Paragraph 5.

e.      **Events of Default**:  Events of Default include any material breach by Debtors of the Interim Order or the Final Order and any Event of Default set forth in the DIP Credit Agreement.

f.    **Liens**:  Pursuant to the DIP Credit Agreement and the Interim Order, the Debtors shall grant Action a continuing security interest and lien upon all assets of the Debtors, including all presently existing or hereafter arising, now owned or hereafter acquired accounts, accounts receivable, earned but unbilled revenue, contract rights, inventory, chattel paper, documents, instruments, general intangibles, reserves, reserve accounts, rebates and all books and records (including without limitation customer lists, computer programs, print outs, and other computer material and records) pertaining to the foregoing and all proceeds of the foregoing property.  See Interim Order at Paragraphs I, 3 and 4.

g.    **Maximum Advance**:  The total aggregate principal amount borrowed under the DIP Credit Agreement shall not exceed $4,500,000, less any outstanding amounts owed under the Pre-Petition Credit Agreement.

h.    **Borrowing Conditions**:  Entry of Interim Order and Final Order acceptable to Action, and compliance with orders and DIP Credit Agreement by Debtor.  See DIP Credit Agreement Sections 10.1 and 10.2.

### 3. Summary and Identification of Additional Required Provisions

a.    **Liens under § 364(c) or (d)**:  As security for the post-petition indebtedness, Action will be granted the following security and liens in the Collateral, subject only to the payment of any "carve out" for professional fees as set forth in the Interim Order and/or Final Order:

(1)    Pursuant to Section 364(c)(2) of the Bankruptcy Code, perfected first priority senior security interests in and liens upon all Collateral that, as of the Petition Date, is not subject to other valid, perfected and non-avoidable liens or to valid and unavoidable liens in existence on the Petition Date that are perfected thereafter (with a priority that relates back to a date prior to the Petition Date), as permitted by Section 546(b) of the Bankruptcy Code;

(2)    Pursuant to Section 364(c)(3) of the Bankruptcy Code, perfected junior security interests in and liens upon all Collateral that is subject to valid, perfected and non-avoidable liens in existence on the Petition Date (other than liens in favor of Action or any Subordinated Creditor) or to valid and unavoidable liens in existence on the Petition Date that are perfected thereafter (with a priority that relates back to a date prior to the Petition Date) as permitted by Section 546(b) of the Bankruptcy Code;

(3)    Pursuant to Section 364(d)(1) of the Bankruptcy Code, DIP Liens shall prime and shall be senior in priority to all pre-petition liens and security interests with respect to any of the Collateral that exists in favor of Action or any Subordinated Creditor; and

(4)    The DIP Liens shall be subject to the Carve-Out, and the DIP Liens shall not attach to any of the following property: (i) any claims pursuant to Sections 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code ("**Avoidance Claims**"), or (ii) any proceeds or property recovered in connection with the successful prosecution or settlement of Avoidance Claims ("**Avoidance Proceeds**").  See DIP Credit Agreement Section 6; and Paragraph 3 of the Interim Order.

- 4 -

b.      **Adequate Protection for Pre-Petition Claims**:    As adequate protection of Action's interest in the Collateral, including use of the Cash Collateral, pursuant to 11 U.S.C. §§ 361, 363 and 552(b), Action is granted replacement liens in and to all of the Collateral that is created, acquired or first arises after the Petition Date (the "**Replacement Liens**") as partial adequate protection to the extent of the diminution in value of the Collateral caused by the Debtor's use, consumption, sale, collection or other disposition of any Collateral. The Replacement Liens in favor of Action on the Collateral shall be junior in priority to the DIP Liens granted to the Action and shall be held by Action for the benefit of itself.  See Paragraph 7 of the Interim Order.

d.      **Waiver of Automatic Stay**:  Except as otherwise provided in the Interim Order, the automatic stay provisions of Section 362 of the Bankruptcy Code are lifted and terminated as to Action to the extent necessary to implement the provisions of the Interim Order and the DIP Financing Documents, thereby permitting Action, *inter alia*, to receive collections of Collateral for application to the Pre-Petition Debt and the DIP Obligations, to file or record any UCC-1 financing statements, mortgages, deeds of trust, security deeds and other instruments and documents evidencing or validating the perfection of the DIP Liens and to enforce the DIP Liens upon default subject to the prior notice provisions of the Interim Order.  See Interim Order Paragraph 15.

e.      **Waiver of State Law Perfection Requirements**:  The DIP Liens are deemed duly perfected and recorded under all applicable federal or state or other laws as of the date of the Interim Order.  See Paragraph 10 of the Interim Order.

f.      **Provisions Remaining Effective if Interim Relief Granted but Final Relief Denied**: The provisions of the Interim Order are binding upon and inure to the benefit of Action, and the Debtors, and their respective successors and assigns (including any trustee or other estate representative appointed as a representative of the Debtors' estates).   If any of the provisions of the Interim Order are modified, vacated or stayed by subsequent order, such stay, modification or vacatur shall not affect the validity of any obligation outstanding immediately prior to the effective time of such stay, modification or vacation, or the validity and enforceability of any lien, priority, right, privilege or benefit authorized by the Interim Order with respect to any such obligations.  Notwithstanding any such stay, modification or vacatur, any obligation outstanding immediately prior to the effective time of such modification, stay or vacatur shall be governed in all respects by the original provisions of the Interim Order, and Action shall be entitled to all the rights, privileges and benefits, including, without limitation, the security interests and priorities granted by the Interim Order, with respect to all such obligations. See Interim Order Paragraphs 9  and 16.

## II.      STATEMENT OF FACTS AND BACKGROUND

### A.      Bankruptcy Filing

On June 28, 2016 (the "**Petition Date**"), the Debtors each filed a voluntary petition for

relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**").  The

Debtors are authorized to operate their businesses as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. No official committee of unsecured creditors or other statutory committee and no trustee or examiner has been appointed in this case.

B.      **The Debtors' Business Structure and Background**

NexxLinx and its co-debtor subsidiaries and affiliates are business process and marketing services outsourcing providers that design custom solutions for inbound and outbound customer care, telemarketing and data collection, help desk, e-mail processing, live web and voice interaction, and back-end data processing. Their unique network-based service delivery platform allows the Debtors to optimize multichannel communications and deliver a consistent and compelling customer experience across multiple channels, devices, and media. With their cloud-based infrastructure, the Debtors provide a true Unified Desktop which allows intelligent call routing, network-to-desktop computer telephony integration (CTI), multimedia contact management and interactive voice response (IVR) tools.

The Debtors provide a rich suite of services for customer retention, technical support, customer service, and sales conversion principally for customers in the following industries:

- Telecommunications
- Publishing
- E-Commerce
- Financial Services
- Government
- Technology
- Media|Entertainment
- Cable TV
- Electronic (video) Gaming

- 6 -

Marketing Services

As of the Petition Date, the Debtors operate customer service call centers in Maine, North Carolina, New York, and Georgia and employ approximately 1100 employees. Additional information about the Debtors' businesses and the events leading up to the Petition Date can be found in the Declaration of D. Alan Quarterman in Support of First Day Applications and Motions (the "**Quarterman Declaration**") which is incorporated herein by reference.

C.    **Requested Relief**

The Debtors request entry of the Interim Order and ultimately entry of a Final Order granting the DIP Motion and authorizing the Debtors to enter into the DIP Credit Agreement with Action.  The Debtors have an immediate need to obtain post-petition financing and to use cash collateral to pay their normal and ordinary operating expenses (such as payroll, rent, utilities and payments to suppliers) as they come due in the ordinary course of the Debtors' business and to make those purchases necessary to preserve the going concern value of its business and assets pending any sale or reorganization efforts.  A proposed interim budget will be filed with the Court at or prior to any interim hearing on the DIP Motion.  The Debtors' projections show that in order to maintain their business operations, the Debtors will require continued financing on the same terms and conditions as was needed prior to the Petition Date.  Absent entry of the Interim Order, the Debtors would suffer immediate and irreparable harm.

The proposed financing will be secured by a senior lien on all of the Debtors' pre-petition and post-petition assets (both real and personal), including, without limitation, all accounts, accounts receivable, earned but unbilled revenue, contract rights, inventory, chattel paper, documents, instruments, general intangibles, reserves, reserve accounts, rebates and all books and records (including without limitation customer lists, computer programs, print outs, and other computer material and records) pertaining to the foregoing and all proceeds of the

foregoing property (the "**Collateral**").

The Debtors submit that the protections requested by Action are reasonable in light of the substantial risk that Action is taking by agreeing to lend the Debtors significant additional sums in addition to the approximately $3,320,000.00 already owed to Action.

The Debtors have also been unable to procure financing in the form of unsecured credit allowable under section 503(b) (1) of the Bankruptcy Code, as an administrative expense under Section 364(a) or (b) of the Bankruptcy Code, or in exchange for the grant of an administrative expense priority pursuant to Section 364 (c)(1) of the Bankruptcy Code without the granting of liens on its assets. The Debtors have been unable to procure the necessary financing on terms more favorable than those contained in the Interim Order. No other lender was prepared to provide the financing needed by the Debtor on these or more favorable terms.

Although the proposed financing has a maximum credit limit of $4.5 million, the Debtors anticipate needing a portion of that financing before a final hearing on the Motion could be scheduled under Bankruptcy Rule 4001(c)(2). The Debtors therefore seek authority to obtain the post-petition financing and to use cash collateral on an interim emergency basis pending a Final Hearing in accordance with the terms and conditions set forth in the Interim Order. Given the devastating impact that a closure of the Debtors' business would have on its going concern value, its creditors and employees, the Debtors submit that the relief requested herein is clearly warranted and appropriate.

### III.    DISCUSSION

A.    **The Debtors Should Be Authorized To Obtain Debtor In Possession Financing To Operate, Maintain and Preserve their Business.**

Pursuant to Bankruptcy Code §§ 364(c) and (d), the Debtors request authority to incur post-petition financing allowable as an administrative expense, having priority over other

administrative expenses and secured by a senior lien on the Collateral.  The Debtors need cash to meet ongoing obligations necessary to operate their business, administer their Chapter 11 estates and maintain the going concern value of their business as they pursue reorganization so as to achieve the highest values possible for their creditors.  The Debtors need to use their cash receipts and the proceeds of the post-petition financing to pay insurance, payroll, payroll expenses, rent, utility charges, professionals and general overhead, to purchase necessary materials, and otherwise continue their business and operations.  The Debtors believe that the post-petition financing will provide funds sufficient to permit them to operate their business for a short period while the Debtors pursues reorganization efforts.

Pursuant to Bankruptcy Code § 364(c), a debtor may, in the exercise of its business judgment, incur secured debt if it has been unable to obtain unsecured credit and the borrowing is in the best interest of the estate.  See, e.g., In re Simasko Production Co., 47 B.R. 444, 448-9 (Bankr. D. Colo. l985) (authorizing interim financing where debtor's business judgment was that financing was necessary and of benefit to the estate); In re Ames Department Stores, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to post-petition credit, courts "permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties"); See also 2 Collier on Bankruptcy ¶ 364.04, at 364-9-1 ( 2007).

Section 364(d) (l) of the Bankruptcy Code governs the incurring of senior secured debt or "priming" loans.  Pursuant to Section 364(d) (1), the Court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien only if

(1)    the trustee is unable to obtain such credit otherwise; and

(2)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364 (d) (1).

Section 364 of the Bankruptcy Code is structured with an escalating series of inducements which a debtor in possession may offer to attract credit during the post-petition period.  See In re Photo Promotion Associates, Inc., 87 B.R. 835, 839 (Bankr. S.D.N.Y. 1988).  If a trustee or debtor in possession cannot otherwise obtain unsecured post-petition credit, such credit may be obtained under certain carefully permitted conditions.   In re T.M. Sweeney & Sons LTL Services, Inc., 131 B.R. 984, 989 (Bankr. N.D. Ill.1991). For example, if creditors are unwilling to extend unsecured credit to a debtor in possession, further inducements are offered, with court approval after notice and a hearing, including liens equal to or senior to existing liens on encumbered property in accordance with 11 U.S.C § 364(d).   See In re Photo Promotion Associates, Inc., 87 B.R. at 839.

Section 364(c) of the Bankruptcy Code also contains incentives that a court may grant to post-petition lenders.  These inducements are not exhaustive.  Courts frequently have authorized the use of other protections not specified in the statute.  See, e.g., In re Ellinssen MacLean Oil Co., 834 F.2d 599 (6th Cir. 1987) (affirming financing order which prohibited any challenges to the validity of already existing liens); In re Defender Drug Stores, 126 B.R. 76 (Bankr. D. Ariz. 1991) aff'd 145 B.R. 312, 316 (BAP 9th Cir. 1992) ("[b]ankruptcy courts . . . have regularly authorized postpetition financial arrangements containing lender incentives beyond the explicit priorities and liens specified in section 364"); In re Antico Mfg. Co., 31 B.R. 103 (Bankr. E.D.N.Y. 1983) (authorizing lien on pre-petition collateral to secure post-petition indebtedness). The Debtors have agreed to grant Action such enhancements in the form of senior liens against its pre-petition and post-petition assets.

Two factors courts consider in determining whether to authorize post-petition financing which grants a security interest in favor of the lender are (1) whether the debtor is unable to

- 10 -

obtain unsecured credit as an administrative claim under Section 364(b)(1)(A) and whether the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor and lender.  See In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D.Pa. 1987); See also In re Aqua Assoc., 123 B.R. 192, 195 (Bankr. E.D.Pa. 1991).

The Debtors submit that all of these standards have clearly been satisfied in this case.

1.    **The Debtors Were Unable to Obtain Unsecured Credit.**

In satisfying the standards of Section 364, a debtor need not seek credit from every available source, but should make a reasonable effort to seek other sources of credit available under §§ 364(a) and (b).  See In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986) (trustee had demonstrated good faith effort that credit was not available without senior lien by contacting other financial institutions in immediate geographic area; the statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable); In re Ames Department Stores, supra, 115 B.R. at 40 (finding that debtors demonstrated the unavailability of unsecured financing where debtors approached four lending institutions).

