IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| NEXXLINX CORPORATION, INC., et al., | ) | PROPOSED |
| | ) | Jointly Administered Under |
| Debtors. | ) | CASE NO. 16-61225-pmb |
| | ) | |

DECLARATION OF D. ALAN QUARTERMAN
IN SUPPORT OF FIRST DAY APPLICATIONS AND MOTIONS

I, D. Alan Quarterman, declare under penalty of perjury as follows:

1.

I am the Chief Executive Officer of NexxLinx Corporation, Inc., a corporation duly organized under and existing pursuant to the laws of the State of Delaware and with its principal place of business in the State of Georgia, the Chief Executive Officer of NexxLinx Global, Inc., a corporation duly organized under and existing pursuant to the laws of the State of Georgia and with its principal place of business in the State of Georgia, the Chief Executive Officer of NexxLinx of New York, Inc., a corporation duly organized under and existing pursuant to the laws of the State of New York and with its principal place of business in the State of Georgia, the Chief Executive Officer of NexxLinx of Texas, Inc., a corporation duly organized under and existing pursuant to the laws of the State of Delaware and with its principal place of business in the State of Georgia, the Chief Executive Officer of CustomerLinx of North Carolina, Inc., a corporation duly organized under and existing pursuant to the laws of the State of North Carolina and with its principal place of business in the State of Georgia, and the Chief Executive Officer of Microdyne Outsourcing, Inc., a corporation duly organized under and existing pursuant to the laws of the State of Maryland and with its principal place of business in the State of Georgia. In

this capacity, I have obtained detailed knowledge of and experience with the business and financial affairs of NexxLinx Corporation, Inc. ("**NexxLinx**"); NexxLinx Global, Inc. ("**NGI**"); NexxLinx of New York, Inc. ("**NNY**"); NexxLinx of Texas, Inc. ("**NTX**"); CustomerLinx of North Carolina, Inc. ("**CNC**"); and Microdyne Outsourcing Inc. ("**MOI**"), debtors and debtors-in-possession (collectively, the "**Debtors**").

2.

I am authorized to submit this declaration in support of the Debtors' First Day Motions (as hereinafter defined). Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, information provided by employees under my supervision or professionals retained by the Debtors, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial affairs. Opinions regarding compliance with applicable statutes or rules are based upon advice of counsel. If I were called upon to testify, I would testify competently to the facts set forth herein.

## Background

3.

On June 28, 2016 (the "**Petition Date**"), the Debtors each filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors are authorized to operate their businesses as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

4.

NexxLinx and its co-debtor subsidiaries and affiliates are business process and marketing services outsourcing providers that design custom solutions for inbound and outbound customer

care, telemarketing and data collection, help desk, e-mail processing, live web and voice interaction, and back-end data processing. Their unique network-based service delivery platform allows the Debtors to optimize multichannel communications and deliver a consistent and compelling customer experience across multiple channels, devices, and media. With their cloud-based infrastructure, the Debtors provide a true Unified Desktop which allows intelligent call routing, network-to-desktop computer telephony integration (CTI), multimedia contact management and interactive voice response (IVR) tools.

5.

The Debtors provide a rich suite of services for customer retention, technical support, customer service, and sales conversion principally for customers in the following industries:

- Telecommunications
- Publishing
- E-Commerce
- Financial Services
- Government
- Technology
- Media/Entertainment
- Cable TV
- Electronic (video) Gaming
- Marketing Services

6.

The Debtors currently operate customer service call centers in Maine, North Carolina, New York, and Georgia and employ approximately 1100 employees.

7.