As mentioned above and as will be demonstrated at the Hearing, the Debtors have been unable to procure financing in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, as an administrative expense under Section 364(a) or (b) of the Bankruptcy Code, or in exchange for the grant of an administrative expense priority pursuant to Section 364(c) (1) of the Bankruptcy Code without the grant of liens on assets.  The Debtors have been unable to procure the necessary financing on terms more favorable than those contained in the Interim Order.  No other lender was prepared to provide the financing needed by the Debtors.

2.    **The Terms Of The Proposed Post-Petition Financing Are Fair, Reasonable and Adequate.**

The terms of the proposed post-petition financing from Action are fair, reasonable and adequate.   Action is taking a substantial economic risk by lending the Debtors significant additional sums in addition to the approximately $3,320,000.00 already owed to Action. Notwithstanding the substantial economic risk that Action is taking, Action has agreed to provide such post-petition financing in order to enable the Debtors to preserve the going concern value of their business.   Significantly, Action has agreed to include as an element of its proposed financing advances against both accounts receivable and earned but unbilled revenues, which should greatly aid the Debtors' cash flow.

3.    **The Liens Being "Subordinated" Are Already Junior To The Liens Which Currently Exist In Favor Of Action.**

Although the liens granted to Action to secure repayment of the post-petition financing and as adequate protection for the use of the Pre-Petition Collateral technically prime the junior liens in favor of BB&T (the "**Subordinated Lender**"), Action is currently secured by a first priority lien against all of the Debtors' accounts receivables and has the ability under its current loan documents to lend more money to the Debtors secured by a senior lien against those assets. Thus, the liens being "subordinated" are already junior to the liens which currently exist in favor of Action.   Moreover, Action is a service based business and the value of any tangible assets such as furniture, fixtures and equipment is not significant compared to the value of its intangible assets such as accounts receivable.

Further, the Subordinated Lender has no right to object to the Debtors granting the security interests and liens to the Action on the terms set forth in the Interim Order, in light of the terms of the Intercreditor Agreement dated as of October 18, 2015, between Action and

BB&T (the "**Intercreditor Agreement**").  Under the Intercreditor Agreement, the Subordinated Lender agreed that its security interest would be subordinate and junior to Action with respect to accounts receivables and earned and unbilled revenue of the Debtors.  Said Intercreditor Agreement constitutes an enforceable agreement in this case pursuant to Bankruptcy Code § 510(a).

      4.      **The Debtors, In The Exercise Of Their Business Judgment, Believe That The Financing From Action Is Necessary And Proper**.

In determining whether to approve a financing transaction, Court should use its informed discretion, but give deference to the business decision of a Chapter 11 debtor.  See Richmond Leasing Co. v. Capital Bank N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).  After investigating their options, the Debtors determined that the financing offered by Action was the best alternative available.  Without new financing, the Debtors' only option for survival would be to seek Court approval for use of cash collateral alone (most likely over Action's objection); however, it is unlikely that the use of cash collateral alone would allow the Debtors to sustain their operation for any length of time.

      5.      **The Debtors Have Satisfied the Procedural Requirements Regarding Authority To Obtain Credit.**

Bankruptcy Rule 4001(c) sets forth the procedural requirements for obtaining credit. Bankruptcy Rule 4001(c)(1)(A) requires that: "A motion for authority to obtain credit shall be made in accordance with Rule 9014 and shall be accompanied by a copy of the credit agreement and a proposed form of order."  Bankruptcy Rule 4001(c)(1)(C) provides, in pertinent part, that the motion "shall be served on (1) . . . the creditors included on the list filed pursuant to Rule 1007(d), and (2) on such other entities as the court may direct."  The Debtors are serving a copy of the DIP Motion upon the Office of the United States Trustee, their pre-petition senior secured

creditors, and the parties on the List of Thirty Largest Unsecured Creditors (on a consolidated basis) by U.S. Mail, overnight delivery, electronic mail and/or facsimile. The DIP Motion is accompanied by a copy of the proposed Interim Order setting forth the terms of the proposed post-petition financing. Accordingly, the DIP Motion complies with the requirements of Bankruptcy Rule 4001(c) and the Debtors request that the Court authorize them to enter into the DIP Credit Agreement.

      B.      **The Debtors Should Be Authorized To Use Cash Collateral To Operate, Maintain and Preserve their Business.**

The Debtors' use of property of the estate is governed by Section 363 of the Bankruptcy Code. Section 363(c) (1) provides in pertinent part:

"If the business of the debtor is authorized to be operated under section. . .1108. . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing."

It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral to maintain and operate its property. See 11 U.S.C. § 363(2)(B); In re Oak Glen R-Vee, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); In re Tucson Industrial Partners, 129 B.R. 614 (9th Cir. BAP 1991). The purpose of Chapter 11 is to rehabilitate debtors and access to cash collateral is essential to operate a business. In re Dynaco Corporation, 162 B.R. 389 (Bankr. D. N.H. 1993), quoting In re Stein, 19 B.R. 458, 459. (Bankr. E.D. Pa. 1982). For the Debtors' businesses to remain viable and to preserve going concern value, continued use of cash collateral is needed. Moreover, Action will consent to the use of cash collateral pursuant to the terms of the Interim Order.

C.      **Cause Exists for Shortening Notice to Conduct a Preliminary Hearing.**

Bankruptcy Rule 4001 controls the procedure for obtaining the relief requested herein. With respect to motions seeking authority to use cash collateral and/or to obtain post-petition credit, Bankruptcy Rules 4001(b) and (c)  specifically require fourteen (14) days notice to the U.S. Trustee and the list of Twenty Largest Unsecured Creditors, but permits the Court to conduct a preliminary hearing before the expiration of the 14-day notice period.  Accordingly, pursuant to Bankruptcy Rules 4001(b) and (c), the Debtors request that this Court conduct a preliminary hearing before the expiration of the fourteen days and authorize the Debtors to obtain credit and/or use cash collateral to the extent necessary to avoid immediate and irreparable harm to the Debtors estates pending a final hearing.  To the extent Action must advance funds prior to the hearing in order to prevent irreparable harm to the estates, the Debtors ask that the Court approve such advances *nunc pro tunc* to the date of such advances.

WHEREFORE, the Debtors respectfully request that this Court:

1.      Enter the proposed Interim Order;

2.      Grant interim approval of the post-petition financing pending a final hearing pursuant to the terms and conditions set forth in the DIP Motion and the DIP Credit Agreement;

3.      Authorize the Debtors to use cash collateral to pay their expenses on an emergency interim basis pending a final hearing pursuant to the terms and conditions set forth in the DIP Motion;

4.      Set a final hearing to consider approval of the DIP Motion; and

5.      Grant such other and further relief as the Court deems just and proper.

- 15 -

This 28th day of June, 2016.

SCROGGINS & WILLIAMSON, P.C.

/s/ J. Robert Williamson
J. ROBERT WILLIAMSON
Georgia Bar No. 765214
ASHLEY REYNOLDS RAY
Georgia Bar No. 601559
One Riverside
4401 Northside Parkway, Suite 450
127 Peachtree Street, NE
Atlanta, Georgia 30327
Telephone: (404) 893-3880
Telecopier: (404) 893-3886
E-mail:  rwilliamson@swlawfirm.com
          aray@swlawfirm.com
Counsel for the Debtors

**EXHIBIT A**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **IN RE:** | ) | **CHAPTER 11** |
| | ) | |
| **NEXXLINX CORPORATION, INC., et al.,** | ) | **PROPOSED** |
| | ) | **Jointly Administered Under** |
| **Debtors.** | ) | **CASE NO. 16-16-61225-pmb** |
| | ) | |

**INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN**
**FINANCING, GRANT SECURITY INTERESTS AND ACCORD**
**PRIORITY STATUS; (2) AUTHORIZING DEBTORS TO USE CASH**
**COLLATERAL; (3) GIVING NOTICE OF FINAL HEARING;**
**AND (4) MODIFYING AUTOMATIC STAY**

This matter is before the Court on the Emergency Motion (the "**DIP Motion**") of the Debtors NexxLinx Corporation, Inc. ("**NexxLinx**"); NexxLinx Global, Inc. ("**NGI**"); NexxLinx of New York, Inc. ("**NNY**"); NexxLinx of Texas, Inc. ("**NTX**"); CustomerLinx of North Carolina, Inc. ("**CNC**"); and Microdyne Outsourcing Inc. ("**MOI**"), debtors and debtors-in-possession, as debtor and debtor-in-possession in the above-captioned Chapter 11 cases (collectively, the "**Debtors**"), requesting entry of an order (1) authorizing Debtors to obtain financing and other extensions of credit from Action Capital Corporation ("**Action**" or, in its capacity as the post-petition lender, the "**DIP Lender**"), grant security interests and liens and accord superpriority claim status in favor of DIP Lender pursuant to Sections 361**,** 364(c) and 364(d) of Title 11 of the United States Code (the "**Bankruptcy Code**"); (2) authorizing Debtors to use cash collateral pursuant to Section 363 of the Bankruptcy Code; (3) giving notice of a final hearing pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2); and (4) modifying the automatic stay.

Based upon this Court's review of the DIP Motion and all matters brought to the Court's attention at the interim hearing, which was held on July ____, 2016, pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2) (the "**Interim Hearing**"), and after due deliberation and consideration, the Court makes the following findings of fact and conclusions of law applicable to the financing sought by Debtors from DIP Lender and Debtors' request to use cash collateral (to the extent any findings of fact constitute conclusions of law, they are adopted as such, and *vice versa*):

THE COURT HEREBY FINDS AND DETERMINES:

A.    On June 28, 2016 (the "**Petition Date**"), the Debtors each filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in this Court initiating these jointly administered Chapter 11 Cases (collectively, the "**Chapter 11 Case**" or "**Case**").  The Debtors are continuing to operate their businesses and manage their property as debtors-in-possession.  No trustee or examiner has been appointed herein.

B.    NexxLinx and its co-debtor subsidiaries and affiliates are business process and marketing services outsourcing providers that design custom solutions for inbound and outbound customer care, telemarketing and data collection, help desk, e-mail processing, live web and voice interaction, and back-end data processing.  As of the Petition Date, the Debtors operate customer service call centers in Maine, North Carolina, New York, and Georgia and employ approximately 1100 employees.

C.    Action has asserted that, as of the Petition Date, Debtors were indebted to Action in the approximate amount of $3,320,000.00, exclusive of any accrued but unpaid interest, fees, costs and expenses.  The obligations owed by Debtors to Action arise out of loans made by Action under a pre-petition Factoring and Security Agreement and an Earned and Unbilled Revenue Line of Credit

-2-

Agreement, and related documents and agreements (collectively, the "**Pre-Petition Credit Agreement**").

D.      Action has asserted that all amounts owed by Debtors to Action as of the Petition Date (such principal amounts, together with all interest, fees, attorneys' fees, expenses and other amounts heretofore or hereafter accruing thereon or at any time chargeable to Debtors in connection therewith, is referred to as the **"Pre-Petition Debt"**) are secured by, *inter alia*, all acquired accounts, accounts receivable, earned but unbilled revenue, contract rights, inventory, chattel paper, documents, instruments, general intangibles, reserves, reserve accounts, rebates and all books and records (including without limitation customer lists, computer programs, print outs, and other computer material and records) pertaining to the foregoing and all proceeds of the foregoing property (all such property owned by Debtors, as the same existed on or at any time prior to the Petition Date, together with all cash and non-cash proceeds thereof, being hereinafter referred to as the "**Pre-Petition Collateral**").

F.      An immediate and ongoing need exists for Debtors to obtain financing and use the cash proceeds of the Collateral (as defined below) (the **"Cash Collateral"**) to continue the operation of its business as debtor-in-possession under Chapter 11 of the Bankruptcy Code, to minimize the disruption of Debtors' business and to allow Debtors to pursue reorganization under Chapter 11. Despite diligent efforts, Debtors have been unable to obtain financing in the form of unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense or solely in exchange for the grant of a special administrative expense priority pursuant to Section 364(c)(1) of the Bankruptcy Code; and other than the discretionary financing from DIP Lender pursuant to the DIP Credit Agreement (as hereinafter defined), Debtors are unable to obtain financing in the form of

credit secured by liens that are junior to existing liens on property of the estates pursuant to Sections 364(c)(2) and (c)(3) of the Bankruptcy Code.

G.    Debtors have requested that DIP Lender establish a secured lending facility in favor of Debtors (the **"DIP Facility"**) pursuant to which Debtors may obtain loans from time to time (**"DIP Loans"**), up to $4,500,000 in principal balance outstanding, upon the terms and conditions set forth herein and in a Factoring and Security Agreement (the "**Factoring Agreement**") and an Earned and Unbilled Revenue Line of Credit Agreement (the "**Line of Credit Agreement**", together with the Factoring Agreement and all related notes, schedules, exhibits and annexes thereto, and as at any time amended or restated, the **"DIP Credit Agreement"**) between DIP Lender and Debtors, in substantially the form attached to the DIP Motion.

H.    DIP Lender is willing to establish the DIP Facility, upon the terms and conditions set forth herein and in the DIP Credit Agreement.  DIP Lender's willingness to make DIP Loans and other extensions of credit (collectively, the **"DIP Credit Extensions"**) is conditioned upon, among other things, Debtors' obtaining Court authority to provide adequate protection of Action's interests in the Pre-Petition Collateral pursuant to Sections 361 and 363 of the Bankruptcy Code.

I.    A condition to the willingness of DIP Lender to establish the DIP Facility is that, as security for the prompt payment of all DIP Loans, together with all interest, fees, expenses and the charges at any time payable by Debtors under the DIP Credit Agreement, DIP Lender receive a security interest in and lien upon all of Debtors' pre-petition and post-petition assets (both real and personal), including, without limitation, Debtors' accounts, inventory, equipment, fixtures, general intangibles, documents, instruments, chattel paper, deposit accounts, letter-of-credit rights, commercial tort claims, contract rights, investment property, leasehold interests, supporting

-4-

obligations, cash, and books and records relating to any assets of Debtors and all cash and non-cash proceeds (including insurance proceeds) of the foregoing, whether now in existence or hereafter created, acquired or arising and wherever located (all such real and personal property, and the proceeds thereof, being collectively hereinafter referred to as the **"Collateral"**), and that such liens have the priority hereinafter set forth. The Collateral shall not include Avoidance Claims or Avoidance Proceeds and shall be subject to the Carve-Out, all as defined and set forth below.