Pursuant to that certain Loan Agreement (as subsequently amended), Note, Security Agreement and related documents dated on or about October 16, 2013 (collectively, the "**BB&T Loan Documents**") by and between the Debtors and Branch Banking & Trust Company ("**BB&T**"), BB&T agreed to provide a seven million dollar ($7,000,000.00) secured line of

credit to the Debtors for its working capital needs (the "**BB&T Facility**"). The BB&T Facility matured on or about October 16, 2015. In approximately September 2015, BB&T notified the Debtors that it would not renew the BB&T Facility upon its maturity. Accordingly, the Debtors sought alternate financing from Action Capital Corporation ("**Action**"). On or about October 7, 2015, the Debtors entered into a Factoring and Security Agreement and an Earned and Unbilled Revenue Line of Credit Agreement (collectively, the "**Action Loan Documents**") pursuant to which Action provided factoring of the Debtors' accounts receivable, as well as a line of credit for earned but unpaid accounts receivable (the "**Action Facility**"). The Action Facility was insufficient to fully extinguish all the indebtedness owing pursuant to the BB&T Facility; therefore, with the consent of Action and BB&T, the Debtors entered into a promissory note for the remaining unpaid balance after application of the Action Facility proceeds to the BB&T Facility (the "**Remaining BB&T Note**") and Action and BB&T entered into an Intercreditor Agreement dated on or about October 8, 2015 (the "**Intercreditor Agreement**"). The Remaining BB&T Note is junior in priority and subordinate to the secured indebtedness owed to Action.

8.

In recent months, the Debtors have restructured their operations and relocated certain services previously performed overseas back to a facility in Georgia. This restructuring was required by one of the Debtors' main customers and, while the Debtors expect it to be profitable in the long term, the immediate costs associated with relocation and training have caused a significant cash shortfall. This coupled with several pending lawsuits and general changes in the industry has led the Debtors, after consultation with their advisors and directors, to conclude that it was in their best interest, and the interests of their creditors and employees, to seek protection under Chapter 11 of the Bankruptcy Code.

**The First Day Motions**

9.

In conjunction with their bankruptcy petitions, the Debtors filed the motions and applications listed on Exhibit A (collectively, the "**First Day Motions**"). I submit this declaration in support of the First Day Motions. I have reviewed each of the First Day Motions (including the exhibits and schedules attached thereto) and, to the best of my knowledge, I believe that the facts set forth therein are true and correct. Such representation is based upon information and belief, through my review of various materials and other information, and my experience and knowledge of the Debtors' operations and financial condition. If called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Motions.

10.

As a result of my first-hand experience, and through my review of various materials and other information, discussions with other of the Debtors' executives and discussions with outside advisors, I have formed opinions as to: (a) the necessity of obtaining the relief sought in the First Day Motions; (b) the importance of the relief sought in the First Day Motions for the Debtors to continue to operate effectively; and (c) the negative impact upon the Debtors of not obtaining the relief sought in the First Day Motions.

11.

As described more fully below, the relief sought in the First Day Motions will minimize the adverse effects of the Chapter 11 cases on the Debtors and ensure that the Debtors' reorganization efforts proceed as efficiently as possible and result in maximum recovery for

creditors, and I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate as debtors-in-possession.

## Motion for Joint Administration

12.

The Debtors are requesting that the Court jointly administer the six (6) related bankruptcy cases in order to promote judicial efficiency and to minimize the administrative expense to each of the Debtor's estates. NexxLinx Corporation, Inc., is the parent company of: (i) NexxLinx Global, Inc., (ii) NexxLinx of New York, Inc., (iii) NexxLinx of Texas, Inc., (iv) CustomerLinx of North Carolina, Inc., and (v) Microdyne Outsourcing, Inc., which are all subsidiaries of NexxLinx Corporation, Inc. and sister companies of each other. Joint administration and the maintenance of a single docket will streamline the bankruptcy process, minimize confusion among the creditor body from receipt of multiple pleadings for each Debtor and minimize the administrative expense to the Debtors' estates. Therefore, joint administration is in the best interest of the Debtors', their creditors and their estates.

## Motion of Debtors for Order Authorizing Debtors to File a Consolidated Mailing Matrix and a Consolidated List of 30 Largest Unsecured Creditors (the "Consolidation Motion")

13.