J.    Debtors have represented and disclosed that, in addition to liens and security interests in favor of Action and statutory liens for taxes, Debtors have granted liens and security interests in favor of Branch Banking & Trust Company ("**BB&T**"). Pursuant to an Intercreditor Agreement dated as of October 18, 2015, between Action and BB&T, BB&T has agreed to subordinate its liens and security interests in favor of liens and security interests granted by Debtors in favor of Action. At the Interim Hearing, counsel for BB&T did not oppose the priming liens being granted in favor of DIP Lender pursuant to Section 364(d) of the Bankruptcy Code. BB&T is sometimes hereinafter referred to as the "**Subordinated Creditor**."

K.    Debtors requested in the DIP Motion, pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2), that the Court hold the Interim Hearing to consider authorizing Debtors to (i) obtain, on an interim basis, DIP Loans for purposes specified in Debtors' cash flow forecast annexed to the DIP Motion (as at any time amended with the consent of DIP Lender, the **"Budget"**); and (ii) to use Cash Collateral as hereinafter set forth.

L.    Debtors have certified that a copy of the DIP Motion (together with copies of the proposed DIP Credit Agreement and Budget annexed thereto) and notice of the Interim Hearing have been served by electronic mail, telecopy transmission, hand delivery, overnight courier and/or

-5-

first class United States mail upon the United States Trustee (the **"U.S. Trustee"**), Action, the Subordinated Creditor, the 30 largest creditors of Debtors on a consolidated basis, the Internal Revenue Service, and any known lien creditors of Debtors. The Court finds that notice of the DIP Motion, as it relates to this Order, is sufficient for all purposes under the Bankruptcy Code and the Bankruptcy Rules, including, without limitation, Sections 102(1) and 364 of the Bankruptcy Code and Bankruptcy Rule 4001(b) and (c).

M.      Good cause has been shown for the entry of this Order and authorization for Debtors to obtain DIP Credit Extensions pursuant to the DIP Credit Agreement and to use Cash Collateral as hereinafter provided pending a final hearing on the DIP Motion pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2) (the "*Final Hearing*"). Debtors' need for financing of the type afforded by the DIP Credit Agreement is immediate and critical. Entry of this Order will minimize disruption of Debtors' business and operations, will preserve the assets of Debtors' estates and is in the best interests of Debtors, their creditors and their estates. The terms of the proposed financing and use of Cash Collateral appear fair and reasonable, reflect Debtors' exercise of business judgment and are supported by reasonably equivalent value and fair consideration.

N.      Based upon the record presented at the Interim Hearing, it appears that the DIP Credit Agreement and this Interim Order have been negotiated in good faith and at arm's length between Debtors, on the one hand, and Action and DIP Lender, on the other. Therefore, all DIP Credit Extensions to Debtors pursuant to the DIP Credit Agreement shall be deemed to have been made in good faith within the meaning of Section 364(e) of the Bankruptcy Code.

-6-

O.    This Court has jurisdiction to enter this Order pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of the DIP Motion constitutes a core proceeding, as defined in 28 U.S.C. § 157(b)(2).

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED, as follows:

1.    Grant of Motion; Authorization of Interim Financing. The DIP Motion is hereby granted and Debtors are hereby authorized (i) to execute and deliver the DIP Credit Agreement in substantially the form annexed to the DIP Motion and all instruments, security agreements, assignments, pledges, mortgages and other documents referred to therein or requested by DIP Lender to give effect to the terms thereof (the DIP Credit Agreement and such other instruments, security agreements, assignments and other documents, as at any time amended, being collectively called the **"DIP Financing Documents"**); (ii) to obtain DIP Loans and other DIP Credit Extensions in accordance with the DIP Credit Agreement from time to time up to an aggregate principal amount outstanding at any time not to exceed $4,500,000, and to incur any and all liabilities and obligations thereunder and to pay all interest, fees, expenses and other obligations provided for under the DIP Financing Documents; and (iii) to satisfy all conditions precedent and perform all obligations hereunder and thereunder in accordance with the terms hereof and thereof; provided, however, that, pending the Final Hearing and subject to all of the terms and conditions in the DIP Credit Agreement, Debtors may obtain DIP Credit Extensions only to the extent necessary to avoid immediate and irreparable harm to Debtors, which, for purposes hereof, shall mean proceeds of DIP Loans used (a) to pay the fees and expenses due and amounts owing by Debtors at any time to DIP Lender under the DIP Financing Documents, (b) for purposes specified (and in amounts not to

-7-

exceed those shown) in the Budget, (c) to make payments pursuant to "first day" orders reviewed and approved by the Court, and (d) to pay other expenses that are authorized to be paid, prior to the Final Hearing, under the DIP Credit Agreement. DIP Lender shall not have any obligation or responsibility to make any DIP Credit Extensions (consistent with the discretionary nature of the DIP Facility) or to monitor Debtors' use of the DIP Loans or Cash Collateral and may rely upon Debtors' representations that the amount of DIP Credit Extensions requested at any time, and the use thereof, are in accordance with the requirements of this Order, the DIP Credit Agreement and Bankruptcy Rule 4001(c)(2). Neither the use of Cash Collateral by the Debtors nor the DIP Loans authorized under this Order shall impair, release or alter any liability of any guarantor, pledgor, co-obligor or surety with respect to the Pre-Petition Debt.

2.      Execution and Delivery of DIP Financing Documents.  Upon execution and delivery thereof, the DIP Financing Documents shall constitute valid and binding obligations of Debtors, enforceable against Debtors in accordance with their terms.  In furtherance of the provisions of paragraph 1 of this Order, Debtors are authorized and directed to do and perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution of security agreements, pledge agreements, mortgages, deeds of trust, deeds to secure debt, financing statements and intellectual property filings), and to pay all filing and recording fees, in each case as may be necessary or, in the opinion of DIP Lender, desirable to give effect to any of the terms and conditions of the DIP Financing Documents, to validate the perfection of the DIP Liens (as defined below) or as otherwise required or contemplated by the DIP Financing Documents.

3.      DIP Liens.  Subject to the provisions of subparagraph 8(b) below, all DIP Credit Extensions, together with all interest, fees and other charges (including, without limitation,

-8-

reasonable legal fees) at any time or times payable by Debtors to DIP Lender in connection therewith or otherwise pursuant to the DIP Financing Documents (all such DIP Credit Extensions, interest fees and other charges, including any "Obligations" as such term is defined in the DIP Credit Agreement, are collectively called the **"DIP Obligations"**) shall be, and hereby are, secured by security interests and liens in favor of DIP Lender with respect to all of the Collateral (collectively, the **"DIP Liens"**), as follows:

(a)    pursuant to Section 364(c)(2) of the Bankruptcy Code, perfected first priority senior security interests in and liens upon all Collateral that, as of the Petition Date, is not subject to other valid, perfected and non-avoidable liens or to valid and unavoidable liens in existence on the Petition Date that are perfected thereafter (with a priority that relates back to a date prior to the Petition Date), as permitted by Section 546(b) of the Bankruptcy Code; and

(b)    pursuant to Section 364(c)(3) of the Bankruptcy Code, perfected junior security interests in and liens upon all Collateral that is subject to valid, perfected and non-avoidable liens in existence on the Petition Date (other than liens in favor of Action or any Subordinated Creditor) or to valid and unavoidable liens in existence on the Petition Date that are perfected thereafter (with a priority that relates back to a date prior to the Petition Date) as permitted by Section 546(b) of the Bankruptcy Code; and

(c)    pursuant to Section 364(d) and Section 510(a) of the Bankruptcy Code, the DIP Liens shall prime and shall be in senior in priority to all pre-petition liens and security interests with respect to any of the Collateral that exist in favor of Action or any Subordinated Creditor.

Notwithstanding the foregoing provisions of this paragraph 3 or anything to the contrary in the DIP Financing Documents, the DIP Liens shall be subject to the Carve-Out (defined below), as and to the extent provided below, and the DIP Liens shall not attach to any of the following property: (x) any claims pursuant to Sections 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code (**"Avoidance Claims"**), or (y) any proceeds or property recovered in connection with the successful prosecution or settlement of Avoidance Claims (**"Avoidance Proceeds"**).

    4.    <u>Superpriority Claim</u>.

    (a)    Subject to the provisions of paragraph 8(b) below, all DIP Obligations shall have administrative priority in accordance with, and shall constitute an allowed superpriority claim (the **"Superpriority Claim"**) pursuant to, Section 364(c)(1) of the Bankruptcy Code over all other administrative expenses in Debtors' case of the kind specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 726 or 1114 of the Bankruptcy Code; <u>provided</u>, <u>however</u>, that the Superpriority Claim shall not attach to any Avoidance Claims, be payable from any Avoidance Proceeds or adversely affect the Carve-Out (as defined below).

    (b)    Except for the Carve-Out, no costs or administrative expenses that have been or may be incurred in the Chapter 11 Case, in any proceedings related hereto or in any superseding Chapter 7 case and no priority claims are or will be prior to or on a parity with the Superpriority Claim of DIP Lender for the DIP Obligations.

    5.    <u>Repayment</u>.  The DIP Obligations shall be due and payable, and shall be paid, as and when provided in the DIP Financing Documents and as provided herein, without offset or counterclaim.

6.    <u>Use of Cash Collateral</u>.

(a)    Debtors shall, promptly after their receipt thereof, remit to Action (in its capacities as pre-petition secured party and DIP Lender) all Cash Collateral at any time in the possession of Debtors; <u>provided</u>, <u>however</u>, that for so long as (i) no Event of Default has occurred under (and as defined in) the DIP Credit Agreement, (ii) all of the conditions precedent to DIP Credit Extensions contained in the DIP Credit Agreement are satisfied, and (iii) the Termination Date has not occurred under (and as defined in) the DIP Credit Agreement, Debtors shall be authorized to retain, and to utilize in the ordinary course of its business and for the purposes and in the amounts provided in the Budget, Cash Collateral in the amounts shown in the Budget. Nothing herein shall be deemed to constitute a consent by DIP Lender or Action to any sale or other disposition of any Collateral or an agreement of either of them to release its security interests in any of the Collateral. Unless and until all of the Pre-Petition Debt and DIP Obligations have been paid in full and the DIP Facility has terminated, Debtors shall not be authorized to use any Cash Collateral (i) for any purpose except as otherwise authorized by this Order or (ii) obtained as a result of, or at any time after, the closing of a sale authorized by the Court under Section 363 of the Bankruptcy Code.  Notwithstanding the foregoing, all Collateral (including Cash Collateral) shall be subject to the Carve-Out.

(b)    Except as otherwise expressly provided in paragraph 6(a), all proceeds realized from any sale or other disposition of any Collateral shall be remitted directly to Action for application to the Pre-Petition Debt and DIP Obligations.  Such proceeds shall be applied to the Pre-Petition Debt and DIP Obligations as DIP Lender and Action may elect from time to time, subject to the terms and conditions set forth herein.

-11-

7.    <u>Adequate Protection of Pre-Petition Lender</u>.  As adequate protection pursuant to Sections 361 and 363 of the Bankruptcy Code for the Debtors' use, consumption, sale, collection or other disposition of any of the Collateral:

(a)    Action is hereby granted replacement liens in and to all of the Collateral that is created, acquired or first arises after the Petition Date (the **"Replacement Liens"**) as partial adequate protection to the extent of the diminution in value of the Collateral caused by the Debtors' use, consumption, sale, collection or other disposition of any Collateral. The Replacement Liens in favor of Action on the Collateral shall be junior in priority to the DIP Liens granted to the DIP Lender and shall be held by Action for the benefit of itself.

(b)    Nothing herein shall be deemed to be a waiver by Action of its rights to request additional or further protection of its interests in any property of Debtors, to move for relief from the automatic stay, to seek the appointment of a trustee or examiner or the conversion or dismissal of the Chapter 11 Case, or to request any other relief in this case, nor shall anything herein or in any of the DIP Financing Documents constitute an admission by Action or DIP Lender of the quantity, quality or value of any Collateral or constitute a finding of adequate protection with respect to the interests of Action in any Collateral.  Action shall be deemed to have reserved all rights to assert entitlement to the protections and benefits of Section 507(b) of the Bankruptcy Code in connection with any use, sale, or other disposition of any of the Collateral, to the extent that the protection afforded by this Order to Action's pre-petition interests in any Collateral proves to be inadequate.

8.    <u>Carve-Out</u>.

(a)    As used herein, **"Professional Expenses"** shall mean, collectively,

-12-

compensation and expense reimbursement of professionals (including attorneys, accountants,

appraisers, consultants and investment bankers) retained by Debtors (the **"Professional Persons"**),

in each case only to the extent that such compensation and expense reimbursement is approved by

the Court.

(b)    The DIP Liens and Superpriority Claim conferred upon DIP Lender shall be

subject and subordinate to the payment of (i) Professional Expenses of Professional Persons that are

approved for payment by final order of the Court, do not exceed amounts set forth in the Debtors'

Budgets, and have not been paid during the Chapter 11 Case by Debtors pursuant to an Order of the

Court (to the extent that retainers paid to such Professional Persons are insufficient and there are not

sufficient, unencumbered funds in Debtors' estates); (ii) fees required to be paid to the Clerk of the

Court; and (iii) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) (the amounts

described in the preceding clauses (i), (ii) and (iii) are collectively called the **"Carve-Out"**);

provided, however, that no proceeds of DIP Loans or any of the Collateral and no amounts received

pursuant to the Carve-Out shall be used to pay Professional Expenses of any Professional Person or

any other costs incurred in connection with (1) commencing or continuing any claims, causes of

actions or contested matters against the DIP Lender or Action, (exclusive of any investigation and

discovery prior to the commencement of any such claims or causes of action); (2) preventing,

hindering or delaying performance or enforcement by DIP Lender or Action of its rights or remedies

under this Order, any of the DIP Financing Documents or any of the Pre-Petition Loan Documents;

(3) challenging any liens or security interests in favor of Action or the DIP Liens or

Superpriority Claim of DIP Lender; or (4) any other purpose prohibited by

the DIP Financing Documents.