The Debtors are comprised of six affiliated companies which the Debtors are seeking to have jointly administered in the Chapter 11. There are approximately 250 creditors and other parties in interest in these cases, and there may be potential for confusion and/or overlap regarding creditor obligations. Given the circumstances, the Debtors submit that it is appropriate for them to file a consolidated mailing matrix and a consolidated list of their 30 largest unsecured creditors. The consolidated mailing matrix and the consolidated list of 30 largest unsecured

creditors will provide good and sufficient notice to all creditors and parties in interest in an efficient manner.

### Motion of the Debtors for Approval of Notice Procedures (the "Notice Procedures Motion")

14.

Hundreds of creditors and parties in interest may be technically entitled to receive notice in these cases. To require the Debtors to provide notice of all pleadings and other papers filed in these cases to these parties in interest would be extremely burdensome and costly to the Debtors' estates as a result of the photocopying, postage, and other expenses associated with such large mailings. Accordingly, the Debtors believe that the notice procedures requested in the Notice Procedures Motion are in the best interests of their estates and creditors, and will not prejudice the rights of any party in interest in these cases.

### Motion for Establishment of Procedures for Monthly Compensation and Reimbursement of Expenses of Professionals (the "Compensation Procedures Motion")

15.

The Debtors believe that the relief requested in this Motion will streamline the professional compensation process and enable the Court and all other parties to monitor the professional fees incurred in this case more effectively.

16.

Briefly stated, the requested procedures would permit each Professional to serve upon counsel for the Debtors, and the Office of the United States Trustee a statement of fees and expenses incurred by the Professional during the preceding month (a "**Monthly Statement**"). Subject to the terms and conditions of any order granting the DIP Financing Motion (defined below), the Debtors would be authorized to pay each Professional the fees and expenses

requested in the Monthly Statement in the absence of an objection received within ten (10) days after service of the Monthly Statement. All fees and expenses of each Professional, whether or not paid or objected to in connection with a Monthly Statement, would remain subject to review and approval by the Court in connection with interim and final fee applications under Sections 330 and 331 of the Bankruptcy Code.

17.

The Debtors propose that these procedures also apply to members of any official committee appointed in this case seeking reimbursement of expenses pursuant to Section 503(b)(3)(F) of the Bankruptcy Code. However, these procedures will not apply to professionals retained in the ordinary course of business pursuant to a separate motion.

**Motion for Authority (I) to Continue Pre-Petition Insurance Programs and (II) to Pay Pre-Petition Premiums and Related Obligations (the "Insurance Motion")**

18.

In connection with the operation of their business, the Debtors maintain various insurance policies and programs (collectively, the "**Insurance Programs**") through several different insurance carriers (the "**Insurance Carriers**"). Exhibit A to the Insurance Motion is a summary of the Debtors' various insurance policies, including a list of the Insurance Carriers, policy terms, and the aggregate annual premiums due thereunder.

19.

The Debtors' Insurance Programs include liability and property insurance policies, which provide the Debtors with insurance coverage relating to, among other things, general liability, workers' compensation, business automobile, and property.

20.

The Debtors are required to pay premiums based upon a fixed rate established by the Insurance Carriers. The premiums for these policies are determined annually and are either (1) directly billed to the Debtors in monthly installments or (2) financed by the Debtors pursuant to a premium finance agreement.

21.

As of the Petition Date, the Debtors believe that they are current on pre-petition premiums with respect to the Insurance Programs. To the extent there is an outstanding insurance policy premium for the pre-petition period, however, the Debtors seek authority to pay the pre-petition premium in the ordinary course and as such payments are necessary to keep the Insurance Programs in force.

22.

It is essential to the continued operation of the Debtors' business and their efforts to reorganize that the Insurance Programs be maintained on an ongoing and uninterrupted basis. The failure to pay premiums when due may affect the Debtors' ability to renew the insurance policies. If the insurance policies are allowed to lapse, the Debtors could be exposed to substantial liability for damages resulting to persons and property of the Debtors and others, which exposure could have an extremely negative impact on the Debtors' ongoing business operations. Such a result would also place at risk the estates' assets that are necessary to satisfy secured and unsecured claims.