(c)    DIP Lender may, in its sole discretion at any time, make one or more DIP Loans pursuant to the DIP Credit Agreement to fund the Carve-Out.  All such DIP Loans shall be entitled to all of the benefits and security of the DIP Financing Documents and this Order and shall reduce the Carve-Out to the extent of any such DIP Loans used to fund the Carve-Out. After the Carve-Out has been fully funded, the Carve-Out provided in paragraph 8(b) of this Order shall be satisfied and the DIP Liens and Superpriority Claims conferred upon DIP Lender shall no longer be subject and subordinate to payment of the Carve-Out.  The proceeds of any such DIP Loan shall be held by Debtors' counsel for the benefit of the payment of Professional Persons.  No person shall have any claim to the proceeds of any DIP Loan used to fund the Carve-Out other than (i) the Professional Persons and (ii) DIP Lender's right to refund of any excess after payment of all fees and expenses that are included in the Carve-Out as defined in paragraph 8(b).

9.    <u>Preservation of Rights Granted Under This Order</u>.

(a)    There shall not be entered in the Chapter 11 Case or in any successor case any order that authorizes the obtaining of credit or the incurrence of indebtedness by Debtors (or any trustee or examiner) that is (i) secured by a security, mortgage or collateral interest or lien on all or any part of the Collateral that is equal or senior to the DIP Liens or (ii) entitled to priority administrative status that is equal or senior to the Superpriority Claim granted to DIP Lender herein; <u>provided</u>, <u>however</u>, that nothing herein shall prevent the entry of an order that specifically provides that, as a condition to the granting of the benefits of clauses (i) or (ii) above, all of the DIP Obligations must be indefeasibly paid in full, in cash, from the proceeds of such credit or indebtedness.

-14-

(b)    If the Chapter 11 Case is dismissed or converted, then neither the entry of this Order nor the dismissal or conversion of the Chapter 11 Case shall affect the rights of DIP Lender under the DIP Financing Documents or this Order, and all of the respective rights and remedies thereunder of DIP Lender shall remain in full force and effect as if the Chapter 11 Case had not been dismissed or converted. It shall constitute an Event of Default if Debtors seek, or if there is entered, any Order dismissing the Chapter 11 Case. If an order dismissing the Chapter 11 Case is at any time entered, such order shall provide (in accordance with Sections 105 and 349 of the Bankruptcy Code) that (i) the DIP Liens, Replacement Liens and Superpriority Claim granted to and conferred upon Action and DIP Lender shall continue in full force and effect and shall maintain their priorities as provided in this Order (and that such liens and Superpriority Claim shall, notwithstanding such dismissal, remain binding on all interested parties) and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purpose of enforcing the DIP Liens, Replacement Liens and Superpriority Claim referred to herein.

(c)    The provisions of this Order, and any actions taken pursuant hereto, shall survive the entry of and shall govern with respect to any conflict with any order that may be entered confirming any plan of reorganization or converting the Chapter 11 Case from Chapter 11 to Chapter 7.

(d)    The DIP Obligations shall not be discharged by the entry of any order confirming a plan of reorganization in the Chapter 11 Cases and, pursuant to Section 1141(d)(4) of the Bankruptcy Code, Debtors have waived such discharge.

-15-

(e)    In no event shall DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to any Collateral securing any of the DIP Obligations; and in no event shall any DIP Liens be subject to any pre-petition or post-petition lien or security interest that is avoided and preserved for the benefit of Debtors' estates pursuant to Section 551 of the Bankruptcy Code.

10.    <u>Automatic Perfection of DIP Liens</u>.  The DIP Liens shall be deemed valid, binding, enforceable and perfected upon entry of this Order.  DIP Lender shall not be required to file any UCC-1 financing statements, mortgages, deeds of trust, intellectual property filings, security deeds, notices of lien or any similar document or take any other action (including possession of any of the Collateral) in order to validate the perfection of the DIP Liens.  DIP Lender may, in its discretion, file a certified copy of this Order in any filing office in any jurisdiction in which Debtors are organized or have or maintain any Collateral or an office, and each filing office is directed to accept such certified copy of this Order for filing and recording.

11.    <u>Reimbursement of Expenses</u>.  All reasonable costs and expenses incurred by DIP Lender in connection with the negotiation and drafting of the DIP Financing Documents, or any amendments thereto, the preservation, perfection, protection and enforcement of DIP Lender's rights hereunder or under the DIP Financing Documents, or in the collection of the DIP Obligations, including, without limitation, all filing and recording fees and reasonable fees and expenses of attorneys, accountants, appraisers and other professionals incurred by DIP Lender in connection with any of the foregoing, whether any of the foregoing were incurred prior to or after the Petition Date, shall form a part of the DIP Obligations and shall be paid by Debtors in accordance with the terms of the DIP Financing Documents.

-16-

12.    <u>Amendments to DIP Financing Documents</u>.  Debtors and DIP Lender are hereby authorized to implement, in accordance with the terms of the DIP Financing Documents, any amendments to and modifications of any of the DIP Financing Documents without further order of the Court on the following conditions:  (i) the amendment or modification must not constitute a material change to the terms of the DIP Financing Documents, (ii) copies of the amendment or modification must be served upon Debtors' 30 largest creditors on a consolidated basis, the U.S. Trustee, and other interested parties specifically requesting such notice, and (iii) notice of the amendment is filed with the Court.  Any amendment or modification that constitutes a material change, to be effective, must be approved by the Court (and, for purposes hereof, a "material change" shall mean a change that operates to shorten the maturity of the DIP Obligations, increase the aggregate principal amount available under the DIP Facility, increase the rate of interest other than as currently provided in or contemplated by the DIP Financing Documents, add specific events of default, enlarge the nature and extent of default remedies available to DIP Lender following an event of default, or is a change that is both material and adverse to Debtors).

13.    <u>Events of Default; Remedies</u>.

(a)    Upon or after the occurrence of an "Event of Default" under (and as defined in) the DIP Credit Agreement, including, without limitation, an Event of Default resulting from the failure of Debtors to pay any of the DIP Credit Extensions when due; breaches of financial, affirmative, and negative covenants in the DIP Loan Documents; the falsity or material inaccuracy of any representations or warranties in the DIP Loan Documents; the appointment of a trustee or examiner with expanded powers, or dismissal or conversion to Chapter 7 of the Chapter 11 Case; confirmation of any plan of reorganization in the Chapter 11 Case, other than one providing for

-17-

payment in full, on the effective date, of all of the DIP Credit Extensions owing to DIP Lender and otherwise acceptable to Action; amendment or stay of this Order or any subsequent order on the DIP Motion or reversal, modification, or vacation of any of such orders, whether on appeal or otherwise; the filing of any motion or other request with the Bankruptcy Court seeking authority to use any cash proceeds of any of the Collateral without DIP Lender's consent or Debtors' obtaining any financing under Section 364(d) of the Bankruptcy Code with respect to any of the Collateral; or a final financing order acceptable to DIP Lender is not entered on or before July 31, 2016; then, in any such event, DIP Lender shall be fully authorized, in its sole discretion, to terminate further DIP Credit Extensions under the DIP Facility as provided in the DIP Credit Agreement, to demand payment of all DIP Obligations, and, upon ten (10) business days' prior written notice to counsel for Debtors and the U.S. Trustee, to enforce the DIP Liens with respect to the Collateral and to take all other action and exercise all other remedies under the DIP Financing Documents and applicable law that may be necessary or deemed appropriate by DIP Lender to collect any of the DIP Obligations, to proceed against or realize upon all or any portion of the Collateral as if the Chapter 11 Case or any superseding Chapter 7 case was not pending and otherwise to enforce the DIP Financing Documents and this Order.

(b)    The rights, remedies, powers and privileges conferred upon DIP Lender and Action pursuant to this Order shall be in addition to and cumulative with those contained in the DIP Financing Documents and the Pre-Petition Loan Documents.

14.    <u>Monitoring of Collateral</u>.

(a)    Representatives of DIP Lender shall be authorized upon reasonable notice to visit the business premises of Debtors to inspect any Collateral and to verify or to obtain supporting

details concerning the financial information to be provided to DIP Lender hereunder or under any of the DIP Financing Documents, all as permitted by the DIP Credit Agreement.

(b)    DIP Lender shall be authorized to retain appraisers, consultants and financial advisors, which appraisers, consultants and advisors shall be afforded reasonable access to the Collateral and Debtors' business premises, during normal business hours, for purposes of monitoring the business of Debtors, verifying Debtors' compliance with the terms of the DIP Financing Documents and this Order, and (to the extent authorized by the DIP Financing Documents) appraising all or any part of the Collateral.

15.    <u>Modification of Automatic Stay</u>.  The automatic stay provisions of Section 362 of the Bankruptcy Code are hereby lifted and terminated as to DIP Lender to the extent necessary to implement the provisions of this Order and the DIP Financing Documents, thereby permitting DIP Lender and Action, *inter alia*, to receive collections of Collateral for application to the Pre-Petition Debt and the DIP Obligations as provided herein, to file or record any UCC-1 financing statements, mortgages, deeds of trust, security deeds and other instruments and documents evidencing or validating the perfection of the DIP Liens and to enforce the DIP Liens upon default subject to the prior notice provisions of this Order.

16.    <u>Effect of Appeal</u>.  Consistent with 11 U.S.C. § 364(e), if any or all of the provisions of this Order are hereafter modified, vacated or stayed on appeal:

(a)    such stay, modification or vacation shall not affect the validity of any obligation, indebtedness, liability or DIP Lien granted or incurred by Debtors to DIP Lender prior to the effective date of such stay, modification or vacation, or the validity, enforceability or

priority of any DIP Lien, priority or right authorized or created under the original provisions of this

Order or pursuant to the DIP Financing Documents; and

(b)      any indebtedness, obligation or liability incurred by Debtors to DIP Lender

under the DIP Financing Documents prior to the effective date of such stay, modification or vacation

shall be governed in all respects by the original provisions of this Order, and DIP Lender shall be

entitled to all the rights, remedies, privileges and benefits, including the DIP Liens and priorities

granted herein and pursuant to the DIP Financing Documents, with respect to any such indebtedness,

obligation or liability.  All DIP Credit Extensions under the DIP Financing Documents are made in

reliance upon this Order, and, therefore, the indebtedness resulting from such DIP Credit Extensions

prior to the effective date of any stay, modification or vacation of this Order cannot (i) be

subordinated, (ii) lose the priority of the DIP Liens or superpriority  administrative claim status, or

(iii) be deprived of the benefit of the status of the DIP Liens and Superpriority Claim granted to DIP

Lender under this Order or the DIP Financing Documents, as a result of any subsequent order in the

Chapter 11 Case, or any superseding case, of Debtors.

17.      <u>Service of Order</u>.  Promptly after the entry of this Order, Debtors shall mail, by first

class mail, a copy of this Order, the DIP Motion (and all exhibits attached to the DIP Motion), and

a notice of the Final Hearing, to counsel for Pre-Petition Lender and DIP Lender, the Subordinated

Creditor, the U.S. Trustee, the 30 largest unsecured creditors of Debtors on a consolidated basis, the

Internal Revenue Service, and all known lienholders at their respective last known addresses, and all

parties who have filed requests for notices under Rule 2002 of the Bankruptcy Rules, and shall file a

certificate of service regarding same with the Clerk of the Court.  Such service shall constitute good

and sufficient notice of the Final Hearing.

18.    <u>No Deemed Control</u>.  By consenting to this Order, making DIP Credit Extensions or administering the financing relationship with Debtors pursuant to the DIP Financing Documents, DIP Lender shall not be deemed to be in control of Debtors or their operations or to be acting as a "responsible person," "managing agent" or "owner or operator" (as such terms are defined in the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any similar state or federal statute) with respect to the operation or management of Debtors.

19.    <u>Binding Effect; Successors and Assigns</u>.  The provisions of this Order shall be binding upon all parties in interest in the Chapter 11 Case, including, without limitation, DIP Lender and Debtors and their respective successors and assigns (including any Chapter 11 trustee hereafter appointed or elected for the estates of Debtors or any Chapter 7 trustee appointed in a superseding Chapter 7 case), and shall inure to the benefit of DIP Lender, Action, Debtors and their respective successors and assigns.  In no event shall DIP Lender have any obligation to make DIP Credit Extensions to any Chapter 7 or Chapter 11 trustee appointed or elected for the estates of Debtors.

20.    <u>Final Hearing</u>.    The Final Hearing shall be held at _____ o'clock _.m., on _____, 2016, at the U.S. Bankruptcy Court, Courtroom _____, 75 Spring Street SW, Atlanta, Georgia. If any or all of the provisions of this Order are modified, vacated or stayed as the result of any objection timely filed and asserted at the Final Hearing, then, without limiting the provisions of paragraph 16 hereof, any DIP Obligations incurred prior to the effective date of such modification, vacation or stay shall be governed in all respects by the original provisions of this Order, and DIP Lender shall be entitled to the protections afforded under Section 364(e) of the Bankruptcy Code and to all the rights, remedies, privileges, and benefits, including,

-21-

without limitation, the DIP Liens and superiority claim status granted herein and pursuant to the DIP Financing Documents with respect to all such DIP Obligations.

21.    <u>Objection Deadline</u>.  If any party in interest shall have an objection to any of the provisions of this Order, such party shall be authorized to assert such objection at the Final Hearing, provided that a written statement setting forth the basis for such objection is filed with the Court, and concurrently served upon the Office of the United States Trustee at Room 362, U.S. Courthouse, 75 Spring Street SW, Atlanta, Georgia 30303; counsel for Debtors, Scroggins & Williamson, P.C., One Riverside, 4401 Northside Parkway, Suite 450 Atlanta, Georgia 30327, Attn: J. Robert Williamson, Esq.; and Action Capital Corp., 230 Peachtree Street, N.W., Suite 1910, Atlanta, Georgia 30303, Attn:  Patrick Thom, in each case so that such objections and responses are filed on or before 5:00 p.m., prevailing Eastern time on _____ __, 2016.  Unless an objecting party shall be and appear at the Final Hearing to assert the basis for such objection before the Court, such objection shall be deemed to have been waived and abandoned by such objecting party.