**Motion for Order Authorizing Payment of Pre-Petition Wages, Payroll Taxes, Certain Employee Benefits, Related Expenses and Other Compensation to Employees and Independent Contractors (the "Wages and Benefits Motion")**

23.

As of the Petition Date, the Debtors employed on a combined basis approximately 1100 employees and independent contractors.

24.

The Debtors have incurred certain pre-petition obligations that remain unpaid as of the Petition Date because they accrued, either in whole or in part, prior to the Petition Date. Even though arising prior to the Petition Date, these obligations (collectively, the "**Obligations**") will become due and payable in the ordinary course of the Debtors' businesses on and after the Petition Date. These obligations can generally be categorized as follows: (i) wages, salaries, and other compensation; (ii) payroll taxes; (iii) 401(k) defined contribution plan obligations; (iv) health and welfare benefits; and (v) other benefits.

25.

Pursuant to Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, a debtor's employees' claims for "wages, salaries, or commission, including vacation, severance, and sick leave pay" earned within one hundred eighty (180) days before the Petition Date, and claims against the Debtors for contributions to employee benefit plans arising from services rendered within one hundred and eighty (180) days before the Petition Date, are afforded unsecured priority status to the extent the claims do not exceed $12,850. 11 U.S.C. §§ 507(a)(4)–(5). The Debtors are not seeking authority to pay any Obligations which exceed the statutory limit provided in Sections 507(a)(4) and 507(a)(5), at this time.

26.

Any delay in paying the Obligations will adversely impact the Debtors' relationship with their Employees and will irreparably impair the morale, dedication, confidence, and cooperation of the very people upon whom the Debtors rely in order for their businesses to be successful. The Debtors must have the support of their employees in order for the Debtors to maximize the going concern value of their assets. At this early stage, the Debtors simply cannot risk the substantial damage to their businesses that would inevitably result from a decline in employees' morale attributable to the Debtors' failure to pay previously earned wages, salaries, benefits, and other similar items.

27.

Moreover, absent an order granting the relief requested in this Motion, the Debtors' employees will suffer undue hardship and, in many instances, serious financial difficulties, as the amounts in question are needed to enable certain of the employees to meet their own personal financial obligations. The stability of the Debtors will thus be undermined, perhaps irreparably, by the possibility that otherwise loyal employees will seek other employment alternatives.

**Motion for an Interim Order (1) Authorizing Debtors to Obtain Financing, Grant Security Interests and Accord Priority Status; (2) Authorizing Debtors to Use Cash Collateral; (3) <u>Giving Notice of Final Hearing; and (4) Modifying Automatic Stay</u>**

28.

The Debtors do not have sufficient available sources of working capital to carry on the operation of their businesses without DIP Financing (as defined in the DIP Financing Motion). The Debtors had an accounts receivable factoring and earned but unbilled revenue line of credit arrangement in place with Action prior to the Petition Date and must be able to obtain the same level of credit post-petition to enable continued operations. Action has agreed to provide DIP

Financing to the Debtors post-petition and allow use of cash collateral on economic terms substantially similar to the pre-petition Action Loan Documents. In the absence of such financing, the operation of the Debtors' businesses would not be possible and serious and irreparable harm to the Debtors and their estates would occur.

29.

Prior to the Chapter 11 filing, financial advisors for the Debtors contacted potential lenders, seeking alternative financing sources. The DIP Financing proposed by the DIP Lender represents the best alternative available to the Debtors.

30.

The Debtors have exercised sound business judgment in determining that a post-petition credit facility is appropriate and have satisfied the legal prerequisites to borrow under the DIP Financing. The terms of the DIP Financing are fair and reasonable, are in the best interests of the Debtors' estates and have been negotiated in good faith and at arm's length. Without the liquidity provided by the DIP Financing, the Debtors will be unable to pay vendors, employees and other constituencies that are essential to the orderly operation of their businesses. The Debtors' management exercised their best business judgment in negotiating the DIP Financing that is presently before the Court.