22.    <u>Inconsistencies</u>.  To the extent that any provisions in the DIP Credit Agreement are inconsistent with any of the provisions of this Order, the provisions of this Order shall govern and control.

**IT IS SO ORDERED,** this _____ day of July, 2016.



_____
**UNITED STATES BANKRUPTCY COURT**

-22-

EXHIBIT B

# FACTORING AND SECURITY AGREEMENT

This Factoring and Security Agreement is dated for purposes of reference October 7, 2015 is by and between the undersigned, NexxLinx Corporation, Inc., a Delaware Corporation and subsidiary entities CustomerLinx of North Carolina, Inc., a North Carolina Corporation and CustomerLinx of New York, Inc., a New York Corporation and NexxLinx of Texas, Inc., a Delaware Corporation and NexxLinx of Maine, Inc., a Maine Corporation and NexxLinx Global, Inc., a Georgia Corporation (hereinafter collectively, jointly and severally referred to as "CLIENT") which has its offices and principal place of business at 3565 Piedmont Road NE, Building 2-100, Atlanta, Georgia 30305 and ACTION CAPITAL CORPORATION (hereinafter, "ACTION"), which has its executive office and principal place of business at 230 Peachtree St. NW, Suite 1910, Atlanta, GA 30303.  CLIENT and ACTION agree as follows:

**I.    PURPOSE OF AGREEMENT**

CLIENT desires to obtain short-term financing by selling and assigning to ACTION acceptable accounts receivable.  The purpose of this financing is commercial in nature, and not for household, family, and/or personal use.  In the event CLIENT and ACTION are currently operating under an earlier Agreement, this Agreement is and shall be a modification and continuation of such earlier Agreement and in the event of any inconsistencies or contradictions within the Agreements, CLIENT and ACTION agree that the terms of this Agreement shall control.

**II.    DEFINITIONS**

2.1    *"ACCOUNT"* means both present and future accounts, contract rights and other forms of obligations for the payment of money arising out of the sale by CLIENT of goods or the performance by CLIENT of services.

2.2    *"ACCEPTABLE ACCOUNT"* means an ACCOUNT offered by CLIENT to ACTION for sale which ACCOUNT ACTION has reviewed and has, in its sole discretion, approved for purchase in whole or in part, and which ACCOUNT conforms to the warranties and terms set forth herein and in the Agreement for the Sale and Assignment of Invoices form accompanying each offer to sell.

2.3    *"AFFILIATE"* means any entity that CLIENT or any officer, shareholder, director or other principal of CLIENT or any spouse or other familial relative of such person shall have the power to direct the management and policies of such entity, directly or indirectly, whether through ownership of voting securities or otherwise.

2.4    *"CUSTOMER"* means CLIENT's customer or the account debtor.

2.5    *"INVOICE"* means the document evidencing any ACCOUNT referenced in and made subject to any Agreement for the Sale and Assignment thereof entered into between the CLIENT and ACTION.

2.6    *"RESERVE ACCOUNT"* means a bookkeeping account on the books of ACTION representing the unpaid portion of an ACCEPTABLE ACCOUNT sold and assigned hereunder by CLIENT to ACTION or any ACCOUNT that is subject to the security hereunder granted to ACTION by CLIENT or otherwise coming into the possession or control of ACTION.

**III.    WARRANTIES AND COVENANTS BY CLIENT**

3.1    CLIENT's business is solvent, and CLIENT is presently paying its debts as they become due.  CLIENT has never filed for bankruptcy under federal or state law or had an involuntary bankruptcy petition filed against it.  CLIENT has made and shall continue to make timely payment of all required taxes.  To the

best of CLIENT's knowledge and based on CLIENT's reasonable business practices, each CUSTOMER is solvent.

3.2    Each ACCOUNT offered for sale to ACTION hereunder is and shall be, as of the time of such offer, a bona fide and existing obligation of CLIENT's CUSTOMER for the payment of money arising out of the sale by CLIENT of goods or the performance by CLIENT of services, which is owed to CLIENT, free from any liens, claims, disputes, off-sets or equities of third parties, that CLIENT is the lawful owner of and has good and undisputed title to the ACCOUNTs offered for sale to ACTION hereunder, and that no ACCOUNT offered or to be offered for sale to ACTION hereunder represents consigned or guaranteed sales, and that no ACCOUNT offered or to be offered for sale and assignment shall be due from an AFFILIATE.

3.3    CLIENT has not transferred, pledged or granted a security interest in CLIENT's ACCOUNTs to any other party except as otherwise disclosed to ACTION and CLIENT will not transfer, pledge or grant a security interest to any other party in said ACCOUNTs for the term of this agreement and for as long as CLIENT is indebted to ACTION hereunder. Additionally, CLIENT will not sell or assign ACCOUNTs except to ACTION for the period of this agreement, and/or for as long as any indebtedness whatsoever remains owing by CLIENT to ACTION.

3.4    FINANCIAL INFORMATION: CLIENT will furnish ACTION financial statements as reasonably required by ACTION from time to time and will furnish ACTION, satisfactory proof of payment and/or compliance with all Federal, State and/or local tax requirements. ACTION will keep any information it receives with respect to the financial or other records of CLIENT or CLIENT's CUSTOMERS strictly confidential. This covenant of confidentially survives this Agreement.

3.5    All financial records, statements, books or other documents shown to ACTION by CLIENT at any time, either before or after the signing of this Agreement, are true and accurate to the best of CLIENT's belief.

3.6    ACTION or any person designated by ACTION shall have the right at any reasonable time with reasonable notice to inspect, audit, check and make copies or extracts from CLIENT's books, records, journals, orders, receipts, and other correspondence and other data relating to CLIENT's business and any other transaction between ACTION and CLIENT without hindrance or delay.

3.7    CLIENT will not, under any circumstances or in any manner whatsoever, interfere with any of ACTION's rights under this Agreement.

3.8    CLIENT will promptly notify ACTION in writing of any change in the location of CLIENT's place(s) of business, name, identity, legal entity, corporate structure, officers, principals, partners, and/or owners.

3.9    CLIENT has full power and authority to execute, deliver and perform this Agreement.

**IV.    FURTHER PROMISES**

4.1    SECURITY INTEREST/COLLATERAL: CLIENT gives to ACTION, as collateral for the repayment of any and all obligations and liabilities whatsoever of CLIENT to ACTION, a security interest, under the Uniform Commercial Code, in the following described property (hereinafter collectively called "Collateral"): All presently existing or hereafter arising, now owned or hereafter acquired accounts, accounts receivable, contract rights, inventory, chattel paper, documents, instruments, general intangibles, reserves, reserve accounts, rebates, and all books and records (including without limitation, customer lists, computer programs, print outs, and other computer material and records) pertaining to the foregoing and all proceeds of the foregoing property. CLIENT agrees to not assign or grant a security interest in the collateral described herein to any other person.

4.2    NOTIFICATION: ACTION will, at its discretion, notify any CUSTOMER to make payments directly to ACTION for any ACCOUNT using the form of notification attached hereto as Exhibit A.

4.3    ASSIGNMENT: CLIENT shall from time to time at CLIENT's option, sell, transfer and assign ACCEPTABLE ACCOUNTs to ACTION, to be identified on a form known as ACTION's Agreement for Sale and Assignment of Invoices together with an original INVOICE and all supporting documents appropriate to CLIENT's business.

4.4    PURCHASE PRICE: Each ACCEPTABLE ACCOUNT purchased by ACTION hereunder shall be purchased for a price equal to the net amount of such ACCEPTABLE ACCOUNT. As used herein, the "net amount" of an ACCEPTABLE ACCOUNT means the face amount thereof less discounts or allowances of any nature, calculated on the basis of the shortest selling terms provided.

4.5    INTEREST AND FEES: ACTION agrees to provide financing to CLIENT for the fees as indicated below:

(a)    with respect to the daily average balance of unpaid advances outstanding hereunder (computed on a monthly basis), interest at a per annum rate equal to the "Prime Rate" of Wells Fargo Bank N.A. (as such rate is announced from time to time with changes in such rate to be effected on the first day of each month based on the Prime Rate in effect as of the last business day of the prior month) plus two percent (Prime + 2%), plus a monthly fee equal to sixty five one hundredths of one percent (.65%) of such average outstanding balance. All interest and fees hereunder shall be billed monthly in arrears with payment due on the billing date. All calculations of interest shall be computed on the basis of a 360 day year, for actual days elapsed.

(b)    all other costs incurred by ACTION including all bank fees for wire transfers, lien search fees, lien recording fees.

4.6    DATE OF ADVANCE: ACTION will buy ACCEPTABLE ACCOUNTs at the net amount less any specified reserve which will be advanced to CLIENT at the time the ACCOUNT is accepted.

4.7    RESERVE: ACTION will reserve and withhold an amount in a reserve account equal to ten percent (10%) of the face amount of each ACCOUNT purchased hereunder. The reserve account may be held by ACTION and applied against charge-backs or any obligations of CLIENT to ACTION, known or anticipated, and the reserve account shall not be due and payable to CLIENT until any and all obligations of CLIENT to ACTION are fully paid and/or satisfied. Notwithstanding the foregoing, as each ACCOUNT is paid in full, the reserve associated with the paid ACCOUNT will be paid to CLIENT provided, however, there does not then exist an event or condition of default and further provided, however, that in no event at any time shall the aggregate balance in the reserve account be less than ten percent (10%) of CLIENT's then unpaid ACCEPTABLE ACCOUNTs purchased by ACTION.

4.8    RECOURSE: ACTION shall have full recourse against CLIENT when an ACCOUNT is not   paid by CUSTOMER when due, including without limitation, the right to charge-back or sell back any such ACCOUNT, if not paid within 90 days of the date of purchase.

4.9    DISPUTED ACCOUNTS: CLIENT will immediately notify ACTION and accept back (repurchase) from ACTION any ACCOUNT subject to a dispute between CUSTOMER and CLIENT of any kind whatsoever.

4.10   HOLD IN TRUST: CLIENT will hold in trust and safekeeping, as the property of ACTION, and immediately turn over to ACTION the identical check or other form of payment received by CLIENT, whenever any payment on any ACCOUNT comes into CLIENT's possession; any failure by CLIENT in this regard constitutes a default under this Agreement (pursuant to SECTION V hereinbelow) and may result in civil and/or criminal actions against CLIENT and /or the person(s) responsible for such failure.

4.11   RESPONSIBILITY FOR TAXES: All taxes and governmental charges with respect to goods or services represented by ACCOUNTs purchased by ACTION shall be the obligation and responsibility of CLIENT. CLIENT has no obligation for ACTION's income or property taxes or any other taxes with respect to ACTION's business.

4.12   NOTICE OF LEVY: CLIENT will promptly notify ACTION of any material attachment, tax assessment or other legal process levied against CLIENT or any of CLIENT's CUSTOMERS.

4.13   BOOK ENTRY: CLIENT will, immediately upon sale of ACCOUNTs to ACTION, make proper entries on its books and records disclosing the absolute sale of said ACCOUNTs to ACTION subject to the terms and conditions of this Agreement.

4.14   LEGAL FEES: Except as is prohibited by law, CLIENT shall pay to ACTION all reasonable costs and expenses, including without limitation attorney's fees and expenses, and costs incurred by ACTION in the prosecution or enforcement of any of ACTION's rights, claims or courses of action which arise out of, relate to or pertain to this Agreement.

4.15   POWER OF ATTORNEY: CLIENT hereby names, appoints, and constitutes ACTION and its designees as CLIENT's true and lawful attorney-in-fact, and does hereby request, authorize, empower and direct ACTION or its designee, for and in the name and instead of CLIENT, either in CLIENT's name or ACTION's name to:

    (a)   compromise, adjust or settle any claim of a CUSTOMER with respect to an ACCOUNT;

    (b)   demand, sue for, collect and give release for any and all monies due or to become due on ACCOUNTs;

    (c)   make any and all corrections or completions on any of the invoices or other documents constituting the ACCOUNTS;

    (d)   endorse CLIENT's name an any checks, drafts, instruments or other evidences of payment with respect to any ACCOUNT or to otherwise collect the same;

    (e)   receive, open and dispose of all mail addressed to CLIENT with respect to any ACCOUNT; and

    (f)   do all other acts and things necessary to carry out the purpose and intent of this Agreement. All acts of ACTION as attorney-in-fact are hereby ratified and approved and ACTION shall not be liable for any errors of commission or omission nor for any error of or mistake of law or fact excepting acts constituting gross negligence or willful misconduct. This power of attorney in coupled with an interest and is irrevocable for so long as CLIENT is indebted to ACTION. The authority granted ACTION shall remain in full force and effect until all assigned accounts are paid in full and any indebtedness of CLIENT to ACTION is discharged.

4.16   ACH AUTHORIZATION: In order to satisfy any of the obligations to ACTION under this Agreement, CLIENT hereby authorizes ACTION to initiate electronic debit or credit entries through the Automated Clearing House system to any bank account maintained by CLIENT wherever located.

**V.    DEFAULT**

5.1    EVENTS OF DEFAULT: Any one or more of the following shall be a default hereunder:

(a)  CLIENT's breach of any promise, covenant or warranty under this Agreement or any other Agreements between CLIENT and ACTION or obligation of CLIENT to ACTION, including without limitation, payment of any indebtedness to ACTION when due;

(b)  the appointment of any receiver or trustee of all or a substantial portion of the assets of CLIENT; insolvency or inability to pay debts as they mature; a general assignment for the benefit of creditors; the voluntary or involuntary filing of a petition for relief under any bankruptcy or similar law;

(c)  issuance of any levies of attachment, executions, tax assessments or similar process against the Collateral;

(d)  CLIENT's tender to ACTION of information that is false or incorrect in any material respect.