31.

For these reasons, access to credit under the DIP Financing is critical. The Debtors cannot wait for the beneficial effects of the DIP Financing; any substantial delay could have the same impact as denial of the Motion. The Debtors' need for access to the DIP Financing therefore is immediate.

32.

A proposed Interim Order is attached as an exhibit to the DIP Financing Motion and is incorporated herein by reference. Pending the Final Hearing (as defined in the DIP Financing Motion), the Debtors require immediate financing under the terms and conditions set forth in the proposed Interim Order for, among other things, financing their operations and other working capital needs. It is essential that the Debtors immediately stabilize their operations and resume paying for ordinary, post-petition operating expenses, as well as the pre-petition expenses approved in the first day orders, to minimize the damage occasioned by their cash flow problems.

33.

Absent immediate financing, the Debtors will be unable to pay ongoing operational expenses. Consequently, if interim relief is not obtained, the Debtors' assets will be immediately and irreparably jeopardized, to the detriment of their estates, their creditors and other parties in interest.

### Motion for Order Shortening Notice and Expediting Hearing on First-Day Motions (the "Expedited Hearing Motion")

34.

The relief requested in the Expedited Hearing Motion is necessary to ensure that there is no interruption in the services being provided by the Debtors or damage to the Debtors' businesses or the value of their assets. To require the Debtors to comply with otherwise applicable notice requirements would cause immeasurable harm to the Debtors' ability to efficiently and effectively manage their operations, would create disruptions in the timely payment of obligations, and would threaten the Debtors' existence in light of their current

condition. Accordingly, the Debtors believe that the relief requested in the Expedited Hearing Motion is warranted.

## Conclusion

Accordingly, for the reasons stated herein, and in each of the First Day Motions, I respectfully request that each of the First Day Motions be granted in its entirety, together with such further relief as the Court deems just and proper.

*[Signature on Next Page]*

Executed this 25th day of June, 2016.

                                                    _____
D. Alan Quarterman, Chief Executive Officer
NexxLinx Corporation, Inc.,
NexxLinx Global, Inc.,
NexxLinx of New York, Inc.,
NexxLinx of Texas, Inc.,
CustomerLinx of North Carolina, Inc., and
Microdyne Outsourcing, Inc..

*Penalty for making a false statement or concealing property:* Fine of up to $500,000 or imprisonment for up to 5 years or both. 18 U.S.C. §§ 152 and 3571.

# EXHIBIT A
## INDEX OF FIRST DAY MOTIONS

| | |
|---|---|
| 1. | Motions for Joint Administration |
| 2. | Motion of Debtors for Order Authorizing Debtors to File a Consolidated Mailing Matrix and a Consolidated List of 30 Largest Unsecured Creditors |
| 3. | Motion of the Debtors for Approval of Notice Procedures |
| 4. | Motion for Establishment of Procedures for Monthly Compensation and Reimbursement of Expenses of Professionals |
| 5. | Motion for Authority (I) to Continue Pre-Petition Insurance Programs and (II) to Pay Pre-Petition Premiums and Related Obligations |
| 6. | Motion for Order Authorizing Payment of Pre-Petition Wages, Payroll Taxes, Certain Employee Benefits, Related Expenses, and Other Compensation to Employees and Independent Contractors |
| 7. | Motion for an Interim Order (1) Authorizing Debtors to Obtain Financing, Grant Security Interests and Accord Priority Status; (2) Authorizing Debtors to Use Cash Collateral; (3) Giving Notice of Final Hearing; and (4) Modifying Automatic Stay |
| 8. | Motion for Order Shortening Notice and Scheduling Expedited Hearing on First-Day Motions |
| 9. | Declaration of D. Alan Quarterman in Support of First Day Applications and Motions |