5.2  REMEDIES AFTER DEFAULT: In the event of any default, ACTION may do any one or more of the following:

(a)  declare any indebtedness including outstanding ACCOUNTS purchased by ACTION, immediately due and payable;

(b)  notify any CUSTOMER of CLIENT to make payments directly to ACTION with respect to any and all ACCOUNTS of CLIENT;

(c)  require CLIENT to send copies of records and files pertaining to ACCOUNTS to ACTION and, with reasonable notice, enter the premises of CLIENT and make copies of the COLLATERAL and the records pertaining to the ACCOUNTS and any other COLLATERAL;

(d)  hold CLIENT liable for any deficiency.

## VI.  *MISCELLANEOUS*

6.1  MAXIMUM ACCOUNT: The outstanding amount of CLIENT's account with ACTION (that is, at any time, the unpaid and owing principal amount of advances made by ACTION to CLIENT) shall not exceed $4,500,000.

6.2.1  TERMINATION: This Agreement shall continue in full force and effect until terminated by written notice by either party.

6.3  POST-TERMINATION: After termination CLIENT shall be liable to ACTION for the full and prompt payment of the full amount of ACCOUNTs which have been sold and assigned to ACTION and are then outstanding and unpaid, disputed or undisputed, as well as any other indebtedness whatsoever. ACTION shall continue to have a security interest in the COLLATERAL of CLIENT until any existing indebtedness of CLIENT to ACTION is paid in full.

6.4  APPLICABLE LAW: This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia and shall be binding upon the successors, assigns and representatives of the parties hereto. CLIENT and ACTION hereby agree that any suit, action, or proceeding arising out the subject matter hereof, or the interpretation, performance or breach of this Agreement shall be instituted in the Superior Court of the State of Georgia located in Atlanta, Fulton County, Georgia (hereinafter, "Fulton County Superior Court"). CLIENT and ACTION hereby agree that Fulton County Superior Court is convenient to each party hereto and CLIENT and ACTION irrevocably submit to such jurisdiction, irrevocably agree to be bound by any judgment rendered thereby in connection with this Agreement, and forever waive any and all objections to jurisdiction or venue that each party may have under the laws of the State of Georgia or otherwise in those courts in any such suit, action or proceeding. If any such proceeding is initiated in any other jurisdiction, CLIENT hereby waives any

right to oppose any motion or application made by ACTION as a consequence of such proceeding having been commenced in a jurisdiction other than Fulton County Superior Court

6.5    ENTIRE AGREEMENT-AMENDMENT: This document contains the entire Agreement   between the parties as of the date specified below. This Agreement may be modified only by a written instrument executed by the parties hereto.

Executed and accepted this __7__ day of October, 2015.

**CLIENT: NEXXLINX CORPORATION, INC.**

Attested By: _____

By: _____

Corporate Secretary

Name: Craig Mento

*(Affix Corporate Seal)*

Title:   President and Chief Executive Officer

**CLIENT: CUSTOMERLINX OF NORTH CAROLINA, INC.**

Attested By: _____

By: _____

Corporate Secretary

Name: Craig Mento

*(Affix Corporate Seal)*

Title:   President and Chief Executive Officer

**CLIENT:  CUSTOMERLINX OF NEW YORK, INC.**

By: _____

By: _____

Attested By: _____

Name: Craig Mento

Corporate Secretary

*(Affix Corporate Seal)*

Title:   President and Chief Executive Officer

**CLIENT: NEXXLINX OF TEXAS, INC.**

Attested By: _____

By: _____

Corporate Secretary

Name: Craig Mento

*(Affix Corporate Seal)*

Title:   President and Chief Executive Officer

Attested By:

Corporate Secretary

*(Affix Corporate Seal)*

Attested By:

Corporate Secretary

*(Affix Corporate Seal)*

**CLIENT: NEXXLINX OF MAINE, INC.**

By:

Name: Craig Mento

Title:  President and Chief Executive Officer

**CLIENT: NEXXLINX GLOBAL, INC.**

By:

Name: Craig Mento

Title:  President and Chief Executive Officer

**ACTION:  Action Capital Corporation**

By:

Name: Jeffrey A. Mitchell
Title:  Senior Vice President

# EARNED AND UNBILLED REVENUE LINE OF CREDIT

THIS AGREEMENT is made this ٦ day of October, 2015, by and between the entities whose names appear at the end of this Agreement and who have executed this Agreement as NexxLinx Corporation, Inc., a Delaware Corporation and subsidiary entities CustomerLinx of North Carolina, Inc., a North Carolina Corporation and CustomerLinx of New York, Inc., a New York Corporation and NexxLinx of Texas, Inc., a Delaware Corporation and NexxLinx of Maine, Inc., a Maine Corporation and NexxLinx Global, Inc., a Georgia Corporation (hereinafter collectively, jointly and severally referred to as "CLIENT") which has its offices and principal place of business at 3565 Piedmont Road NE, Building 2-100, Atlanta, Georgia 30305") and Action Capital Corporation ("Action"), which has its executive office and principal place of business at 230 Peachtree Street, NW, Suite 1910, Atlanta, Georgia, 30303.

## *W I T N E S S E T H:*

WHEREAS, Action provides financing to Client pursuant to and based on Client's compliance with the terms of that certain Factoring and Security Agreement dated October ٦, 2015 ("Factoring and Security Agreement") by and between Client and Action; and

WHEREAS, Client has requested Action to provide additional financing to Client with respect to certain of its earned-and-unbilled receivables, all as set forth more fully hereinbelow.

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

SECTION 1.  Definitions.

In addition to other terms that are defined elsewhere in this Agreement and The Factoring and Security Agreement, the following terms shall have the definitions set forth below:

1.1 "Eligible Earned-and-Unbilled Revenue" means at any time the aggregate revenue earned under ongoing Customer contracts of Client which cannot yet be billed to the Customer because the full billing period as specified in the contract has not yet ended but which revenue will be billable on the next invoice to Customer at the end of the current billing period.

1.2 "Collateral Report" means a detailed report by Customer and Contract of amount that are earned and unbilled in form and format as detailed in Exhibit "A".

1.3 "Current Collateral Availability" means at any time the U. S. dollar value of all Eligible Earned-But-Unbilled Revenue multiplied by eight-five percent (85%).

1.4 "Termination Date" means on Demand or such earlier date as Action may terminate this Agreement, as provided herein.

SECTION 2.  Line of Credit Arrangement.

2.1 Security Agreement.  In addition to the security interests that have been granted to Action pursuant to the Factoring and Security Agreement, Client hereby grants to Action a continuing first priority and only security interest in all of Client's now existing or hereafter acquired or arising earned-but-unbilled revenue, inventory, intangibles and all cash and non-cash proceeds of the foregoing.  Client agrees not to assign or otherwise pledge any of its earned-but-unbilled revenue, inventory, and intangibles or proceeds to any entity other than Action.

2.2 Advances.  Client may obtain from Action, subject to Action's sole discretion, advances hereunder in amounts not to exceed the Current Collateral Availability, provided that Client is at all times in compliance with the terms and conditions of this Agreement and the Factoring and Security Agreement and that the aggregate amount of unpaid advances owing by Client hereunder shall not at any time

exceed Eight Hundred and Fifty Thousand Dollars ($850,000). Client agrees to provide to Action a Collateral Report as date Client is requesting an advance. In addition, prior to each advance hereunder, Client shall provide to Action a statement certified by an officer of Client setting forth the Current Collateral Availability and the amount that Client wishes to have advanced under this Agreement.

2.3  Repayment.  Upon the billing of any item comprising the Earned-and-Unbilled Revenue, Client shall immediately remove such item from the Earned-and-Unbilled Revenue Collateral Report, prepare a proper invoice with supporting documentation, and submit said invoice to Action pursuant to the Factoring and Security Agreement. All proceeds that Action may make available to Client with respect to such invoices may, at Action's sole discretion, be applied to the unpaid advances outstanding under this Agreement (a) if the unpaid advances outstanding hereunder exceed the Current Collateral Availability or (b) if Client shall not be in compliance with the terms and conditions of this Agreement or The Factoring and Security Agreement.

2.4  Representations.  Client represents and warrants that: (a) all Eligible Earned-and-Unbilled Revenue represents an existing, bonafide, enforceable obligation created in the ordinary course of Client's business upon the Customer (b) Client has good title thereto, free of any encumbrances or liens whatsoever except those created by this Agreement and the Factoring and Security Agreement; (c) the Customer issuing the Contract is obligated to pay the U.S. dollar amount thereof, without defense, or known counterclaim or offset; (d) each invoice submitted representing an item comprising the Eligible Earned-But-Unbilled Revenue shall be the only invoice for such item described therein; and (e) all documents submitted in connection therewith are completely accurate, bona fide and genuine.

2.5  Evidence of Advances.  Client shall execute and deliver to Action upon execution of this Agreement a promissory note in the form attached as Exhibit "B" evidencing Client's obligation to Action for sums advanced pursuant to the terms of this Agreement and for other obligations due under this Agreement by Client to Action.

2.6  Charges to Client. With respect to advances outstanding hereunder that are advanced after the date hereof, interest at a per annum rate equal to the Prime Rate of Wells Fargo Bank, (as such rate is announced from time to time, with changes in such rate to be effected on the first day of each month based on the Prime Rate in effect on the last business day of the prior month) plus two percent (Prime + 2%) (as of the date hereof, the Prime Rate of Wells Fargo Bank, is 3.25% and may hereafter increase or decrease; future changes in such Prime Rate shall be made on the first day of each month hereafter, based on the Prime Rate in effect on the last day of the preceding month and all calculations of interest due shall be computed on a year of 360 days, for actual days elapsed) plus a monthly fee equal to eighty five hundredths of one percent (.85%), both to be billed monthly in arrears with payment due on the billing date.

2.7  Action's Statement of Clients Account.  Each month, Action shall render to Client a monthly statement showing the daily outstanding balances for the previous month and the interest due. Unless Client gives Action notice of a specific objection thereto within thirty (30) days from the date of the statement, the statement shall constitute an account stated between Client and Action. The interest and fees are payable by the 5th day of the month following the month for which they are due and will be deducted from proceeds made available to Client either hereunder or under the Factoring and Security Agreement.

2.8  Settlement of Claims and Disputes.  Client agrees to settle any and all disputes with Customers without loss or expense to Action and shall notify Action immediately of any alleged dispute, claim, defense or offset made by any such Customer. Action shall have the right to reduce the amount of any advance with respect to any disputed invoice.

2.9  Access to Client's Records. Client will permit Action to have reasonable access on a regular basis to Client's books and records and to make copies and extracts thereof.

SECTION 3.  Incorporation of Representations and Warranties.

3.1 All of the representations and warranties made by Client to Action in The Factoring and Security Agreement are incorporated herein by reference and are made with respect to this Agreement as if fully set forth herein.

SECTION 4. Affirmative Covenants of Client.

4.1 All of the affirmative covenants set forth in the Factoring and Security Agreement apply to this Agreement as if fully set forth herein with respect to this Agreement.

SECTION 5.  Miscellaneous.

5.1 Waivers.  In addition to the other waivers contained herein and in any other agreement between Client and Action, Client hereby expressly waives, to the extent permitted by law: demand, protest, notice of protest, notice of default or dishonor, notice of payments and non-payments, or of any default, release, compromise, settlement, extension or renewal of all instruments or guarantees at any time held by Action on which Client may in any way be liable.

5.2  Indulgences Not Waivers. Neither the failure nor any delay on the part of a party hereto to exercise any right, remedy, power or privilege hereunder shall operate as a waiver thereof or give rise to any estoppel, nor be construed as an agreement to modify the terms of this Agreement, nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or further exercise of the same or of any other right, remedy, power or privilege; nor shall any waiver of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence.  No waiver by a party hereunder shall be effective unless it is in writing and signed by the party making such waiver, and then only to the extent specifically stated in such writing.

5.3 Survival.  All warranties, representations and covenants made by Client herein or in any certificate or other instrument delivered by it or on its behalf under this Agreement shall be considered to have been relied upon by Action regardless of any investigation by Action or on its behalf.  All statements in any such certificate or other instrument shall constitute warranties and representations by Client hereunder.

5.4 Definitions and Applicable Law.  All terms not otherwise defined herein shall be defined in accordance with the appropriate definitions appearing in the Uniform Commercial Code as in force in the State of Georgia, and such definitions are hereby incorporated herein by reference and made a part hereof. This Agreement shall be governed in all respects by, and construed in accordance with, the laws of the State of Georgia, including without limitation the Uniform Commercial Code of the State of Georgia.

5.5  Entire Agreement/Amendment.   This Agreement, including all exhibits and schedules hereto and agreements referred to herein, constitutes and expresses the entire understanding between the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements and understandings, inducements or conditions, express or implied, oral or written, except as herein contained. The express terms hereof control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof. Neither this Agreement nor any portion or provision hereof may be changed, altered, waived, modified, supplemented, discharged, cancelled, terminated, or amended orally or in any manner other than by an agreement in writing signed by the parties hereto.

5.6 Section Headings.  The section headings in this Agreement are for convenience of reference only; they form no part of the substantive provisions of this Agreement and shall not affect its interpretation.

5.7 Severability.  The provisions of this Agreement are independent of and separable from each other.  If any provision hereof shall for any reason be held invalid or unenforceable, such invalidity or

unenforceability shall not affect the validity or enforceability of any other provision hereof, but this Agreement shall be construed as if such invalid or unenforceable provision had never been contained herein.

5.8  Successors and Assigns.  The rights, remedies, powers and privileges of Action hereunder shall inure to the benefit of the successors and assigns of Action, and the duties and obligations of Client hereunder shall bind the successors and assigns of Client.

5.9  Notices.  All notices, requests, demands and other communications required or permitted under this Agreement or by law shall be in writing and shall be deemed to have been duly given, made and received when delivered against receipt or when deposited in the United States mail, (registered or certified mail, return receipt requested), overnight mail, or email and addressed as set forth below:

   (a) If to Client:       Nexxlinx Corporation, Inc. and Subsidiaries
                           3565 Piedmont Road NE
                           Building Two, Suite 100
                           Atlanta, Georgia 30305
                           Attention: Craig Mento
                           Email: cmento@nexxlinx.com

   (b) If to Action:       Action Capital Corporation
                           230 Peachtree Street, N.W.
                           Suite 1910
                           Atlanta, Georgia 30303
                           Attention:  Jeffrey Mitchell
                           Email: jeff@actioncapital.com

A party may alter the address to which communications are to be sent to it by giving notice of such change of address in conformity with the provisions of this paragraph for the giving of notice. The parties hereby agree that a notice sent as specified in this paragraph at least seven (7) calendar days before the date of any intended public sale or the date after which any private sale or other intended disposition of any collateral held by Action under this Agreement is to be made by Action shall be deemed to be reasonable notice of such sale or other disposition.

Term and Termination.  This Agreement shall become effective when executed and delivered by Client and accepted by Action, shall survive the making by Action of the loans contemplated hereby and the execution and delivery of the Loan Documents, and shall continue in full force and effect until terminated as herein provided.  Client or Action may terminate this Agreement at any time upon written notice to the other of much termination; provided, however, that such termination shall in no way effect any transaction entered into or rights created or obligations incurred prior to the receipt of such notice by the other party, as to which transactions, rights and obligations this Agreement shall be fully operative until the same are fully disposed of, concluded or liquidated.  If not earlier terminated, this Agreement shall terminate on the Termination Date, but the representations, warranties and obligations of Client shall survive termination.

IN WITNESS WHEREOF, Client has caused this Agreement to be signed, sealed and delivered, and its corporate seal to be affixed hereto, on the day and year first written above.

Executed and accepted this _____ day of October, 2015.

CLIENT:  NEXXLINX CORPORATION, INC.

By: _____

Name: Craig Mento

Title:  President and Chief Executive Officer

**Attested By:**

Corporate Secretary

*(Affix Corporate Seal)*

CLIENT: CUSTOMERLINX OF NORTH CAROLINA, INC.

By: _____

Name: Craig Mento

**Attested By:**

Corporate Secretary

*(Affix Corporate Seal)*

Title:  President and Chief Executive Officer

CLIENT:  CUSTOMERLINX OF NEW YORK, INC.

By: _____

By: _____

Name: Craig Mento

**Attested By:**

Corporate Secretary

*(Affix Corporate Seal)*

Title:  President and Chief Executive Officer

CLIENT: NEXXLINX OF TEXAS, INC.

By: _____

**Attested By:**

Corporate Secretary

*(Affix Corporate Seal)*

Name: Craig Mento

Title:  President and Chief Executive Officer

CLIENT:  NEXXLINX OF MAINE, INC.

By: _____

**Attested By:**

Corporate Secretary

*(Affix Corporate Seal)*

Name: Craig Mento

Title:  President and Chief Executive Officer

**Attested By:**

**Corporate Secretary**

*(Affix Corporate Seal)*

CLIENT:  NEXXLINX GLOBAL, INC.

By: _____

Name: <u>Craig Mento</u>

Title:  <u>President and Chief Executive Officer</u>

ACTION:  Action Capital Corporation

By: _____

Name: <u>Jeffrey A. Mitchell</u>
Title:  <u>Senior Vice President</u>

## PROMISSORY NOTE

$850,000                                                                October 7, 2015

FOR VALUE RECEIVED, the entities whose names appear at the end of this Promissory Note and who have executed this Promissory Note (hereinafter referred to collectively and individually as "Client"), promise to pay to the order of ACTION CAPITAL CORPORATION, a Georgia corporation (hereinafter together with any other holder hereof referred to as the "Action"), in full on the earlier of demand or such expiration date as Action may specify in writing, whichever is earlier, in lawful money of the United States, the principal sum of Eight Hundred Fifty Thousand Dollars ($850,000), or so much thereof as may be disbursed and remain outstanding from time to time under a revolving Earned But Unbilled Revenue Line of Credit Agreement ("the Line of Credit Agreement") between Action and Client dated October 7, 2015, with accrued interest from the date hereof on the unpaid principal balance hereof on the fifth day on each month, commencing on November 30, 2015 and continuing thereafter on the 5th day of each successive calendar month until final payment or maturity.

With respect to advances outstanding hereunder that are advanced after the date hereof, interest at a per annum rate equal to the Prime Rate of Wells Fargo Bank, N.A. (as such rate is announced from time to time, with changes in such rate to be effected on the first day of each month based on the Prime Rate in effect on the last business day of the prior month) plus two percent (Prime + 2%) (as of the date hereof, the Prime Rate of Wells Fargo Bank, NA is 3.25% and may hereafter increase or decrease; future changes in such Prime Rate shall be made on the first day of each month hereafter, based on the Prime Rate in effect on the last day of the preceding month and all calculations of interest due shall be computed on a year of 360 days, for actual days elapsed) plus a monthly fee equal to eight and a half tenths of one percent (.85%), both to be billed monthly in arrears with payment due on the billing date.

Payments shall be made in coin or currency of the United States of America, which at the time of payment shall be legal tender for the payment of public and private debts, at 230 Peachtree Street, NW, Suite 1910, Atlanta, Georgia 30303, or at such other place as Action may designate.

In no contingency or event whatsoever, shall the interest rate charged pursuant to the terms of this Note exceed the highest rate permissible under any law which a court of competent jurisdiction shall, in a final determination, deem applicable hereto. In the event that such a court determines that Action has received interest hereunder in excess of the highest applicable rate, Action shall promptly refund such excess interest to Client.

This Note is issued to evidence a revolving line of credit facility made available pursuant to the provisions of an Earned and Unbilled Revenue Line of Credit Agreement dated October___, 2015, between Client and Action, to which reference is hereby made for a statement of the terms, conditions and covenants under which the Earned and Unbilled Revenue Line of Credit evidenced hereby was made and is to be repaid. Client and Action acknowledge that this Note shall evidence a revolving line of credit facility. Subject to the provisions of the Earned and Unbilled Revenue Line of Credit Agreement, Client may borrow up to the maximum principal amount specified herein, subject to the approval of Action, and repay all or any portion thereof, and re-borrow up to such amount on a revolving basis.

The loan represented hereby is to be repaid at Atlanta, Georgia.  This Note shall be governed by the laws of the State of Georgia.

The Client represents and warrants to Action that the loan evidenced hereby is for business, not for personal or household, purposes.

The Client hereby waives presentment, demand for payment, protest, and notice of dishonor and all other notices in connection with this Note.

WITNESS the hand and seal of the undersigned.

Attested By:

Corporate Seal

CLIENT:  NEXXLINX CORPORATION, INC.

By: _____

Name: Craig Mento

Title:  President and Chief Executive Officer

Attested By:

Corporate Seal

CLIENT: CUSTOMERLINX OF NORTH CAROLINA, INC.

By: _____

Name: Craig Mento

Title:  President and Chief Executive Officer

CLIENT:  CUSTOMERLINX OF NEW YORK, INC.

By: _____

Attested By:

Corporate Seal

By: _____

Name: Craig Mento

Title:  President and Chief Executive Officer

**CLIENT: NEXXLINX OF TEXAS, INC.**

Attested By:

Corporate Seal

By: _____

Name: Craig Mento

Title:  President and Chief Executive Officer


**CLIENT:  NEXXLINX OF MAINE, INC.**

Attested By:

Corporate Seal

By: _____

Name: Craig Mento

Title:  President and Chief Executive Officer


**CLIENT:  NEXXLINX GLOBAL, INC.**

Attested By:

Corporate Seal

By: _____

Name: Craig Mento

Title:  President and Chief Executive Officer

# PROMISSORY NOTE

$1,350,000                                                                June 1⁄4 ,2016

FOR VALUE RECEIVED, the entities whose names appear at the end of this Promissory Note and who have executed this Promissory Note (hereinafter referred to collectively and individually as "Client"), promise to pay to the order of ACTION CAPITAL CORPORATION, a Georgia corporation (hereinafter together with any other holder hereof referred to as the "Action"), in full on the earlier of demand or such expiration date as Action may specify in writing, whichever is earlier, in lawful money of the United States, the principal sum of One Million Three Hundred Fifty Thousand Dollars ($1,350,000), or so much thereof as may be disbursed and remain outstanding from time to time under a revolving Earned-And-Unbilled Revenue Line of Credit Agreement ("the Line of Credit Agreement") between Action and Client dated October 7, 2015, as amended June 14, 2016 with accrued interest from the date hereof on the unpaid principal balance hereof on the fifth day on each month, commencing on July 5, 2016 and continuing thereafter on the 5th day of each successive calendar month until final payment or maturity.

With respect to advances outstanding hereunder that are advanced after the date hereof, interest at a per annum rate equal to the Prime Rate of Wells Fargo Bank, N.A. (as such rate is announced from time to time, with changes in such rate to be effected on the first day of each month based on the Prime Rate in effect on the last business day of the prior month) plus two percent (Prime + 2%) (as of the date hereof, the Prime Rate of Wells Fargo Bank, NA is 3.5% and may hereafter increase or decrease; future changes in such Prime Rate shall be made on the first day of each month hereafter, based on the Prime Rate in effect on the last day of the preceding month and all calculations of interest due shall be computed on a year of 360 days, for actual days elapsed) plus a monthly fee equal to eight and a half tenths of one percent (.85%), both to be billed monthly in arrears with payment due on the billing date.

Payments shall be made in coin or currency of the United States of America, which at the time of payment shall be legal tender for the payment of public and private debts, at 230 Peachtree Street, NW, Suite 1910, Atlanta, Georgia 30303, or at such other place as Action may designate.

In no contingency or event whatsoever, shall the interest rate charged pursuant to the terms of this Note exceed the highest rate permissible under any law which a court of competent jurisdiction shall, in a final determination, deem applicable hereto. In the event that such a court determines that Action has received interest hereunder in excess of the highest applicable rate, Action shall promptly refund such excess interest to Client.

This Note is issued to evidence a revolving line of credit facility made available pursuant to the provisions of an Earned and Unbilled Revenue Line of Credit Agreement dated October 7, 2015, between Client and Action as further amended on June 14, 2016, to which reference is hereby made for a statement of the terms, conditions and covenants under which the Earned and Unbilled Revenue Line of Credit evidenced hereby was made and is to be repaid. Client and Action acknowledge that this Note shall evidence a revolving line of credit facility. Subject to the provisions of the Earned and Unbilled Revenue Line of Credit Agreement, Client may borrow up to the maximum principal amount specified herein, subject to the approval of Action, and repay all or any portion thereof, and re-borrow up to such amount on a revolving basis.

The loan represented hereby is to be repaid at Atlanta, Georgia.  This Note shall be governed by the laws of the State of Georgia.

The Client represents and warrants to Action that the loan evidenced hereby is for business, not for personal or household, purposes.

The Client hereby waives presentment, demand for payment, protest, and notice of dishonor and all other notices in connection with this Note.

WITNESS the hand and seal of the undersigned.

CLIENT:  NEXXLINX CORPORATION, INC.

By: _____

Name: Alan Quarterman

Title: _____C E O_____

CLIENT: CUSTOMERLINX OF NORTH CAROLINA, INC.

By: _____

Name: Alan Quarterman

Title: _____C E O_____

CLIENT:  CUSTOMERLINX OF NEW YORK, INC.

By: _____

By: _____

Name: Alan Quarterman

Title: _____C E O_____

Attested By: _____
Corporate Seal

Attested By: _____
Corporate Seal

Attested By: _____
Corporate Seal

**CLIENT: NEXXLINX OF TEXAS, INC.**

By: _____

Name: <u>Alan Quarterman</u>

Title: _____ *C EO* _____

Attested By:

Corporate Seal

**CLIENT:  NEXXLINX OF MAINE, INC.**

By: _____

Name: <u>Alan Quarterman</u>

Title: _____ *C. EO* _____

Attested By:

Corporate Seal

**CLIENT:  NEXXLINX GLOBAL, INC.**

By: _____

Name: <u>Alan Quarterman</u>

Title: _____ *C EO* _____

Attested By:

Corporate Seal

### Amendment to Earned-And-Unbilled Revenue Line of Credit Agreement between
### Action Capital Corporation and NexxLinx Corporation, Inc. and subsidiary entities CustomerLinx of North Carolina, CustomerLinx of New York, NexxLinx of Texas, Inc., NexxLinx of Maine, and NexxLinx Global, Inc.

WHEREAS NexxLinx Corporation, Inc. and subsidiary entities CustomerLinx of North Carolina, CustomerLinx of New York, NexxLinx of Texas, NexxLinx of Maine, and NexxLinx Global, Inc. (hereinafter "Client") entered into an Earned-And-Unbilled Revenue Line of Credit Agreement with Action Capital Corporation (hereinafter "Action") on the 7th day of October, 2015, and

WHEREAS Action and Client want to amend the agreement to increase the maximum credit limit in Section 2.2 Advances;

NOW, THEREFORE, and in consideration of ten dollars ($10), the sufficiency of which is hereby established, Client and Action agree that Section 2.2 shall be deleted in its entirely and replaced with the following:

2.2 Advances: Client may obtain from Action, subject to Action's sole discretion, advances hereunder in amounts not to exceed the Current Collateral Availability, provided that Client is at all times in compliance with the terms and conditions of the Agreement and the Financing and Security Agreement and that the aggregate amount of unpaid advances owing by Client hereunder shall not at any time exceed One Million Three Hundred Fifty Thousand Dollars ($1,350,000). Client agrees to provide to Action a Collateral Report as date Client is requesting an advance. In addition, prior to each advance hereunder, Client shall provide to Action a statement certified by an officer of Client setting forth the Current Collateral Availability and the amount that Client wishes to have advanced under this Agreement.

All other terms and conditions of the Factoring and Security Agreement shall remain unchanged. Effective this 14th day of June 2016.

Attested By:

Corporate Secretary

(Affix Corporate Seal)

Client: NexxLinx Corporation, Inc.
By:
Name: Alan Quarterman
Title:    C E O

Attested By:

_____

Corporate Secretary

(Affix Corporate Seal)

Client: CustomerLinx of North Carolina, Inc.
By: _____
Name:  Alan Quarterman
Title: _____ C E O _____

Attested By:

_____

Corporate Secretary

(Affix Corporate Seal)

Client: CustomerLinx of New York, Inc.
By: _____
Name:  Alan Quarterman
Title: _____ C E O _____

Attested By:

_____

Corporate Secretary

(Affix Corporate Seal)

Client: NexxLinx of Texas, Inc.
By: _____
Name:  Alan Quarterman
Title: _____ C e O _____

Attested By:

_____

Corporate Secretary

(Affix Corporate Seal)

Client: NexxLinx of Maine, Inc.
By: _____
Name:  Alan Quarterman
Title: _____ C E O _____

Attested By:

_____

Corporate Secretary

(Affix Corporate Seal)

Client: NexxLinx Global, Inc.
By: _____
Name:  Alan Quarterman
Title: _____ C E O _____

Action: Action Capital Corporation
BY: _____
Name:  Patrick Thom
Title:    President

## UNCONDITIONAL GUARANTY

To induce Action Capital Corporation (hereinafter together with its representatives, agents, successors and assigns referred to as   "ACTION") to extend credit to NexxLinx Corporation, Inc., a Delaware Corporation and subsidiary entities CustomerLinx of North Carolina, Inc., a North Carolina Corporation and CustomerLinx of New York, Inc., a New York Corporation and CustomerLinx of Oklahoma, Inc. an Oklahoma Corporation and CustomerLinx of Rhode Island, LLC a Rhode Island Limited Liability Corporation and NexxLinx of Texas, Inc., a Delaware Corporation and NexxLinx of Maine, Inc., a Maine Corporation and NexxLinx Global, Inc., a Georgia Corporation (hereinafter collectively, jointly and severally referred to as "CLIENT", the undersigned, who by signing herein below confirms that he/she is an officer, director, shareholder, owner and/or member of CLIENT and further confirms that there exists among the undersigned, CLIENT,  and ACTION good and valuable consideration for the undersigned to enter into this Guaranty, hereby undertakes and guarantees unconditionally that CLIENT will diligently and timely perform or cause to be performed all of their duties and obligations to ACTION as set forth in that certain Factoring and Security Agreement dated  October ___, 2015 by and among CLIENT and ACTION, whether now existing or hereafter incurred, and that if CLIENT fails at any time to perform any such duty or obligation or to pay any amount due, then the undersigned will perform or cause to be performed all of the covenants and obligations of CLIENT and pay all amounts due to ACTION from CLIENT.  This Guaranty is unconditional.  The undersigned acknowledges that he/she has entered into this Guaranty willingly and, if deemed necessary by the undersigned acting in his/her sole discretion, with the advice of legal counsel prior to the execution of this Guaranty and that this Guaranty is a jointly drafted document by the undersigned and ACTION.  The undersigned waives notice of any alteration or amendment of any agreement or agreements of any kind, whether written or oral, between CLIENT and ACTION.  The undersigned consents that at any time any party liable for any obligation of CLIENT, including without limitation any co-guarantor, may be granted indulgences or released by ACTION and that ACTION may at any time release any collateral with respect to any obligation of CLIENT or co-guarantor.  The undersigned agrees that no modification, renewal, extension or other change of any kind which may be made in the underlying guaranteed agreements between CLIENT and ACTION will discharge the undersigned or constitute a waiver of any kind.  It is not a requirement of the obligation of the undersigned, whose promise hereunder is joint and several with CLIENT, that CLIENT or any other guarantor or person be pursued first for the indebtedness and the undersigned waives any demand by ACTION, its agents, representatives, successors or assigns.  The undersigned waives any and all notice of non-performance or non-payment.  This Guaranty of performance is a continuing Guaranty and shall be binding upon the undersigned, his/her successors, executors and assigns and shall inure to the benefit of ACTION, its agents, representatives, successors and assigns. This Guaranty shall remain in full force and effect until all duties and obligations of undersigned to ACTION have been performed, including the obligation to pay, and any credit arrangements between CLIENT and ACTION have been fully and finally terminated.  No delay or failure on the part of ACTION in the exercise by ACTION of any right or remedy under this agreement shall operate as a waiver thereof and no single or partial exercise by ACTION of any right or remedy shall preclude any other future exercise thereof or the exercise of any other right or remedy.  In the event that it is necessary to commence legal action to enforce the terms of this Guaranty, reasonable attorney's fees incurred on the part of ACTION in the enforcement of the Guaranty shall be payable to ACTION by the undersigned, along with interest at the highest rate allowed by law from the date of demand made upon the undersigned to pay the joint and several obligation of the CLIENT and the undersigned.  This Guaranty shall be governed by and construed in accordance with the laws of the State of Georgia and shall be binding upon the successors, assigns and representatives of the parties hereto.  The undersigned and ACTION hereby agree that any suit, action, or proceeding arising out the subject matter hereof, or the interpretation, performance or breach of this Guaranty shall be instituted in the Superior Court of the State of Georgia located in Atlanta, Fulton County, Georgia (hereinafter, "Fulton County Superior Court").  The undersigned and ACTION hereby agree that Fulton County Superior Court is convenient to each party hereto and the undersigned and ACTION irrevocably submit to such jurisdiction, irrevocably agree to be bound by any judgment rendered thereby in connection with this Guaranty, and forever waive any and all objections to jurisdiction or venue that each party may have under the laws of the State of Georgia or otherwise in those courts in any such suit, action or proceeding.  If any such proceeding is initiated in any other jurisdiction, the undersigned hereby waives any right to oppose any motion or application made by ACTION as a consequence of such proceeding having been commenced in a jurisdiction other than Fulton County Superior Court

IN WITNESS WHEREOF, the undersigned has duly executed this Guaranty this 8th       day of October, 2015.

Name:          Craig Mento

Guarantor's Signature:    _____

SWORN TO AND SUBSRIBED BEFORE ME THIS 8th DAY OF October , 2015.

PERSONALLY   KNOWN     [   X   ]          PRODUCED   IDENTIFICATION   [        ]    TYPE:

Notary Public                    3-17-2019
                                 Commission Expiration Date

Print, Type or Stamp Name        Commission Number
[AFFIX NOTARIAL SEAL]

## Amendment to Factoring and Security Agreement between Action Capital Corporation and NexxLinx Corporation, Inc. and subsidiary entities CustomerLinx of North Carolina, CustomerLinx of New York, NexxLinx of Texas, Inc., NexxLinx of Maine, and NexxLinx Global, Inc.

WHEREAS NexxLinx Corporation, Inc. and subsidiary entities CustomerLinx of North Carolina, CustomerLinx of New York, NexxLinx of Texas, NexxLinx of Maine, and NexxLinx Global, Inc. (hereinafter "Client") entered into an Factoring and Security Agreement with Action Capital Corporation (hereinafter "Action") on the 7th day of October, 2015, and

WHEREAS Action and Client want to amend the agreement in Section III. Warranties and Covenants By Client 3.1 AND V. Default 5.1 Events of Default (b);

NOW, THEREFORE, and in consideration of ten dollars ($10), the sufficiency of which is hereby established, Client and Action agree that Section III. 3.1 shall be deleted in its entirety and replaced with the following:

Section III. 3.1 Client has made and shall continue to make timely payment of all required taxes. To the best of Client's knowledge and based on Client's reasonable business practices, each Customer is solvent.

Section V. Default 5.1 Events of Default (b) shall be deleted in its entirety.

All other terms and conditions of the Factoring and Security Agreement shall remain unchanged.  Effective this _____ day of June, 2016.

Attested By:                           Client: NexxLinx Corporation, Inc.


_____          _____
Corporate Secretary                        Alan Quarterman, CEO

(Affix Corporate Seal)

Attested By:                                    Client:   CustomerLinx of North Carolina, Inc.

_____           By: _____
Corporate Secretary                           Alan Quarterman, CEO
[Affix Corporate Seal]

Attested By:                                    Client:   CustomerLinx of New York, Inc.

_____           By: _____
Corporate Secretary                           Alan Quarterman, CEO
[Affix Corporate Seal]

Attested By:                                    Client:   NexxLinx of Texas, Inc.

_____           By: _____
Corporate Secretary                           Alan Quarterman, CEO
[Affix Corporate Seal]

Attested By:                                    Client:   NexxLinx of Maine, Inc.

_____           By: _____
Corporate Secretary                           Alan Quarterman, CEO
[Affix Corporate Seal]

Attested By:                                    Client:   NexxLinx Global, Inc.

_____           By: _____
Corporate Secretary                           Alan Quarterman, CEO
[Affix Corporate Seal]

                                                Action:  Action Capital Corporation

                                    By: _____
                                                Patrick Thom, President

# GUARANTY OF VALIDITY

To induce Action Capital Corporation (hereinafter "ACTION") to continue to extend credit to NexxLinx Corporation, Inc., a Delaware Corporation, CustomerLinx of North Carolina, Inc., a North Carolina Corporation, CustomerLinx of New York, Inc. a New York Corporation, NexxLinx of Texas, Inc. a Delaware Corporation, NexxLinx of Maine, Inc. a Maine Corporation, and NexxLinx Global, Inc. a Georgia Corporation (hereinafter collectively, jointly and severally referred to as "CLIENT") pursuant to that certain Factoring and Security Agreement dated October 7, 2015 and that certain Earned and Unbilled Revenue Line of Credit Agreement dated October 7, 2015 and Amendment to said Agreement dated June 14, 2016 (hereinafter "AGREEMENT") between CLIENT and ACTION, as may hereafter be modified or amended, the undersigned, who by signing below confirms that there exists among the undersigned, CLIENT and ACTION adequate consideration for the undersigned to enter into this Guaranty of Validity, hereby undertakes and guarantees unconditionally and to the best of his knowledge that:

    (1)   all accounts, contract rights and other forms of obligation for the payment of money arising out of the sale by CLIENT of goods or the performance by CLIENT of services (hereinafter referred to as "ACCOUNTS") and submitted to Action for financing purposes shall be bona fide and existing obligations of CLIENT' account debtors to CLIENT and any moneys or other form of payment shall be timely and faithfully remitted to ACTION, even if such moneys or other form of payment shall be first remitted by such account debtors to CLIENT;

    (2)   all such ACCOUNTs shall be due and payable on the terms as stated thereon (and in the event that no terms are stated on such ACCOUNTs, the terms shall be deemed to be net 30 days), free whatsoever from any liens, claims, disputes, off-sets or indulgences by any other party whatsoever, including without limitation any account debtors of CLIENT, any governmental agencies or authorities, any other creditors of CLIENT, and any parties that have issued or caused to be issued on the account of CLIENT any bonds or sureties;

    (3)   CLIENT is the lawful owner of and has good and undisputed title to the ACCOUNTS submitted to ACTION for financing purposes and that no ACCOUNTS shall represent consigned, pay-when-sold, conditional or guaranteed sales or shall represent "progress" or "percentage-of-completion" billings.

If CLIENT or any other party, including without limitation any account debtors of CLIENT, shall breach any covenant or warranty set forth hereinabove, as such breach shall be determined by ACTION in its sole discretion, then the undersigned will UPON DEMAND by ACTION pay all amounts due to ACTION from CLIENT or such account debtors. The undersigned waives notice of any alteration or amendment of the AGREEMENT or other any agreement or agreements of any kind, whether written or oral, between CLIENT and ACTION. The undersigned consents that at any time any party liable for any obligation of CLIENT, including without limitation any co-guarantor, may be granted indulgences or released by ACTION and that ACTION may at any time release any collateral with respect to any obligation of CLIENT or co-guarantor. The undersigned agrees that no modification, renewal, extension or other change of any kind which may be made in the underlying guaranteed AGREEMENT will discharge the undersigned or constitute a waiver of any kind. It is not a requirement of the obligation of the undersigned, whose promise hereunder is joint and several with CLIENT, that CLIENT or any other guarantor or person be pursued for the indebtedness and the undersigned waives any demand by ACTION, its successors or assigns. The undersigned waives any and all notice of non-performance or non-payment. This Guaranty of Validity is a continuing guaranty and shall be binding upon the undersigned, his successors, and assigns and shall inure to the benefit of ACTION, its successors and assigns. This Guaranty of Validity shall be a Forward Guaranty in connection with a Debtor-In-Possession Loan and shall remain in full force and effect until all duties and obligations of CLIENT to ACTION have been performed, including the obligation to pay. No delay or failure on the part of ACTION in the exercise by ACTION of any right or remedy under this agreement shall operate as a waiver thereof and no single or partial exercise by ACTION of any right or remedy shall preclude any other future exercise thereof or the exercise of any other right or remedy. In the event that it is necessary to commence legal action to enforce the terms of this Guaranty of Validity, reasonable attorney's fees incurred on the part of ACTION in the enforcement of this Guaranty of Validity shall be payable to ACTION by the undersigned, along with interest at the maximum legal rate from the date of demand made upon the undersigned to pay the joint and several obligation of the undersigned and CLIENT. This Guaranty of Validity shall be governed by and construed in accordance with the laws of the State of Georgia and shall be binding upon the successors, assigns and representatives of the parties hereto. The undersigned and ACTION hereby agree that any suit, action, or proceeding arising out the subject matter hereof, or the interpretation, performance or breach of this Guaranty of Validity shall be instituted in the Superior Court of the State of Georgia located in Atlanta, Fulton County, Georgia (hereinafter, "Fulton County Superior Court"). The undersigned and ACTION hereby agree that Fulton County Superior Court is convenient to each party hereto and the undersigned and ACTION irrevocably submit to such jurisdiction, irrevocably agree to be bound by any judgment rendered thereby in connection with this Guaranty of Validity, and forever waive any and all objections to jurisdiction or venue that each party may have under the laws of the State of Georgia or otherwise in those courts in any such suit, action or proceeding. If any such proceeding is initiated in any other jurisdiction, the undersigned hereby waives any right to oppose any motion or application made by ACTION as a consequence of such proceeding having been commenced in a jurisdiction other than Fulton County Superior Court.

IN WITNESS WHEREOF, the undersigned has duly executed this Guaranty of Validity this _____ day of _____, 2016.

Guarantor's Signature: _____    Gurantor's Name: Alan Quarterman

SWORN TO AND SUBSCRIBED BEFORE ME THIS ___DAY OF_____, 2016.

PERSONALLY KNOWN ( ) OR PRODUCED IDENTIFICATION ( ) TYPE/ID NUMBER: _____

_____   _____   _____
NOTARY PUBLIC    COMM. EXP. DATE    COMMISSION NUMBER   [AFFIX NOTARIAL SEAL]