**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| NEXXLINX CORPORATION, INC., et al., | ) | Jointly Administered Under |
| | ) | CASE NO. 16- 61225-PMB |
| | ) | |
| Debtors. | ) | |
| | ) | |
| | ) | |

---

**SECOND AMENDED DISCLOSURE STATEMENT TO ACCOMPANY
DEBTORS' SECOND AMENDED PLAN OF REORGANIZATION**

---

**SCROGGINS & WILLIAMSON, P.C.**

**J. Robert Williamson
Georgia Bar No. 765214
Ashley Reynolds Ray
Georgia Bar No. 601559
One Riverside
4401 Northside Parkway
Suite 450
Atlanta, GA 30327
404.893.3880**

**ATTORNEYS FOR NEXXLINX CORPORATION, INC., ET AL.
DEBTORS AND DEBTORS-IN-POSSESSION**

**Dated: February 10, 2017**

# ARTICLE I
# INTRODUCTION

This disclosure statement ("**Disclosure Statement**") is submitted by Nexxlinx Corporation, Inc., ("**Nexxlinx**"); NexxLinx Global, Inc. ("**NGI**"); NexxLinx of New York, Inc. ("**NNY**"); CustomerLinx of North Carolina, Inc. ("**CNC**"); Microdyne Outsourcing Inc. ("**MOI**"), NexxLinx of Texas, Inc. ("**NTX**"), and NexxPhase, Inc. ("**Nexxphase**"), debtors and debtors-in-possession in the above-styled, jointly administered Chapter 11 cases (collectively, the "**Debtors**"), to provide information to all of their known creditors and equity interest holders about the Second Amended Plan of Reorganization ("**Plan**") filed by the Debtors.  The purpose of the Disclosure Statement is to provide information of a kind and in detail sufficient to enable Creditors and Interest Holders in certain impaired Classes to make an informed judgment regarding whether to accept or reject the Plan and to inform Holders of Claims and Interests in the unimpaired Classes of their treatment under the Plan.

The Debtors believe that the Plan provides Creditors with the greatest possible value that can be realized on their respective claims, and that the Plan is in the best interests of all Creditors. **The Official Committee of Unsecured Creditors (the "Committee") appointed on July 11, 2016 to act as a fiduciary for the interests of all unsecured creditors in these Chapter 11 Cases has reviewed the Plan, is confident that the Plan provides the most viable option to maximize the return to unsecured creditors and supports confirmation of the Plan.** If the Plan is not confirmed by the Bankruptcy Court, the Debtors may be forced to convert these Chapter 11 cases to cases under Chapter 7 of the Bankruptcy Code.  The Debtors believe that, in the event the cases were converted to Chapter 7 of the Bankruptcy Code, Creditors would receive substantially smaller distributions, if any, than are provided for in the Plan.  **Consequently, the Debtors seek confirmation of the Plan and both the Debtors and the Committee urge all Creditors and Interest Holders to vote to accept the Plan.**

Unless otherwise defined herein, capitalized terms used herein shall have the same meaning ascribed to them in the Plan.

## 1.1    Disclaimer

**ALL CREDITORS AND INTEREST HOLDERS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS AND THE DISCLOSURE STATEMENT AS A WHOLE.**

**THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, EVENTS IN THE DEBTORS' CHAPTER 11 CASES, AND FINANCIAL INFORMATION.  ALTHOUGH THE DEBTORS BELIEVE THAT THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH**

THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.   FOR THE FOREGOING REASONS, AS WELL AS THE COMPLEXITY OF THE DEBTORS' FINANCIAL MATTERS, THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY INACCURACY OR OMISSION.   THE FINANCIAL DATA SET FORTH HEREIN, EXCEPT AS OTHERWISE SPECIFICALLY NOTED, HAS NOT BEEN SUBJECTED TO AN INDEPENDENT AUDIT.

NEITHER THE DEBTORS NOR THE BANKRUPTCY COURT HAS AUTHORIZED THE COMMUNICATION OR REPRESENTATION BY ANY PERSON OR ENTITY (INCLUDING ANY OF THE DEBTORS' AGENTS, OFFICERS, DIRECTORS, EMPLOYEES, ACCOUNTANTS, FINANCIAL ADVISORS, ATTORNEYS OR AFFILIATES) CONCERNING THE DEBTORS, THEIR OPERATION, FUTURE REVENUE, PROFITABILITY, VALUE OR OTHERWISE, OTHER THAN AS SET FORTH IN THE DISCLOSURE STATEMENT.   THE DEBTORS MAKE NO SUCH REPRESENTATIONS OTHER THAN THAT THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT IS BELIEVED TO BE CORRECT AT THE TIME OF THE FILING OF THE DISCLOSURE STATEMENT.   ANY INFORMATION, REPRESENTATION OR INDUCEMENT MADE TO SECURE OR OBTAIN ACCEPTANCES OR REJECTIONS OF THE PLAN THAT ARE OTHER THAN, OR ARE INCONSISTENT WITH, THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY ANY PERSON IN ARRIVING AT A DECISION TO VOTE FOR OR AGAINST THE PLAN.   ANY SUCH ADDITIONAL INFORMATION, REPRESENTATIONS AND INDUCEMENTS SHOULD BE IMMEDIATELY BROUGHT TO THE ATTENTION OF THE PLAN PROPONENTS.

EXCEPT FOR HISTORICAL INFORMATION, ALL THE STATEMENTS, EXPECTATIONS, AND ASSUMPTIONS, INCLUDING EXPECTATIONS AND ASSUMPTIONS CONTAINED IN THIS DISCLOSURE STATEMENT, ARE FORWARD LOOKING STATEMENTS THAT INVOLVE A NUMBER OF RISKS AND UNCERTAINTIES.   ALTHOUGH THE DEBTORS HAVE USED THEIR BEST EFFORTS TO BE ACCURATE IN MAKING THESE FORWARD-LOOKING STATEMENTS, IT IS POSSIBLE THAT THE ASSUMPTIONS MADE BY THE DEBTORS MAY NOT MATERIALIZE.   IN ADDITION, OTHER IMPORTANT FACTORS COULD AFFECT THE PROSPECT OF RECOVERY TO CREDITORS, INCLUDING, BUT NOT LIMITED TO, THE CONTINGENCIES NECESSARY TO FULLY FUND THE PLAN AND THE AMOUNT OF ALLOWED CLAIMS.

## 1.2    Disclosure Statement

This Disclosure Statement sets forth certain information regarding the Debtors' pre-petition activity.  This Disclosure Statement also describes the Plan, alternatives to the Plan, effects of confirmation of the Plan, and the manner in which distributions will be made under the

Plan.  In addition, the Disclosure Statement discusses the confirmation process and voting procedures that Holders of Claims in impaired Classes must follow for their votes to be counted.

When and if confirmed by the Bankruptcy Court, the Plan will bind the Debtors and all Holders of Claims against, and Interests in, the Debtors, whether or not they are entitled to vote or did vote on the Plan and whether or not they receive or retain any Distributions or Property under the Plan.  Thus, all Claimants are encouraged to read this Disclosure Statement carefully.  In particular, Holders of Impaired Claims who are entitled to vote on the Plan are encouraged to read this Disclosure Statement, the Plan, and any exhibits to the Plan or Disclosure Statement, carefully and in their entirety before voting to accept or reject the Plan.

### 1.3    Summary of Distributions Under the Plan

The chart below summarizes the treatment, timing and percentage distributions to each Class under the Plan.   For a further discussion, see Article IV below.

| Class No. | Claim/Interest | Treatment of Claim/Interest | Estimated Amount and Projected Recovery | Voting Rights |
|---|---|---|---|---|
| N/A | Administrative Expense Claims | Each holder of an Allowed Administrative Expense Claim (other than Postpetition Trade Claims), will be paid in full and in Cash, without interest, on or as soon as practicable after the later of (a) the Effective Date, or (b) the date after such Claim is Allowed; or (c) as the holder may otherwise agree. | Estimated Amount: under $100,000.00<br><br>Estimated Recovery: 100% of Allowed Amount | Unimpaired and not entitled to vote |
| N/A | Priority Tax Claims | Each holder of an Allowed Priority Tax Claim, will be paid in Cash in full on the Effective Date or as soon thereafter as is reasonably practicable, but in no event later than the end of five (5) years from the Petition Date through regular quarterly installments in Cash through and including the date such Allowed Priority Tax Claim is paid in full.  If paid over time, | Estimated Amount: $117,000.00<br><br>Estimated Recovery: 100% of Allowed Amount | Unimpaired and not entitled to vote |

| Class No. | Claim/Interest | Treatment of Claim/Interest | Estimated Amount and Projected Recovery | Voting Rights |
|---|---|---|---|---|
| | | the Holder shall receive interest at the Section 6621 Interest Rate (or the applicable statutory rate under state law). | | |
| 1 | Priority Claims | Each holder of an Allowed Priority Claim, will be paid in full and in Cash, without interest, on or as soon as practicable after the later of (a) the Effective Date, or (b) the date after such Claim is Allowed; or (c) as the holder may otherwise agree. | Estimated Amount: $0.00 Estimated Recovery: 100% of Allowed Amount | Unimpaired and not entitled to vote |
| 2 | Post-Petition Trade Claims | All Allowed Post-Petition Trade Claims shall be assumed and paid by the Reorganized Debtor in the normal course of business according the terms of any agreement or course of dealing between the Holder and the Debtors. | Estimated Amount: $500,000.00 Estimated Recovery: 100% of Allowed Amount | Unimpaired and not entitled to vote |
| 3 | Secured Claim of Action Capital | Action Capital's Class 3 Claim shall be paid by the Debtors as follows: (a) the Pre-Petition Loans shall be repaid from operating revenues of the Debtors in accordance with the terms of the Pre-Petition Loan Documents, and (b) the DIP Financing shall be paid in accordance with the terms of the Post-Petition Loan Documents. | Estimated Amount: $3,700,000.00 Estimated Recovery: 100% of Allowed Amount | Impaired and entitled to vote |

| Class No. | Claim/Interest | Treatment of Claim/Interest | Estimated Amount and Projected Recovery | Voting Rights |
|---|---|---|---|---|
| 4 | Secured Claim of BB&T | BB&T's Class 4 Claim shall be paid by the Reorganized Debtor in accordance with Schedule 5.06 attached to the Plan for a total of approximately $549,857.36. | Estimated Amount: $549,857.36<br><br>Estimated Recovery: 100% of Allowed Amount | Impaired and entitled to vote |
| 5 | Secured Claim of Susquehanna Commercial Finance, Inc. | Susquehanna's Class 5 Claim shall be paid in thirty-six equal monthly payments of $2,194.00 for a total Allowed Secured Claim of $78,984.00. Susquehanna shall have an allowed deficiency claim in the amount of $55,000.00 which shall be treated as a Class 9 Claim. | Estimated Amount: $ 78,984.00<br><br>Estimated Recovery: 100% of Allowed Secured Claim | Impaired and entitled to vote |
| 6 | Secured Claim of Ascentium Capital, LLC | Ascentium's Class 6 Claim shall be paid in twenty-three equal monthly payments of $615.05 for a total Allowed Secured Claim of $14,146.15.   Any remaining claim, to the extent Allowed, will be treated as a Class 9 Claim. | Estimated Amount: $14,146.15<br><br>Estimated Recovery: 100% of Allowed Secured Claim | Impaired and entitled to vote |
| 7 | Secured Claim of SHI International Corporation | SHI's Class 7 Claim shall be paid in thirteen equal monthly payments of $1,110.93 for a total Allowed Secured Claim of $14,442.13.   Any remaining claim, to the extent Allowed, will be treated as a Class 9 Claim. | Estimated Amount: $14,442.13<br><br>Estimated Recovery: 100% of Allowed Secured Claim | Impaired and entitled to vote |
| 8 | Other Secured Claims | Class 8 Secured Claims shall be paid at the Reorganized Debtor's option, as follows (i) by the transfer of the collateral | Estimated Amount: $0.00<br>Estimated Recovery: 100% of Allowed Secured Claim | Impaired and entitled to vote |

| Class No. | Claim/Interest | Treatment of Claim/Interest | Estimated Amount and Projected Recovery | Voting Rights |
|---|---|---|---|---|
| | | securing such Class 8 Claim, (ii) by the sale of the collateral securing such Allowed Secured Claim and the payment of the net sale proceeds in an amount equal to the value of such Holder's interest in the collateral, or (iii) by payment of Cash in an amount equal to the value of such holder's interest in the collateral. | | |
| 9 | Unsecured Claims | The Reorganized Debtor will contribute a total of $5M over the life of the Plan to the Creditor Trust. This is comprised of scheduled Plan payments plus contingent annual "profit sharing" payments to Class 9 Claimants. Holders of an Allowed Unsecured Claim in Class 9 shall receive payment of a proportionate share of the funds in the Creditor Trust equal to that Holder's Pro Rata Share. | Estimated Amount: $6,500,000.00 to $8,000,000.00<br><br>Estimated Recovery: 63% to 77% (plus any additional amounts which may be received from Creditor Trust Assets) | Impaired and entitled to vote |
| 10 | Convenience Class Claims<br><br>(Unsecured Claims of $5,000.00 or less) | Holders of an Allowed Class 10 Claim shall receive a one-time Distribution from the Creditor Trust in an amount equal to twenty percent (20%) of such Holder's Allowed Claim in full and final satisfaction of such Allowed Claim. | Estimated Amount: $140,000.00<br><br>Estimated Recovery: 20% | Impaired and entitled to vote |
| 11 | Allowed Equity Interests | Holders of Allowed Equity Interests shall not receive or retain any property | Estimated Recovery: $0.00 | Deemed to reject and not |

| Class No. | Claim/Interest | Treatment of Claim/Interest | Estimated Amount and Projected Recovery | Voting Rights |
|---|---|---|---|---|
| | | under the Plan, and such Equity Interests will be cancelled. | | entitled to vote |

The liability estimates outlined in the above chart are estimates only.   The projected Administrative Expense Claims do not include estimated professional fees to be incurred by the Debtors or the Committee through a projected Effective Date of May 1, 2017.   It is assumed that operating expenses will be paid in the normal course of business prior to the Effective Date and that a substantial portion of the professional fees and expenses to be incurred in the future will be paid on a monthly basis under the interim compensation arrangement approved previously in the Reorganization Case, subject to final review and approval by the Bankruptcy Court.

**1.4     Notice of Substantive Consolidation**

**PLEASE TAKE NOTICE THAT THE PLAN PROVIDES FOR SUBSTANTIVE CONSOLIDATION OF THE DEBTORS' ASSETS AND LIABILITIES INTO A SINGLE ESTATE.   THE PLAN PROVIDES THAT THE ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE APPROVAL, PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE, OF THE SUBSTANTIVE CONSOLIDATION OF NEXXLINX; NGI; NNY; CNC; MOI, AND NEXXPHASE, AND THEIR BANKRUPTCY ESTATES FOR ALL PURPOSES RELATED TO CLAIMS AND DISTRIBUTION OF ASSETS UNDER THE PLAN.   AS A RESULT, ON AND AFTER THE CONFIRMATION DATE (I) ALL ASSETS AND LIABILITIES OF ANY OF THE DEBTORS AND THE ESTATES SHALL BE TREATED AS THOUGH THEY WERE MERGED WITH AND INTO NEXXLINX CORPORATION, INC., WHICH SHALL BECOME THE REORGANIZED DEBTOR; (II) NO DISTRIBUTIONS SHALL BE MADE UNDER THE PLAN ON ACCOUNT OF ANY CLAIM HELD BY ANY OF THE DEBTORS AGAINST ANY OTHER DEBTOR PARTY; (III) ALL GUARANTEES OF ANY DEBTOR OF THE OBLIGATIONS OF ANY OTHER DEBTOR SHALL BE ELIMINATED; AND (IV) EACH AND EVERY CLAIM AND PROOF OF CLAIM AGAINST ANY OF THE DEBTORS SHALL BE DEEMED ONE CLAIM OR PROOF OF CLAIM AGAINST ALL OF THE DEBTORS AND A SINGLE OBLIGATION OF THE CONSOLIDATED REORGANIZED DEBTOR ON AND AFTER THE CONFIRMATION DATE.   ADDITIONALLY, THE SUBSTANTIVE CONSOLIDATION EFFECTED PURSUANT TO THE PLAN SHALL NOT CREATE DEFENSES TO ANY AVOIDANCE ACTION OR CAUSE OF ACTION OR REQUIREMENTS FOR ANY THIRD PARTY TO ESTABLISH MUTUALITY IN ORDER TO ASSERT A RIGHT OF SETOFF.   FOR THE REASONS SET FORTH IN GREATER DETAIL BELOW IN ARTICLE V, SECTION 5.1 OF THE DISCLOSURE STATEMENT, THE PLAN PROPONENTS BELIEVE THAT THE REQUIREMENTS FOR SUBSTANTIVE CONSOLIDATION ARE MET IN THESE BANKRUPTCY CASES**

**AND THAT SUBSTANTIVE CONSOLIDATION IS NECESSARY TO ENSURE EQUITABLE TREATMENT OF CREDITORS.**

**1.5    Background**

On June 28, 2016 (or in the case of NexxPhase, July 14, 2016) (the "**Petition Date**"), the Debtors each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division (the "**Bankruptcy Court**").   Upon filing for Chapter 11 protection, the Debtors each became a "Debtor-in-Possession" under the Bankruptcy Code and have acted in that capacity since that time.

The Debtors have filed simultaneously with this Disclosure Statement their Plan of Reorganization.  The Debtors, as proponents of the Plan, distribute this Disclosure Statement together with the Plan in order to solicit acceptances of the Plan.  This introductory section is qualified in its entirety by the detailed explanations that follow and the provisions of the Plan.   In the event of conflict between anything stated in this Disclosure Statement and the Plan, the terms of the Plan will control.

**1.6    Solicitation of Acceptances**

Pursuant to a Court Order dated _____, 2017, creditors and interest holders may accept or reject the Plan no later than _____, **2017** (the "**Voting Deadline**").  A ballot with which to indicate and file an acceptance or rejection of the Plan has been provided to you. You must complete and file your ballot on or before the Voting Deadline in order for your vote to count.   Any ballot that is executed by the holder of any Allowed Claim or Allowed Interest but does not indicate acceptance or rejection of the Plan shall be deemed to have accepted the Plan. Any other ballot not filed in accordance with the filing instructions on the ballot pertaining to the Plan shall not be counted for voting purposes.

*THE DEBTORS HEREBY SOLICIT APPROVAL OF THE PLAN BY THEIR CREDITORS AND INTEREST HOLDERS.   THE DEBTORS BELIEVE THE PLAN PROVIDES THE OPTIMUM RETURN TO CREDITORS AND THAT LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE WOULD RESULT IN A REDUCED DISTRIBUTION TO UNSECURED CREDITORS.   THE DEBTORS URGE EACH CREDITOR AND INTEREST HOLDER TO VOTE IN FAVOR OF THE PLAN BY MARKING THE "ACCEPTS" BOX ON THE ENCLOSED BALLOT AND FILING IT WITH THE COURT ON OR BEFORE THE VOTING DEADLINE.*

**ARTICLE II**
**HISTORY OF THE DEBTORS AND EVENTS LEADING UP TO CHAPTER 11**

**2.1    History of the Debtors**

Nexxlinx is a Delaware corporation with its headquarters in Atlanta, Georgia.   NGI, NNY, NTX, NexxPhase, CNC, and MOI are all wholly-owned subsidiaries of Nexxlinx.   Collectively, the Debtors operate customer service call centers in Georgia, North Carolina, New York, and Maine and employ approximately 1100 employees.   The Debtors have six major clients, with one representing approximately seventy percent (70%) of their business.

Customerlinx, the predecessor to Nexxlinx, was founded in 1998 by a group of individual investors to provide customer calling services for AT&T.    Shortly thereafter, SAC Capital Advisors, a Connecticut investment firm ("**SAC**"), invested over $30.0 million for growth and for selected acquisitions.    In 2001, Five Paces Ventures ("**Five Paces**") invested $3.0 million as part of a round of financing led by SAC.    During 2002 and 2003, Customerlinx lost the AT&T relationship as well as another critical client resulting in significant financial struggles. In 2003, Five Paces Ventures acquired 85% of Customerlinx from SAC for $2.0 million, with SAC owning the remainder. To date, Five Paces has invested a total of approximately $8.0 million through debt and equity securities.    In November 2012, the name was changed from Customerlinx to Nexxlinx.

Customerlinx sought to grow its business and expand its footprint with the acquisition of NNY in 2001 and CNC in 2005.    Then, in 2009, Nexxlinx made its largest investment in NexxPhase, Inc., its wholly owned subsidiary which was formed to provide an in–the-cloud solution for the operation and applications used in the call center business. Prior to the internet, call center companies bought large legacy based hardware to operate the functions of the call center. Advances in technology allowed call centers to avoid the cost and inefficiency of these legacy systems by utilizing web-based systems.    Although there were a number of commercially available products, Nexxlinx chose to develop its own software platform, principally for two reasons.    First, Nexxlinx felt it could develop products and applications that were unique to its customers, thus helping to solidify the relationship. Secondly, and more importantly, Nexxlinx believed that if it could sell this technology to other call centers, it could greatly enhance the overall market value of the Nexxlinx.

In February, 2011, Nexxlinx acquired the operations of MOI from L-3 Communications which operated a contact center in Orono, Maine.    Nexxlinx paid $115,000 plus future payments based on EBIDA performance for 2011 and 2012.    This was a strategic acquisition that not only added significant revenue, but also improved margins as it gave the Debtors greater capacity to handle work for its largest customer, and the ability to spread costs over multiple sites. In addition, the MOI acquisition brought with it several new clients. The additional volume greatly increased Nexxlinx's financial performance.    As a result of this improved financial condition, the company embarked on a number of new business opportunities to try to raise the overall value of the corporate enterprise.

Nexxlinx invested heavily into Nexxphase and aggressively ramped up the growth of Nexxphase in anticipation of a large contract with the State of Georgia to provide software licenses and seats. Nexxphase grew its staff to over 20 with people in research and development, sales and marketing and operations with a monthly cost of approximately $250,000. Unfortunately, soon after signing the agreement, the State of Georgia revised its strategy and reverted back to a case worker model that reduced seat count from approximately 1500 seats to 300 seats over a five month period. As a result, revenue from the contract was approximately $600,000 per month, far short of the $1.0 million per month that Nexxphase had been anticipating. Nexxphase was slow to reduce headcount, hopeful that it could re-work the contract. By the end of 2014, Nexxlinx had invested approximately $4.0 million in Nexxphase and ultimately lost an undetermined amount of money. In August 2015, Nexxphase was sold to Contact Solutions Inc. ("**CSI**") in a transaction that provided approximately $2.0 million in net proceeds.

- 10 -

In 2012, Nexxlinx entered into a joint venture with General Larry Ellis (ret.) to form VetConnexx, a disabled-veteran owned company established to recruit and train disabled veterans to work as agents in customer care call centers.   General Ellis owned 51% of VetConnexx and Nexxlinx owned the remaining 49%.   The idea was compelling and many corporations supported hiring veterans, even if it meant paying a premium above the cost of traditional call centers.   By the end of 2013, Nexxlinx had invested $163,000 in VetConnexx and loaned an additional $521,000.   Unfortunately, Nexxlinx and General Ellis were unable to agree on operating policies and principles, and the parties agreed to disband the relationship. VetConnexx is still operating, but the collectability of the loan advances is doubtful.

In 2013, Nexxlinx entered into another partnership designed to expand its business footprint.   Nexxlinx acquired a 19% ownership interest in Savilinx LLC, a female-owned contact call services company, with the hope that it would win diversity contracts. Savilinx remains in operation and is moderately profitable.

Also in 2013, Nexxlinx advanced working capital to Perfetta LLC, a minority owned business. As with Savilinx, Nexxlinx hoped that Perfetta would be able to attract corporations desiring to use contact centers to meet diversity guidelines. Nexxlinx invested heavily in this strategy, advancing significant sums to Perfetta and betting heavily on Perfetta's CEO and his ability to bring diversity business. By the end of 2014, Nexxlinx had advanced over $1.3 million to Perfetta.   In addition to repayment of its advances, Nexxlinx expected Perfetta to subcontract a significant portion of its diversity business to Nexxlinx.   Unfortunately, Perfetta was never able to get off the ground and the relationship resulted in no new business to Nexxlinx.   By the summer of 2015, Perfetta was performing less than $50,000 per month in volume and the relationship ended by September 1, 2015. The collectability of remaining advances to Perfetta is highly doubtful.

## 2.2    Events Leading Up To Chapter 11

In the spring of 2015, the Debtors lost a significant customer, NCS Pearsons, Inc., ("**Pearsons**") due to complaints regarding alleged performance issues.  Pearsons refused to pay invoices totaling approximately seven hundred seventy-five thousand dollars ($775,000) in May of 2015 and this nonpayment by Pearsons caused significant cash flow problems for the Debtors. Additionally, in May of 2015, a large contract anticipated with Comcast unexpectedly fell through. The Debtors had increased staff to account for the anticipated additional work.

As a result of these largely unsuccessful ventures, and in the wake of losing one or more large customers, the Debtors faced increasingly difficult cash flow constraints.   Beginning in the summer of 2015, the Debtors implemented a number of operational changes to address their financial hardships.   In July, the Debtors closed their Austin, Texas facility which was no longer needed after losing their contract with Pearsons.   The Debtors also downsized their management team, particularly in the sales and marketing and technology groups resulting in a savings of approximately $40,000- $50,000 per month.   Finally, and most significantly, in September, 2015, the Debtors sold Nexxphase, a wholly owned software platform to CSI for $2.85 million (less the approximate $800,000 the Debtors owed CSI). The sale proceeds were paid to BB&T and applied against the outstanding indebtedness.   While the sale proceeds did not fully extinguish the BB&T

- 11 -

debt, the transaction did eliminate approximately $200,000 in monthly losses associated with the operation of the Nexxphase business.

In the late summer and early fall of 2015, the Debtors cash flow constraints worsened. The Debtors' revolving line of credit facility with BB&T was stretched beyond capacity and was up for renewal. BB&T was unwilling to renew upon maturity and the Debtors were left with no choice but to seek alternate financing.  In October 2015, the Debtors[1] entered into a Factoring and Security Agreement (the "**Factoring Agreement**") and an Earned and Unbilled Revenue Line of Credit Agreement (the "**Line of Credit Agreement**") with Action.   While the proceeds from the Action facility were used to pay BB&T, the facility was insufficient to pay BB&T all outstanding amounts owed; therefore, the Debtors and BB&T entered into a subordinated note in the approximate amount of $1,028,000.00 and BB&T and Action entered into an intercreditor agreement setting forth the relative priorities of each party's interests.   This transaction, and the resulting financing, came at an increased monthly expense to the Debtors.   The Debtors continued to struggle financially and ultimately negotiated a series of loans from Five Paces Ventures, the Debtors' majority shareholder, in the approximate aggregate amount of $600,000, to fund certain operating expenses and to address structured payments of past due obligations.

During the late fall and winter of 2015, the Debtors continued to make operational adjustments aimed at improving cash flow.   The Debtors terminated the CEO, COO and a number of other senior corporate staff, which resulted in an additional reduction of approximately $80,000 per month.   The Debtors reworked payment schedules with a number of creditors including BB&T, Century Link, CSI, Pipkins, and VPI to more ably manage cash flow. In February of 2016, the Debtors reached a settlement with Pearson to accept $250,000 in settlement of a collection suit. The same month, the Debtors sub-leased their Atlanta headquarters saving approximately $15,000 per month. In March, the Debtors closed their main Newburgh, New York facility and consolidated the operations in a much smaller building with an anticipated savings of approximately $60,000 per month.

While implementing these various cost cutting measures, the Debtors also actively engaged in discussions with potential purchasers.   In particular, the Debtors had meaningful discussions with two potential third party purchasers and entered into a Letter of Intent with one of the parties to explore the possibility of an acquisition.   After extensive due diligence, both parties declined to pursue the transaction based principally on concerns regarding customer concentration.   This was a similar issues raised by potential lenders when the Debtors sought take-out financing when the BB&T loan matured.   The Debtors acknowledged that the customer concentration concerns would likely be a hurdle to any buyer seeking financing in connection with the acquisition.

In the first quarter of 2016, the Debtors generated EBITDA of $787,000 on revenue of $10,456,000. This compares to the forecasted EBITDA and revenue for the same period of $645,000 and $10,655,000, respectively. Over the six-month period from November 2015 to April 2016 the Debtors had repaid approximately $900,000 -$1,000,000 to various creditors including approximately $350,000 to BB&T, $300,000 to Century Link and $250,000 to CSI. The Debtors'

---

[1] Nexxphase was not a party to the agreements with Action.

original budget provided for 2016 forecast revenues of $36.0 million and EBITDA of $2.45 million. Under that forecast, the Debtors felt they could make a significant dent in repaying some of their legacy obligations. Unfortunately, in March of 2016, the Debtors largest customer required that work being outsourced by the Debtors to a sub-contractor in Costa Rica be brought back to the United States and be performed by the Debtors domestically. The Debtors simply did not have enough trained staffing to fill the void from work previously serviced in Costa Rica; therefore, the Debtors experienced reduced volumes and therefore realized reduced revenues as they transitioned services from Costa Rica to the Debtors' facility in Duluth, Georgia.   Additionally, the Debtors realized a 27.0% profit margin on the work which it sub-contracted to a vendor in Costa Rica, much higher than what they realize on work performed domestically.   While the Debtors believe they will regain the same volumes previously serviced once they have sufficient trained staff, the interim period cost the Debtors approximately $1 million dollars in lost revenues during April and May of 2016.

The Debtors are currently negotiating modifications to their agreements with several large customers which the Debtors believe will facilitate improved cash flow; however, the scope and timing of such modifications are uncertain.   The relocation of services from Costa Rica to Georgia and the associated increase in overhead, coupled with the other issues facing the Debtors, proved to be a setback which they simply could not overcome.   After consultation with their advisors and directors, the Debtors concluded that it was in their best interest, and the interests of their creditors and employees, to seek protection under Chapter 11 of the Bankruptcy Code.

## ARTICLE III
## CLASSIFICATION OF CLAIMS AND INTERESTS

### 3.1    Introduction

The following is a summary of the Plan.   This overview is qualified in its entirety by reference to the provisions of the Plan.   In accordance with Section 1123(a)(1) of the Bankruptcy Code, Allowed Administrative Expense Claims and Allowed Priority Tax Claims are not classified under the Plan.   All other Claims and Interests in the Case are classified as shown below.   The Plan provides that holders of Allowed Claims in certain classes will be entitled to a distribution of cash.   Notwithstanding any provision of the Plan, a Claim in a particular Class is entitled to receive Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class, and only to the extent such Claim has not been paid, released, or otherwise satisfied prior to the Effective Date.

### 3.2    Classifications

The Plan divides all classified Claims and Interests into the following Classes, which shall be mutually exclusive.

| | |
|---|---|
| Class 1: | Class 1 shall consist of all Allowed Priority Claims. |
| Class 2: | Class 2 shall consist of all Allowed Post-Petition Trade Claims. |
| Class 3: | Class 3 shall consist of the Allowed Secured Claims of Action Capital. |
| Class 4: | Class 4 shall consist of the Allowed Secured Claims of BB&T. |

- 13 -

| Class 5:  | Class 5 shall consist of the Allowed Secured Claims of Susquehanna Commercial Finance, Inc. |
| Class 6:  | Class 6 shall consist of the Allowed Secured Claims of Ascentium Capital, LLC. |
| Class 7:  | Class 7 shall consist of the Allowed Secured Claims of SHI International Corporation. |
| Class 8:  | Class 8 shall consist of the Allowed Secured Claims against the Debtors that are not included in Class 3, Class 4, Class 5, Class 6 or Class 7. |
| Class 9:  | Class 9 shall consist of the Allowed Unsecured Claims not included in Class 10. |
| Class 10: | Class 10 shall consist of all Allowed Unsecured Convenience Class Claims. |
| Class 11: | Class 11 shall consist of all Allowed Equity Interests in the Debtors. |

## ARTICLE IV
## DESCRIPTION OF CLAIMS AND TREATMENT UNDER THE PLAN

Claims and Interests, as well as their treatment and an analysis of whether they are classified or unclassified and impaired or unimpaired, are described as follows:

### 4.1    Unclassified Claims

**(a)    Nonclassification.**

In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Expenses and Priority Tax Claims have not been classified in the Plan. The treatment accorded to Administrative Expenses and Priority Tax Claims is set forth in Article II of the Plan.

**(b)    Administrative Expenses.**

Except as otherwise provided below, on or before the later to occur of the Effective Date or five business days following the date of entry of a Final Order Allowing the Claim, each Holder of an Allowed Administrative Expense Claim (other than Postpetition Trade Claims) shall be paid by the Reorganized Debtor in full, in cash in an amount equal to the Allowed Amount of its Administrative Expense Claim, in accordance with Section 1129(a)(9)(A) of the Bankruptcy Code. Notwithstanding the foregoing, each Holder of an Allowed Administrative Expense Claim may be paid (a) on such other terms as may be agreed upon by the Holder of such Allowed Administrative Expense Claim and the Reorganized Debtor or (b) as otherwise ordered by a Final Order of the Bankruptcy Court.

**(c)    Fees and Charges**.

All fees and charges assessed against the Estate under Chapter 123 of Title 28, United States Code, 28 U.S.C. §§1911-1930, which are incurred but unpaid for all periods through the Effective Date, will be paid on the Effective Date by the Reorganized Debtor.

**(d)**     **Applications for Allowance of Administrative Expenses**.

All Holders of Administrative Expenses (other than Claims pursuant to 11 U.S.C. § 503(b)(9)) that do not file an application or other Bankruptcy Court-approved pleading on or before the date which is thirty (30) days after the Effective Date will be forever barred from asserting such Administrative Expense against the Reorganized Debtor, the Debtors or their Estates.

**(e)**     **Priority Tax Claims**.

The Reorganized Debtor will pay all Allowed Priority Tax Claims in Cash in full on the Effective Date or as soon thereafter as is reasonably practicable, but in no event later than the end of five (5) years from the Petition Date.   As to any Allowed Priority Tax Claim not paid in full on the Effective Date, the Holder of such Allowed Priority Tax Claim shall receive on account of such Allowed Priority Tax Claim regular quarterly installment payments in Cash in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code through and including the date such Allowed Priority Tax Claim is paid in full.   Holders of Allowed Priority Tax Claims shall receive interest on account of their Allowed Priority Tax Claims at the Section 6621 Interest Rate; provided, however, that if the Holder of such Allowed Priority Tax Claim is a city, county or state, such Holder shall receive interest on account of its Allowed Priority Tax Claim at the applicable statutory rate under state law. To the extent that any Allowed Priority Tax Claim is allowed after the Effective Date, it will be paid in full in Cash as soon after allowance as is reasonably practicable over a period no later than the end of five (5) years from the Petition Date, including interest as calculated above.

**4.2**     **Unimpaired Classes of Claims and Interests**

The following classes of Claims and Interests are unimpaired; therefore, under 11 U.S.C. § 1126(f), they will be conclusively presumed to have accepted the Plan.

**(a)**     **Class 1 - Priority Claims**

Each holder of an Allowed Priority Claim designated in Class 1 shall be paid as follows:

(a)   In full, in cash, on or before the later of the Effective Date or, if an objection to such Claim is asserted, five business days following the date of a Final Order allowing any such Claim; or

(b)   Upon such other terms as may be agreed to between the Debtors and each such Priority Claimant.

Class 1 is unimpaired by the Plan.   Accordingly, Holders of Class 1 Claims are not entitled to vote to accept or reject the Plan.

**(b)      Class 2- Post-Petition Trade Claims**

Class 2 consists of all Allowed Post-Petition Trade Claims.   On the Effective Date any Allowed Post-Petition Trade Claims shall be assumed and paid by the Reorganized Debtor in the normal course of business according the terms of any agreement or course of dealing between the Holder and the Debtors.   Class 2 is unimpaired by the Plan.   Accordingly, Holders of Class 2 Claims are not entitled to vote to accept or reject the Plan.

**4.3      Impaired Classes of Claims**

The following classes of Claims and Interests are impaired; therefore, Holders of such Allowed Claims are entitled to vote on the Plan.

**(a)      Class 3- Secured Claim of Action Capital**

Class 3 consists of the Allowed Secured Claim of Action Capital, which is secured by a first priority security interest in certain assets of the Debtors, including but not limited to accounts receivable.   Except as modified herein, Action Capital's Class 3 Claim shall be paid by the Debtors as follows: (a) the Pre-Petition Loans shall be repaid from operating revenues of the Debtors in accordance with the terms of the Pre-Petition Loan Documents, (b) the DIP Financing shall be paid in accordance with the terms of the Post-Petition Loan Documents, and (c) the Pre-Petition Loan Documents and the Post-Petition Loan Documents shall continue in full force and effect following Confirmation of the Plan.   Class 3 is impaired by the Plan, and Action Capital, as the Holder of the Allowed Class 3 Claim is entitled to vote to accept or reject the Plan.

**(b)      Class 4- Secured Claim of BB&T**

Class 4 consists of the Allowed Secured Claim of BB&T, which is secured by a second priority security interest in certain assets of the Debtors, including but not limited to accounts receivable. BB&T's Class 4 Claim shall be paid by the Reorganized Debtor as set forth on Schedule 5.06 attached to the Plan. Class 4 is impaired by the Plan, and BB&T, as the Holder of the Allowed Class 4 Claim is entitled to vote to accept or reject the Plan.

**(c)      Class 5- Secured Claim of Susquehanna Commercial Finance, Inc.**

Class 5 consists of the Allowed Secured Claim of Susquehanna Commercial Finance, Inc. ("**Susquehanna**"), which is secured by a first priority security interest in certain office furniture located in Duluth, Georgia.   Susquehanna's Class 5 Claim shall be satisfied by payment of Cash to Susquehanna in an amount equal to Seventy-Eight Thousand Nine Hundred Eighty-Four Dollars ($78,984.00), the value of Susquehanna's interest in the collateral securing the Allowed Secured Claim, with such payment to be made in accordance with Schedule 5.07 attached to the Plan. Susquehanna shall have a deficiency claim in the amount of Fifty-Five Thousand Dollars ($55,000.00) which shall be treated as a Class 9 general, unsecured claim.   Accordingly, Susquehanna, as the Holder of the Allowed Class 5 Claim is entitled to vote to accept or reject the Plan.

**(d)**    **Class 6- Secured Claim of Ascentium Capital, LLC**

Class 6 consists of the Allowed Secured Claim of Ascentium Capital, LLC ("**Ascentium**"), which is secured by a first priority security interest in a certain generator located in Duluth, Georgia.   Ascentium's Class 6 Claim shall be satisfied, at the Reorganized Debtor's option, as follows (i) by the transfer, assignment and conveyance by the Reorganized Debtor of the collateral securing such Class 6 Claim to Ascentium in full and final satisfaction of such Allowed Secured Claim, (ii) by the sale of the collateral securing such Allowed Secured Claim, following Designated Notice, and the payment by the Reorganized Debtor to Ascentium of the net sale proceeds in an amount equal to the value of Ascentium's interest in the collateral in full and final satisfaction of such Allowed Secured Claim, or (iii) by payment of Cash to Ascentium in an amount equal to the value of Ascentium's interest in the collateral securing the Allowed Secured Claim, with such payment to be made in accordance with Schedule 5.08 attached to the Plan, unless the Secured Claim is a Disputed Claim, in which case any past due payments set forth on Schedule 5.08 shall be paid within five business days following entry of a Final Order allowing the Secured Claim.   In the event Ascentium disputes the valuation of its collateral by the Reorganized Debtor, the parties shall work in good faith to try and resolve such dispute.   If the parties are unable to agree on a valuation, the parties shall ask the Court to hold a valuation hearing after confirmation of the Plan and Schedule 5.08 shall be amended to reflect the court's ruling. Class 6 is impaired by the Plan.   Accordingly, Ascentium, as the Holder of the Allowed Class 6 Claim is entitled to vote to accept or reject the Plan.

**(e)**    **Class 7- Secured Claim of SHI International Corporation**

Class 7 consists of the Allowed Secured Claim of SHI International Corporation ("**SHI**"), which is secured by a first priority security interest in a certain Symantec computer hardware and software.   SHI's Class 7 Claim shall be satisfied, at the Reorganized Debtor's option, as follows (i) by the transfer, assignment and conveyance by the Reorganized Debtor of the collateral securing such Class 7 Claim to SHI in full and final satisfaction of such Allowed Secured Claim, (ii) by the sale of the collateral securing such Allowed Secured Claim, following Designated Notice, and the payment by the Reorganized Debtor to SHI of the net sale proceeds in an amount equal to the value of SHI's interest in the collateral in full and final satisfaction of such Allowed Secured Claim, or (iii) by payment of Cash to SHI in an amount equal to the value of SHI's interest in the collateral securing the Allowed Secured Claim, with such payment to be made in accordance with Schedule 5.09 attached to the Plan, unless the Secured Claim is a Disputed Claim, in which case any past due payments set forth on Schedule 5.09 shall be paid within five business days following entry of a Final Order allowing the Secured Claim.   In the event SHI disputes the valuation of its collateral by the Reorganized Debtor, the parties shall work in good faith to try and resolve such dispute.   If the parties are unable to agree on a valuation, the parties shall ask the Court to hold a valuation hearing after confirmation of the Plan and Schedule 5.09 shall be amended to reflect the court's ruling. Class 7 is impaired by the Plan.   Accordingly, SHI as the Holder of the Allowed Class 7 Claim is entitled to vote to accept or reject the Plan

**(f)**    **Class 8- Other Allowed Secured Claims**

Class 8 consists of the Allowed Secured Claims against the Debtors that are not included in Class 3, Class 4, Class 5, Class 6 or Class 7. Each Allowed Secured Claim in Class 8 shall be

satisfied, at the Reorganized Debtor's option, as follows (i) by the transfer, assignment and conveyance by the Reorganized Debtor of the collateral securing such Class 8 Claim to the holder of such Allowed Secured Claim in full and final satisfaction of such Allowed Secured Claim, (ii) by the sale of the collateral securing such Allowed Secured Claim, following Designated Notice, and the payment by the Reorganized Debtor to the Holder of such Allowed Secured Claim the net sale proceeds in an amount equal to the value of such Holder's interest in the collateral in full and final satisfaction of such Allowed Secured Claim, or (iii) by payment of Cash to the Holder of such Allowed Secured Claim in an amount equal to the value of such holder's interest in the collateral securing the Allowed Secured Claim, unless the Secured Claim is a Disputed Claim, in which case any past due payments shall be paid within five business days following entry of a Final Order allowing the Secured Claim. In the event any Other Allowed Secured Creditor disputes the valuation of its collateral by the Reorganized Debtor, the parties shall work in good faith to try and resolve such dispute. If the parties are unable to agree on a valuation, the parties shall ask the Court to hold a valuation hearing after confirmation of the Plan and payments shall be amended to reflect the court's ruling. Class 8 is impaired by the Plan. Accordingly, Holders of Class 8 Claims are entitled to vote to accept or reject the Plan.

   **(g)      Class 9- Unsecured Claims**

   Class 9 consists of all Allowed Unsecured Claims which are not Class 10 Convenience Class Claims. Holders of Allowed Unsecured Claims in Class 9 shall receive distributions from the Creditor Trust. The Reorganized Debtor shall make quarterly payments into the Creditor Trust beginning on or before the later to occur of (i) the 30th1st day of JuneMarch, 2017, or (ii) the Effective Date, and continuing on or before the last day of each successive quarter thereafter, through and including the last day of December 2025, with each installment being in the amount set forth on Schedule 5.11 (and through such extended years at the same times and amounts as the final year on Schedule 5.11, to the extent needed to arrive at $5,000,000 in total payments to the Creditor Trust, after taking into account any Creditor Profit Sharing Payments (and after also taking into account the absolute limitation set forth below that the total payments shall not exceed the total aggregate amount of all Allowed Unsecured Claims in Class 9 plus amounts needed to satisfy Allowed Convenience Class Claims). Additionally, on or before June 30, 2018 and on or before June 30 each year thereafter through and including June 30, 2026, the Reorganized Debtor shall make Creditor Profit Sharing Payments to the Creditor Trust (but only if there is any Adjusted Cash Available, based on the calculation of Adjusted Cash Available as set forth in this Plan, a sample of which calculation is  as set forth on Exhibit A to the Disclosure Statement). The aggregate value of the quarterly payments into the Creditor Trust and the Creditor Profit Sharing Payments shall total $5,000,000.00. Notwithstanding anything to the contrary herein, the sum of all payments to the Creditor Trust shall not exceed an amount equal to 100% of the total aggregate amount of all Allowed Unsecured Claims in Class 9 plus amounts paid by the Reorganized Debtor to satisfy obligations under Article V, Section 5.12 (Allowed Convenience Class Claims). To ensure timely payment of the obligations under this Article V, Section 5.11, the Reorganized Debtor, the New Value Equity Participants and the Creditor Trustee will enter into a Stock Pledge Agreement, in a form substantially similar to Schedule 5.11(b) attached hereto (or as it may be amended and filed with the Court no later than fifteen days prior to the hearing on confirmation of this Plan, with the consent of the Debtors and the Committee), pursuant to which the New Value Equity Participants will pledge fifty-one percent (51%) of the outstanding stock in the Reorganized

Debtor to the Creditor Trust for the purposes and pursuant to the terms and conditions set forth in the Stock Pledge Agreement.

If there is a Liquidity Event within the first four years following Plan confirmation which allows the Reorganized Debtor to accelerate payments to the Creditor Trust on behalf of Class 9 Creditors, the Reorganized Debtors shall receive a twenty-five percent (25%) discount on cash payments to the Creditor Trust (with credit being given for all payments made to date) if the Plan payments are made within twenty-four months of the Effective Date, a twenty percent (20%) discount for payments made between twenty four months and one day five and thirty six months following the Effective Date and a ten percent (10%) discount for payments made between thirty six months and one day seven and forty eight months of the Effective Date.

Additionally, on the Effective Date, the Debtors shall transfer the Creditor Trust Assets into the Creditor Trust as more fully set forth in Article VI, Section 6.1008 below.  The Creditor Trustee shall make distributions from the Creditor Trust whenever the amount in the Creditor Trust equals or exceeds one hundred fifty thousand dollars ($150,000.00), but in no event less frequently than semi-annually.  On each of the Distribution Dates, each Holder of an Allowed Unsecured Claim in Class 9 shall receive payment of a proportionate share of the funds then available in the Creditor Trust equal to that Holder's Pro Rata portion of the aggregate amount of all Claims in Class 9 (both Allowed and Disputed) on such Distribution Date.  Distributions with respect to each Disputed Claim in Class 9 shall be held in reserve until such time as the Claim becomes an Allowed Claim or Disallowed Claim.  Distributions held in reserve with respect to Disputed Claims in Class 9 that become Allowed after the Effective Date shall be paid as soon as reasonably practicable after the dates such Claims become are Allowed Claims.  Class 9 is Impaired by the Plan.  Each Holder of an Allowed Class 9 Unsecured Claim is entitled to vote to accept or reject the Plan.

**(h)**     **Class 10 - Convenience Class Claims**

Class 10 consists of all creditors holding Allowed Unsecured Claims equal to or less than five thousand dollars ($5,000.00) and all creditors who hold Allowed Unsecured Claims that exceed five thousand dollars ($5,000.00) and who elect voluntarily to reduce their Claims to five thousand dollars ($5,000.00), waive and release any remaining Claims against the Debtors, their Estates, and the Reorganized Debtor and participate in Class 10.  In the event Class 10 votes to reject the Plan, Class 10 will be eliminated and Holders of Claims that would otherwise be included in Class 10 will be treated as Holders of Class 9 Claims.  On or before sixty days following the Effective Date or as soon thereafter as is reasonably practicable, the Reorganized Debtor shall make a one-time payment to the Creditor Trust in an amount equal to twenty percent (20%) of all Allowed Class 10 Claims.  On or before sixty days following the Effective Date or as soon thereafter as is reasonably practicable, the Creditor Trustee shall make a one-time Distribution to each Holder of an Allowed Class 10 Claim in an amount equal to twenty percent (20%) of such Holder's Allowed Claim in Class 10 in full and final satisfaction of such Allowed Claim.  To the extent that any Class 10 Claim is allowed after the Effective Date, it will be paid twenty percent (20%) of the Allowed Claim in Cash within five (5) business days after the Claim is allowed or as soon thereafter as is reasonably practicable.  Class 10 is Impaired by the Plan.  Each Holder of an Allowed Class 10 Unsecured Claim is entitled to vote to accept or reject the Plan.

### (i)    Class 11- Equity Interests

Class 11 consists of all Equity Interests in the Debtors.  All Equity Interests shall be cancelled on the Effective Date.  Because Holders of Equity Interests in Class 11 do not retain any property under the Plan on account of such Equity Interests; under the provisions of Section 1126(g) of the Bankruptcy Code, Class 11 is deemed not to have accepted the Plan.

## ARTICLE V
## MEANS FOR EXECUTION OF THE PLAN

### 5.1    Substantive Consolidation

As noted above, entry of the Confirmation Order shall constitute the approval, pursuant to Section 105(a) of the Bankruptcy Code, of the substantive consolidation as of the Effective Date of Nexxlinx; NGI; NNY; CNC; MOI, and NexxPhase, and their Estates for all purposes related to Claims and distribution of assets under the Plan.    Substantive consolidation is an equitable remedy that has the effect of creating "one common pool of assets, liabilities and a single body of creditors, while extinguishing the intercorporate liabilities of the consolidated estates." *White v. Creditors Serv. Corp. (In re Credit Serv. Corp.)*, 195 B.R. 680, 689 (Bankr. S.D. Ohio 1996); *In re Bonham*, 229 F.3d 750, 764 (9th Cir. 2000). Its primary purpose is to promote the equitable treatment of all creditors. *Eastgroup Props. v. Southern Motel Assoc., Ltd.*, 935 F.2d 245, 248 (11th Cir. 1991). The Plan Proponents strongly believe that substantive consolidation of the Debtors and their respective bankruptcy estates as proposed under the Plan will reflect the economic reality of the Debtors' true operational and financial structure. Further, substantive consolidation will be fair and equitable for creditors because it avoids the burden and expense of requiring the Debtors to untangle the web of their respective businesses and operations.    The applicable legal standard for substantive consolidation has been well defined by the courts.

To establish a *prima facie* case for substantive consolidation, a party must demonstrate that (i) there is a substantial identity between the entities to be consolidated; and (ii) consolidation is necessary to avoid some harm or to realize some benefit. *Eastgroup Props. v. Southern Motel Assocs. Ltd.*, 935 F.2d 245, 249 (11th Cir. 1991). Factors considered by courts to determine whether substantive consolidation is appropriate include:

(i) presence or absence of consolidated financial statements;

(ii) unity of interests and ownership between the various corporate entities;

(iii) existence of parent and inter-corporate guarantees on loans;

(iv) degree of difficulty in segregating and ascertaining individual assets and liabilities;

(v) existence of transfers of assets without formal observance of corporate formalities;

- 20 -

(vi) commingling of assets and business functions; and

(vii) profitability of consolidation at a single physical location.

*Id. See also Holywell Corp. v. Bank of New York*, 59 B.R. 340, 347 (S.D. Fla. 1986). Once a *prima facie* case for substantive consolidation is made, a presumption arises that creditors have not relied solely upon the credit of individual debtor entities.   The burden then shifts to an objecting creditor to show that: (i) it has relied on the separate credit of one of the entities to be consolidated; and (ii) it will be prejudiced by substantive consolidation. *Eastgroup*, 935 F.2d at 249. Even if the objecting creditor meets this burden, the Court may still order substantive consolidation if the benefits of such relief heavily outweigh the harm. *Id.*

The Plan Proponents believe that substantive consolidation of the Debtors' separate Estates is warranted and appropriate in these cases because the Debtors operated as a single, integrated entity: (i) the Debtors used consolidated financial statements and systems, including a centralized cash-management system through which all cash flow was deposited and controlled;  (ii) the Debtors filed tax returns on a consolidated basis;  (iii) there was a strong unity of interest and ownership between these Debtors because they were all controlled by the same group of officers and directors; (iv) the Debtors were co-obligors on the Action and BB&T secured loans, which loans were secured by substantially all of the assets of the Debtors, as well as co-obligors on other obligations; (v) the Debtors' remaining assets were and are commingled and interdependent; (vi) the Debtors' administrative, managerial, and financial records are now and have been centered at one physical location; and (vii) a failure to consolidate the cases might unfairly favor one group of similarly situated creditors over others.

These Debtors all pooled their funds and operated as a single financial entity to a large degree. The reality is that all of the Debtors had a common secured debt to Action[2] and to BB&T. All Debtors operated using the same "Nexxlinx" bank accounts.   All deposits were made into the Nexxlinx accounts and bills were paid from these same Nexxlinx accounts.   None of the Nexxlinx subsidiaries had separate operating accounts.   Moreover, the operational divisions between the Debtors were fairly arbitrary.   For the most part, the NexxLinx Corp.'s subsidiaries were viewed by the creditor body as primarily denoting a separate location where the "NexxLinx" business was operated.   Perhaps more importantly, prior to the Petition Date millions of dollars of investor funds through purchases of debt and equity securities were invested into Nexxlinx at the parent level and those funds were deposited into the common bank accounts and used to fund all of the Debtor subsidiaries and operating divisions.   Additionally, the senior corporate management of each of the Debtors overlapped substantially.   In reality, the Debtors were consolidated prior to the Bankruptcy Case in both operation and corporate structure.   Funds generated from the operations of each of the subsidiaries and divisions flowed into the common bank accounts and were used to fund operations of other subsidiaries. The task of sorting out these intercompany obligations in order to accurately reflect the separate assets and liabilities between the various Debtors would be virtually impossible at this juncture and prohibitively expensive to the Estate.

---

[2] NexxPhase is not an obligor on the Action liabilities.

Based on the foregoing, the Plan Proponents believe that the facts of this case establish a *prima facie* case for substantive consolidation under the *Eastgroup* test. Indeed, the Plan Proponents believe that substantive consolidation is the only way to deal fairly with creditors of these Debtors.  For these reasons, substantive consolidation is both desirable and necessary. Substantive consolidation will also facilitate and expedite the administration of the Debtors' Estates by eliminating duplicative or inconsistent efforts on the part of the various estates with respect to claims administration and asset recovery.

**5.2    Post-Confirmation Management**

Following confirmation of the Plan, the Reorganized Debtor will continue to employ Alan Quarterman as President and CEO, and he will serve as the sole corporate officer.  Mr. Quarterman's salary during the first year following Confirmation of the Plan shall be $120,000. His compensation will be subject to annual review and any increase of more than 10% will be subject to the limitations set forth in Article VI, Section 6.08.1(b) of the Plan.  In addition to its corporate officers, the Reorganized Debtor will have the following managers: (a)  Jan Santafede, COO; Bernie Huckstein, V.P. Sales; and Christy Skerski, V.P. Human Resources.  The initial directors of the Reorganized Debtor will be Alan Quarterman, Jan Santafede and Katie Goodman. The directors shall not receive any cash compensation for services rendered as a director during the life of the Plan from the Reorganized Debtor but may receive non-cash compensation.

**5.3    Sources of Cash**

Allowed Administrative Claims for professional compensation and expenses awarded under 11 U.S.C. §§ 327 or 330 shall be paid first from any retainers provided or reserves established as contemplated under orders entered in the Case and, to the extent any deficiencies remain, from cash on hand and/or future earnings of the Reorganized Debtor.  All payments to Holders of Allowed Claims in Classes 1-8 shall be paid from future earnings of the Reorganized Debtor.  All other Payments to Holders of Allowed Claims in Classes 9 and/or 10 shall be paid from the Creditor Trust to be funded by future earnings of the Reorganized Debtor,  capital contributions from the New Value Equity Participants, and any other Creditor Trust Assets . Attached hereto as **Exhibit A** is the Debtors' consolidated *pro forma* and financial projections (the "**Pro Forma**") for the period of time during which payments are to be made to Holders of Allowed Claims or Interests under the Plan.  The Pro Forma also contains notes explaining certain line items and key assumptions utilized (the "**Notes**").  Except as otherwise provided in the Plan, no Claims shall bear interest from and after the Petition Date.

The Pro Forma shows that the Reorganized Debtor will be able to meet its obligations under the Plan. In additions to the matters explained in the Notes, several additional assumptions should be noted with respect to the projections.  First, the Pro Forma indicates that Reorganized Debtor will not owe any federal income taxes during the period covered by the Plan based on an assumption that the Reorganized Debtor will be able to use certain tax attributes of the Debtors. The Debtors currently have approximately $42 million of accumulated net operating losses on a consolidated basis (the "**NOLs**").  The Debtors have consulted with their tax professionals and are informed that, although the matter is complicated and not entirely free from doubt, under the reorganization structure set forth in the Plan, since the New Value Equity Participants who will acquire the equity in the Reorganized Debtor include existing equity holders of the Debtors, the

Reorganized Debtor should be able to utilize a sufficient portion of the accumulated NOL's to offset any income tax liable during the period covered by the Plan.

The Debtors project that approximately $250,000 per year for the first four years (total $1 million) will be needed for capital expenditures.   It is estimated that a significant portion of this will be needed to purchase expensive telephone and computer equipment and software, as the existing equipment and software ages and/or becomes obsolete and as the Reorganized Debtor expands to accommodate projected growth.   Additionally, the Reorganized Debtor will need to consolidate one or more of its existing locations based on economic conditions.   For example, voters in one state where the Debtors are located, Maine, just voted to raise its minimum hourly wage to $15, almost double the current minimum wage in effect. Based on the Debtors' current cost structure and customer contracts, it was determined that the Reorganized Debtor would not be able to operate profitably in Maine and thus that facility lease was not assumed.

The Debtors have also included a contingency "reserve" in the Pro Forma for working capital needs.   This is calculated as 15% of the Adjusted Available Cash shown on the Pro Forma. The estimated annual contingency amounts range from $67,820 to $166,176, during the four year life of the Plan.   For a business of the size projected, this is not a large cushion and is needed to ensure operations run smoothly.   Moreover, it also provides some additional assurance that the Reorganized Debtor will have sufficient funds available to make all Plan payments.

**5.4     Issuance of Stock in Reorganized Debtor**

The New Value Equity Participants shall make an infusion of capital in the Reorganized Debtor in the amount of Fifty Thousand Dollars ($50,000.00) and cause the waiver of Claims in the amount of not less than Two Million One Hundred Seventy-Five Thousand Dollars ($2,175,000) which shall be contributed by the New Value Equity Participants to the Reorganized Debtor on or before the Effective Date, and which may be used as partial funding for the Postconfirmation Distribution Fund.   In exchange for this contribution, one hundred percent (100%) of the New Equity Interests in the Reorganized Debtor will be issued to the New Value Equity Participants.   The Claims being waived are held by Five Paces Ventures, Inc. and/or Alan Quarterman and arose out of several loans made to the Debtors.   Those loans are evidenced by various promissory notes.   The dates of the loans, interest rates, and calculation of unpaid balance in each loan is shown on a Summary of Loans attached as **Exhibit B** hereto.

**5.5     Post-Confirmation Working Capital.**   It is contemplated that any required working capital will be provided to the Reorganized Debtor following Confirmation from cash generated by the Reorganized Debtor's operations and/or equity infusions as set forth in Article V, Section 5.04.

**5.6     Creation of Creditor Trust.**   On the Effective Date, the Creditor Trust shall be created. The Creditor Trust shall be governed by the Creditor Trust Agreement, the Plan and the Confirmation Order.   The terms of the employment of the Creditor Trustee shall be part of the Plan Documents and approved as part of the Confirmation Hearing.   On the Effective Date, or such later dates as are specified in the Plan, the Debtors shall, pursuant to Section 1123(b) of the Bankruptcy Code, transfer the Creditor Trust Assets to the Creditor Trust.   All transfers to the

Reorganized Debtor should be able to utilize a sufficient portion of the accumulated NOL's to offset any income tax liable during the period covered by the Plan.

The Debtors project that approximately $250,000 per year for the first four years (total $1 million) will be needed for capital expenditures.   It is estimated that a significant portion of this will be needed to purchase expensive telephone and computer equipment and software, as the existing equipment and software ages and/or becomes obsolete and as the Reorganized Debtor expands to accommodate projected growth.   Additionally, it is likely that the Reorganized Debtor will need to consolidate one or more of its existing locations based on economic conditions.   For example, voters in one state where the Debtors are located, Maine, just voted to raise its minimum hourly wage to $15, almost double the current minimum wage in effect. The increase is supposed to be phased in over four years.   Based on the Debtors' current cost structure and customer contracts, the Reorganized Debtor would not be able to operate profitably in Maine if such changes take effect.

The Debtors have also included a contingency "reserve" in the Pro Forma for working capital needs.   This is calculated as 15% of the Adjusted Available Cash shown on the Pro Forma. The estimated annual contingency amounts range from $67,820 to $166,176, during the four year life of the Plan.   For a business of the size projected, this is not a large cushion and is needed to ensure operations run smoothly.   Moreover, it also provides some additional assurance that the Reorganized Debtor will have sufficient funds available to make all Plan payments.

**5.4     Issuance of Stock in Reorganized Debtor**

The New Value Equity Participants shall make an infusion of capital in the Reorganized Debtor in the amount of Fifty Thousand Dollars ($50,000.00) and cause the waiver of Claims in the amount of not less than Two Million One Hundred Seventy-Five Thousand Dollars ($2,175,000) which shall be contributed by the New Value Equity Participants to the Reorganized Debtor on or before the Effective Date, and which may be used as partial funding for the Postconfirmation Distribution Fund.  In exchange for this contribution, one hundred percent (100%) of the New Equity Interests in the Reorganized Debtor will be issued to the New Value Equity Participants.   The Claims being waived are held by Five Paces Ventures, Inc. and/or Alan Quarterman and arose out of several loans made to the Debtors.   Those loans are evidenced by various promissory notes.   The dates of the loans, interest rates, and calculation of unpaid balance in each loan is shown on a Summary of Loans attached as **Exhibit B** hereto.

**5.5     Post-Confirmation Working Capital.**   It is contemplated that any required working capital will be provided to the Reorganized Debtor following Confirmation from cash generated by the Reorganized Debtor's operations and/or equity infusions as set forth in Article V, Section 5.04.

**5.6     Creation of Creditor Trust.**   On the Effective Date, the Creditor Trust shall be created. The Creditor Trust shall be governed by the Creditor Trust Agreement, the Plan and the Confirmation Order.   The terms of the employment of the Creditor Trustee shall be part of the Plan Documents and approved as part of the Confirmation Hearing.   On the Effective Date, or such later dates as are specified in the Plan, the Debtors shall, pursuant to Section 1123(b) of the Bankruptcy Code, transfer the Creditor Trust Assets to the Creditor Trust.   All transfers to the

- 23 -

Creditor Trust shall be free and clear of all liens, claims, interests and encumbrances.  For the avoidance of doubt, nothing in the Plan shall be construed to restrict or limit the ability or standing of the Creditor Trustee to assert any Causes of Action transferred to the Creditor Trust.  In connection with any Causes of Action that are included in the Creditor Trust, any attorney-client privilege, work-product privilege or protection, or other privilege or immunity attaching to any documents or communications thereto (whether written or oral) will also exist for the benefit of the Creditor Trust and will vest in the Creditor Trustee and its representatives, and will also be preserved for and as to the Debtors.  The Creditor Trustee is authorized to take all necessary actions to benefit from such privileges.  For federal income tax purposes, the transfer of the identified assets to the Creditor Trust will be deemed to be a transfer to the Holders of Allowed Claims (who are the Creditor Trust Beneficiaries), followed by a deemed transfer by such Beneficiaries to the Creditor Trust.

**5.7    Rights and Obligations of the Creditor Trustee.**  The Creditor Trustee shall have the rights, duties and obligations set forth in the Plan Trust Agreement.  The Creditor Trustee will not be obligated to obtain a bond but may do so, in its sole discretion, in which case the expense incurred by such bonding will be paid by the Creditor Trust.

**5.8    Post-Confirmation Report of Creditor Trust**.  Every three months, beginning on the last business day of the third month anniversary of the Effective Date, or such other date as shall be determined by the Creditor Trustee, the Creditor Trustee shall file a report with the Bankruptcy Court setting forth the assets, liabilities and activities of the Creditor Trust during the prior three months, including a statement of all amounts paid for compensation of professionals and the Creditor Trustee, and the Creditor Trustee shall serve a copy upon all parties entitled to Designated Notice.  The Post-Confirmation Report of Creditor Trust shall be in addition to any operating reports which the Reorganized Debtor may be obligated to file.

**5.9    Settlement Authority.**  The Creditor Trustee shall be authorized to resolve objections to Claims, to enter into settlements of Causes of Action and otherwise resolve disputes, without notice or further order of the Bankruptcy Court; provided, however, that, with respect to matters involving more than $250,000 in controversy, the Creditor Trustee shall only be authorized to resolve such matters upon approval by Final Order of the Bankruptcy Court.  If the Creditor Trustee seeks Bankruptcy Court approval of any settlement of any Cause of Action, Disputed Claim, or other matter, such request must provide Designated Notice.

**5.10    Powers and Duties of the Post-Confirmation Committee.**

(a)    On the Effective Date, the Post-Confirmation Committee will be appointed and will succeed to any and all rights of the Committee, as well as the other additional rights and obligations set forth in this Plan.  The initial members of the Post-Confirmation Committee shall be the members of the Committee immediately prior to the Effective Date.  The Post-Confirmation Committee shall retain and have all of the rights, powers, and duties necessary to carry out its responsibilities under this Plan.  Members of the Post-Confirmation Committee will be reimbursed by the Creditor Trust for expenses in connection with serving on the Post-Confirmation Committee that would otherwise be compensable for members of a creditors' committee under Section 503(b)(3)(F) of the Bankruptcy Code.  The Post-Confirmation Committee shall have

- 24 -

independent standing to appear and be heard in any judicial or other proceeding as to any matter relating to this Plan, the Reorganization Case, or the Creditor Trust.

(b)    The Post-Confirmation Committee may retain attorneys, accountants, or other professionals to represent the interests of the Post-Confirmation Committee, including attorneys, accountants, and other professionals employed by the Debtors or the Committee, and such attorneys, accountants or other professionals shall be compensated from the Creditor Trust.

(c)    The Post-Confirmation Committee may, through its by-laws, agree to provisions for removal and replacement members of the Post-Confirmation Committee or the addition of new members of the Post-Confirmation Committee; provided, however, that: (i) the Post-Confirmation Committee shall be comprised of no less than three members and no more than nine members; (ii) each member of the Post-Confirmation Committee must hold, at all times throughout their service on the Post-Confirmation Committee, an Unsecured Claim against the Estate  (or be the legal nominee or designee of a holder of an Unsecured Claim against the Estate); (iii) any member that sells all of its Unsecured Claim against the Estate shall be immediately removed from the Post-Confirmation Committee; (iv) the purchaser of an Unsecured Claim from a member of the Post-Confirmation Committee shall not automatically succeed to the member's position on the Post-Confirmation Committee by reason of the purchase of the Unsecured Claim but may be appointed pursuant to the bylaws of the Post-Confirmation Committee; and (v) a member's rights of membership on the Post-Confirmation Committee may not be transferred to or otherwise be assigned or delegated to another person or entity without the express consent of the Post-Confirmation Committee.

**5.11    Administration of Claims.**  Subsequent to the Effective Date, the Reorganized Debtor and/or Creditor Trustee, as applicable, shall review the filed proofs of claim and audit these Claims with regard to (i) the supporting documents evidencing the Claims; (ii) the appropriateness of the characterization of each Claim; (iii) the amount of the Claim as set forth in the proof of claim; (iv) the extent to which the Debtors originally Scheduled the Claim as contingent, disputed or unliquidated; and (v) whether the proof of claim is otherwise valid, permissible, due and payable under the Bankruptcy Code and applicable state law.  Following the Confirmation Date, the Reorganized Debtor and/or the Creditor Trustee, as applicable, shall complete its review of the Claims and shall initiate, file and prosecute any and all actions deemed necessary and appropriate to dispute, disallow, object to or otherwise quantify the Claims against the Debtors and/or their Estate(s).  Except as otherwise provided in the Plan, all Claims Litigation, including actions that arise out of the amount of a submitted Claim, or any objection to a submitted Claim, shall vest with the Estates or the Creditor Trust, as applicable, and shall be prosecuted by the Reorganized Debtor or the Creditor Trustee, as applicable.  The Reorganized Debtor or the Creditor Trustee, as applicable, shall take actions regarding the administration, reconciliation and settlement of Claims, and shall object to Claims and prosecute Claims actions, until such time as the Reorganized Debtor or the Creditor Trustee, as applicable, determines that further pursuit of litigation or actions objecting to Claims is no longer cost efficient, and will be of no further benefit to the Estates and their creditors.  Following the Effective Date (a) the Creditor Trustee shall have the exclusive right and authority to object to any Class 9 or Class 10 Claim, and (b) the Reorganized Debtor shall have the exclusive right and authority to object to any Claim other than a Class 9 or Class 10 Claim.  **THE FAILURE TO OBJECT TO ANY CLAIM PRIOR TO THE COMMENCEMENT OF THE HEARING ON CONFIRMATION OF THE PLAN**

**SHALL NOT BE DEEMED TO BE A WAIVER OF THE RIGHT TO OBJECT THEREAFTER TO SUCH CLAIM IN WHOLE OR IN PART FOR THE PURPOSE OF DISTRIBUTION.**

## ARTICLE VI
## PRESERVATION OF RIGHTS OF ACTION

### 6.1    Causes of Action

Except as otherwise expressly provided in the Plan, as of the Effective Date (a) any rights or causes of action accruing to or held by the Debtors or their Estates, including, without limitation, any rights or Causes of Action accruing to or held by the Debtors or their Estates which are not Creditor Trust Assets shall be deemed  Assets of, and vest in, the Reorganized Debtor, and (b) Causes of Action which are Creditor Trust Assets shall be deemed Assets of and vest in the Creditor Trust.   The Reorganized Debtor and the Creditor Trustee, as applicable, may pursue any of those rights of action, as   deemed appropriate.

As a condition of the agreement of the New Value Equity Participants to make the $50,000.00 capital infusion and to waive Claims asserted against the Debtors in an amount of no less than $2,175,000, the Plan contains a provision releasing the New Value Equity Participants from certain potential Claims held by the Debtors and/or creditors, as described in more detail in Article XV below.   The Debtors believe that the only potentially viable Claim being released is a potential "preference" claim under 11 U.S.C. § 546 against Alan Quarterman and/or Five Paces to recover $180,000 in short term loans that were made to the Debtors on or about February 16, 2016, and repaid shortly thereafter.   The loans were required to allow the Debtors to pay a critical vendor after expected payments to the Debtors were delayed several days and the vendor threatened to take action which would have effectively shut down the Debtors.   The loans were earmarked for that purpose and when the delayed payments owed the Debtors arrived they loans were promptly repaid, within a week of the loans being made.   Under the circumstances, the Debtors believe that Mr Quarterman and Five Paces would likely be able to avail themselves of one or more recognized preference defenses. In any event, even if no defenses were available, the Debtors believe the benefits to creditors under the Plan, including the value being provided by the New Value Equity Participants, are substantially greater to creditors than the potential net value of pursuing these preference claims against the New Value Equity Participants if the required release was not provided and the Plan was not confirmed.

The Committee has investigated whether the Debtors have other viable claims against the New Value Equity Participants which are being released, including a claim to recover over $650,000 of consulting fees going back 3-4 years to an entity named Jet Systems which was controlled by Mr. Quarterman and did contract work for the Debtors.   The Debtors disagree that these alleged claims are viable and have any significant value.   For one thing, the commission payments to Jet Systems were made outside the "preference period."   To the extent an argument can be made that the payments might be recoverable under a constructive fraudulent transfer theory, Jet would likely be able to argue that the Debtors were solvent during the time period in which some if not all of the payments were made, and that reasonably equivalent value was provided to the Debtors through the services rendered by Jet.

**6.2**    **Preservation of Rights of Action**

All Causes of Action, including any Excluded Causes of Action, not expressly released or waived in the Plan or the Confirmation Order shall survive confirmation, and the assertion of Causes of Action shall not be barred or limited by any estoppel, whether judicial, equitable or otherwise. Potential Avoidance Actions which are being preserved under the Plan include, without limitation, those claims and causes of action designated as Creditor Trust Assets and transferred and assigned to the Creditor Trust under the Plan.

**6.3**    **Procedures for Resolving Disputed Claims**

Notwithstanding any other provisions of the Plan, no payment or distribution shall be made on account of a Disputed Claim until such Claim becomes an Allowed Claim.   In lieu of distributions under the Plan to holders of Disputed Claims in Classes 1 through 8, a Disputed Claims reserve shall be maintained by the Reorganized Debtor for payment of any Disputed Claim that becomes an Allowed Claim.   In lieu of distributions under the Plan to holders of Disputed Claims in Classes 9 and/or 10, a Disputed Claims Reserve shall be maintained by the Creditor Trustee for payment of any Disputed Claim which becomes an Allowed Claim.   Distributions on account of any Disputed Claim that has become an Allowed Claim shall be made as soon as is reasonably practicable.

Subsequent to the Effective Date, the Reorganized Debtor and/or the Creditor Trustee, as applicable (each, an "Objecting Party"), shall have the authority to settle and resolve a Disputed Claim that was originally asserted in an amount less than One Hundred Thousand Dollars ($100,000.00) upon such terms and conditions as the Objecting Party deems appropriate and in the best interests of the Estates.   Any such compromise and settlement shall be deemed final and binding upon all parties in interest in the Case.   The Objecting Party shall not have any obligation to provide notice to or file and serve pleadings upon any such parties in interest, and shall be released from any requirement to obtain Court approval, in connection with compromising these claims.

With respect to any Disputed Claim that was originally asserted in an amount that equals or exceeds One Hundred Thousand Dollars ($100,000.00), the Objecting Party shall have the authority to compromise and settle any such Claim on such terms as the Objecting Party deems appropriate and in the best interests of the Estates, subject to providing Designated Notice of any such proposed compromise and a reasonable opportunity to object thereto.   If a party in interest files a written objection with the Court in the Case with respect to any proposed compromise of any Disputed Claim, and serves a copy of said objection upon the Creditor Trustee, the Reorganized Debtor and its counsel within 10 days from the service of Designated Notice of the proposed compromise, then a hearing shall be scheduled with respect to said objection.   If no such objection is timely filed and served, the Creditor Trustee is authorized to compromise and resolve such Disputed Claim without further authorization.   Motions may be filed which seek to compromise more than one Claim.

## ARTICLE VII
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**7.1    Customer Contracts**

All executory contracts, customer care agreements and statements of work identified on Schedule 11.1 attached to the Plan shall be deemed assumed, and to the extent necessary, assigned to the Reorganized Debtor, upon confirmation of the Plan.  No cure costs are required in connection with assumption of any of the executory contracts or unexpired leases identified on Schedule 11.1.

**7.2    Focus Services, LLC**

That certain Statement of Work, dated July 1, 2013 by and between Focus Services, LLC and Nexxlinx, as subsequently amended and/or modified, shall be deemed assumed, and to the extent necessary, assigned to the Reorganized Debtor, upon confirmation of the Plan.  The Reorganized Debtor shall make cure payments in accordance with Schedule 11.2 attached to the Plan.

**7.3    Nonresidential Real Property Leases**

The Debtors lease the space for its operations in Maine, New York, Georgia and North Carolina under five separate leases.   Pursuant to orders of the Court dated January 25, 2017 [Doc. No. 198-200], the Debtors assumed the non-residential real property leases for facilities in Jacksonville, North Carolina, Newburgh, New York and Duluth, Georgia.   The total cure obligations for the North Carolina and Georgia facilities totals approximately $171,908.07 and will be paid as set forth on Schedule 11.03 attached to the Plan.   No cure obligations exist with respect to the New York lease.   The Debtors have rejected the lease for its Piedmont Center office and the lease for the Maine facility is deemed rejected.   The Debtors estimate that the rejection of those two leases will result in additional rejection claims under Class 9 in an estimated total amount of $672,000.

**7.4    Executory Contracts and Unexpired Leases**

The Reorganized Debtor shall be authorized to assume or reject any and all Executory Contracts and Unexpired Leases of the Debtors, other than non-residential real property leases, which (i) have not previously been assumed or rejected, or (ii) are not assumed or rejected under the Plan, through and including April 30, 2017, or longer upon consent of the counterparty to the Executory Contract or Unexpired Lease, notwithstanding entry of a Confirmation Order.

**7.5    Rejection Damage Claims**

Claims arising from the rejection of any Executory Contracts or Unexpired Leases shall be filed within thirty (30) days following the rejection and shall be treated as Class 9 Claims to the extent Allowed.  Any person seeking to assert such a Claim who fails to file a proof of claim within this thirty (30) day period shall be deemed to have waived said Claim, and it shall be forever barred.

## ARTICLE VIII
## DISTRIBUTION TO HOLDERS OF CLAIMS

**8.1    Address for Distributions**

All Cash payments required to be made under the Plan will be sent to Holders of Claims at the addresses listed in the Debtors' schedules or stated in any Proof of Claim filed by a Holder of a Claim or to such other address as the Holder of a Claim shall provide in writing to the Reorganized Debtor. The proceeds of any payment properly sent to the Creditor but returned because of unknown or insufficient address, and the proceeds of any check not cashed within ninety (90) days of sending will become property of the Reorganized Debtor or the Creditor Trust, as applicable, and the rights of the original payee shall be extinguished. Return of mail by the United States Post Office as "undeliverable and without forwarding address" shall be conclusive evidence of an attempt to deliver to the address shown.

**8.2    Rounding**

Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding of such fraction down to the nearest whole cent.

**8.3    No Interest on Claims**

Except as provided in a Final Order entered in this Case, (a) no holder of any Unsecured Claim (except Priority Tax Claims) shall be entitled to interest accruing on or after the Petition Date on such Claim, and (b) interest shall not accrue or be paid upon any Disputed Claim with respect to the period from the Petition Date to the date a final Distribution is made thereon if and after such Disputed Claim, or any part thereof, becomes an Allowed Claim.

## ARTICLE IX
## CONDITIONS PRECEDENT TO EFFECTIVENESS OF PLAN

Each of the following conditions must occur and be satisfied on or before the Effective Date for the Plan to be effective on the Effective Date, provided that the Debtors may agree to waive any one or more of the following conditions (other than Section 9.5):

**9.1    Confirmation Order Must Be Entered**

The Confirmation Order must have been signed by the Bankruptcy Court and duly entered on the docket for this Case by the clerk of the Bankruptcy Court, in form and substance acceptable to the Debtors.

**9.2    Confirmation Order Must Not Be Stayed, Reversed, Modified or Amended**

There must not be any stay in effect with respect to the Confirmation Order, and the Confirmation Order must not have been reversed, modified or amended in any material respects prior to the Effective Date without the written consent of the Debtors.

- 29 -

**9.3      Provisions of the Confirmation Order**

The Confirmation Order must be satisfactory in form and substance to the Debtors. Among other things, the Confirmation Order must:

**(a)**      Authorize and direct the Reorganized Debtor to take, or cause to be taken, all such actions as are necessary to enable the Reorganized Debtor to implement the provisions of the Plan;

**(b)**      Authorize and direct the Reorganized Debtor to perform its obligations under the Plan, and to take all actions and execute all documents and instruments reasonably necessary to consummate the transactions contemplated by the Plan;

**(c)**      Approve the Creditor Trust Agreement; and

**(d)**      Provide that no holder of a Claim, Lien or Interest will be permitted to execute against or receive Distributions except in accordance with the express provisions of the Plan.

**9.4      Confirmation Order Must Be Final**

The Confirmation Order shall have become a Final Order.

**9.5      New Value Equity Contribution**

The New Value Equity Contribution shall have been paid to the Reorganized Debtor.

**ARTICLE X**
**VOTING ON THE PLAN AND THE CONFIRMATION PROCESS**

**10.1      Classes Entitled to Vote**

Only a Holder of an Allowed Claim or Allowed Interest classified in an Impaired Class is entitled to vote on the Plan.   Under Section 1124 of the Bankruptcy Code, a Class of Claims or Interests is "impaired" by the Plan if the legal, equitable or contractual rights attaching to the Claims or Interests of that Class are modified.   Modification for purposes of determining impairment, however, does not include the curing of defaults and the reinstating of maturity.

In order to have an Allowed Claim, a Claimant must have (1) timely filed a Proof of Claim or (2) been listed in the Schedules as having a Claim that is not contingent, unliquidated or disputed.   If such a Claim was scheduled as contingent, unliquidated or disputed, and if Claimant does not file proof of such Claim on or before the Bar Date, or if such Claim is the subject of an objection, Claimant does not have an Allowed Claim, cannot vote, and will not participate in any Distributions under the Plan until such time as the Claim becomes an Allowed Claim.

The Claims and Interests of the Debtors are divided by the Plan into Classes 1 through 11. The Claims in Classes 1 and 2 are unimpaired.   Consequently, the Holders of such Claims and are conclusively presumed to have accepted the Plan and will not be entitled to vote on the Plan.   The Claims and Interests in each of Classes 3 through 11 are impaired and may vote on the Plan.

**10.2    Voting Instructions**

Each Holder of an Allowed Claim or Interest in a voting Class may cast its vote electronically pursuant to the Court's electronic filing system or may vote to accept or reject the Plan by completing, dating, signing and returning the Ballot accompanying this Disclosure Statement to:

> Clerk, United States Bankruptcy Court
> Northern District of Georgia
> 75 Ted Turner Drive
> Suite 1340
> Atlanta, GA 30303

With a copy to:

> Ashley R. Ray, Esq.
> Scroggins & Williamson, P.C.
> One Riverside
> 4401 Northside Parkway
> Suite 450
> Atlanta, Georgia 30327

Any Ballot received which does not indicate either an acceptance or rejection of the Plan shall be deemed to constitute an acceptance of the Plan.   Ballots submitted by facsimile will not be accepted.   A Ballot shall not constitute a Proof of Claim or Proof of Interest or an amendment to a Proof of Claim or Proof of Interest.

If a Creditor has a Claim in more than one Class under the Plan, that Creditor should receive a separate Ballot for each such claim.   If Claimant needs additional Ballots, or believes it has a Claim that is in Class 3 through 11 and did not receive a Ballot, please contact the Debtors' counsel, Ashley R. Ray, at the address set forth above, sufficiently in advance of the Voting Deadline to obtain the Ballot and return the Ballot before the Voting Deadline.

**10.3    Requirements of Confirmation**

The Bankruptcy Court will confirm the Plan only if it determines that all of the requirements of the Bankruptcy Code have been met.   The Bankruptcy Code requires, among other things, that (i) the Plan be accepted by at least one impaired Class, (ii) the Bankruptcy Court make a determination that the Plan is in the "best interests" of all Holders of Claims and Interests (that is, dissenting Creditors and Interest Holders will receive at least as much under the Plan as they would receive in a liquidation under Chapter 7 of the Bankruptcy Code), (iii) the Bankruptcy Court make a determination that the Plan is feasible, and (iv) the Plan has classified Claims and Interests in a permissible manner.   In order to confirm the Plan, the Bankruptcy Court must find that all of these and certain other requirements have been met.   Thus, even if the requisite vote is achieved for each impaired Class, the Bankruptcy Court must make independent findings regarding the Plan's conformity with these requirements of the Bankruptcy Code before it may confirm the Plan.   Additionally, if the requisite vote will not be achieved for each impaired Class,

the Bankruptcy Court must also make independent findings regarding the Plan's conformity with the requirements of Section 1129(b) of the Bankruptcy Code.   The various statutory requirements are discussed below.

**10.4    Acceptance by at Least One Impaired Class**

In order for the Plan to be confirmed, the Plan must be accepted by at least one impaired Class that is entitled to vote on the Plan.   A Class of Impaired Claims will have accepted the Plan if at least two-thirds in amount and more than one-half in number of the Claims actually voting in the Class have accepted it.

**10.5    Best Interests Test**

The Plan cannot be confirmed unless the Bankruptcy Court determines that the Plan is in the "best interests" of the Debtors' Creditors and Interest Holders.   The Plan will be deemed to have satisfied the "best interests" test if the Plan provides to each dissenting or nonvoting member of each impaired Class a recovery that has a value that is at least equal to the distribution that such member would receive if the assets of the Debtors were liquidated on the Effective Date in a hypothetical case under Chapter 7 of the Bankruptcy Code by a Chapter 7 trustee.   If all members of an impaired Class of Claims or Equity Interest Holders vote to accept the Plan, the "best interests" test does not apply with respect to that Class.

In applying the "best interests" test, the Bankruptcy Court would ascertain the hypothetical recoveries in a Chapter 7 liquidation to the Debtors' Creditors and Interest Holders.   These hypothetical Chapter 7 liquidation recoveries would then be compared with the distributions offered to each impaired Class of Claims or Interests under the Plan in order to determine if the Plan satisfies the "best interests" test.

In applying the "best interests" test, it is likely that Claims and Interests in the Chapter 7 case would not be classified in the same manner that such Claims and Interests are classified under the Plan.   In the absence of a contrary determination by the Bankruptcy Court, all pre-bankruptcy Unsecured Claims which have the same rights upon liquidation would be treated as one Class for the purposes of determining the potential distribution of the liquidation proceeds resulting from the Debtors' Chapter 7 cases.   The distributions from the liquidation proceeds would be calculated ratably according to the amount of the Claim held by each Creditor.   The Debtors believe that the most likely outcome of liquidation proceedings under Chapter 7 would be the application of the rule of absolute priority of distributions.   Under that rule, no junior Creditor receives any distribution until the Allowed Claims of all senior Creditors are paid in full, and no Equity Interest Holder receives any distribution until the Allowed Claims of all Creditors are paid in full.

As discussed in more detail in Article XVI of this Disclosure Statement, the Debtors' analysis indicates that confirmation of the Plan will provide each Creditor and Interest Holder holding a Claim or Interest in an impaired Class with a recovery that is at least equal to the recovery that such Creditor or Interest Holder would receive pursuant to a liquidation and distribution of the Assets under Chapter 7 of the Bankruptcy Code.

**10.6      Feasibility of the Plan**

In order for the Plan to be confirmed, the Bankruptcy Court must determine that the Plan is feasible; that is, as a practical matter, that the Debtors will be able to meet their obligations under the Plan on a timely basis and according to its terms. The Debtors believe that the Plan is feasible.

**10.7      Classification of Claims**

The Debtors believe that the Plan meets the classification requirements of the Bankruptcy Code, which require that a Plan of Reorganization place each Claim or Interest in a Class with other Claims or Interests that are "substantially similar."

**10.8      Additional Requirements of Section 1129(b) of the Bankruptcy Code**

In the event the Plan does not satisfy the requirements of Section 1129(a) of the Bankruptcy Code, the Debtors will seek confirmation of the Plan pursuant to the so-called "cramdown" provisions of Section 1129(b) of the Bankruptcy Code.  Pursuant to Section 1129(b), the Bankruptcy Court must determine whether the Plan is fair and equitable and does not discriminate unfairly against each impaired Class of Claims or Interests that has not accepted the Plan.  The Plan will not discriminate unfairly if no Class receives more than it is legally entitled to receive for its Claims.  "Fair and equitable" has different meanings for Secured Claims, Unsecured Claims and Equity Interests.

With respect to a Secured Claim, "fair and equitable" means either (i) the impaired Secured Creditor retains its liens to the extent of its Allowed Secured Claim and receives deferred Cash payments at least equal to the allowed amount of its Claim with a present value as of the Effective Date of the Plan at least equal to the value of its interest in the property securing its liens, (ii) if property subject to the lien of the impaired Secured Creditor is sold free and clear of its lien, the impaired Secured Creditor receives a lien attaching to the proceeds of the sale, or (iii) the impaired Secured Creditor realizes the "indubitable equivalent" of its Claim under the Plan.  Under certain circumstances, a Secured Creditor is entitled under Section 1111(b) of the Bankruptcy Code to elect to have its entire Claim, including any deficiency, treated as a Secured Claim.

With respect to an Unsecured Claim, "fair and equitable" means either (i) the impaired Unsecured Creditor receives property of a value equal to the amount of its Allowed Claim, or (ii) the Holders of Claims or Interests that are junior to the Claims of the dissenting Class will not receive any property under the Plan.

With respect to a Class of Equity Interests, "fair and equitable" means either (i) each Holder of an Interest of such Class receives or retains on account of such Interest property with a value equal to the greater of the allowed amount of any fixed liquidation preference to which such Holder is entitled, any fixed redemption price to which such Holder is entitled or the value of such Interest, or (ii) the Holder of any Interest that is junior to the Interests of such Class will not receive or retain any property on account of such junior Interest.

The Debtors believe the Plan meets the fair and equitable test with respect to each Holder of an impaired Claim or Interest.

**10.9    Objections to Confirmation**

As will be set forth in the Order Conditionally Approving Disclosure Statement and Notice of Confirmation Hearing, any objections to confirmation of the Plan must be in writing, must set forth the objector's standing to assert any such objection, and must be filed with the Bankruptcy Court and served on counsel for the Debtors.   The Order Approving Disclosure Statement and Notice of Confirmation of Hearing will contain all relevant procedures relating to the submission of objections to confirmation and should be reviewed in its entirety by any party who has an objection to confirmation.

**10.10    Confirmation of Plan Without Acceptance of All Impaired Classes**

Even if one or more impaired Classes do not vote to accept the Plan, the Bankruptcy Court may, pursuant to Section 1129(b) of the Bankruptcy Code, confirm the Plan without the acceptance of all impaired Classes.   Confirmation under Section 1129(b) requires that the Plan be fair and equitable with respect to each impaired Class of Claims that has not accepted the Plan.   The Plan proponents reserve their right to seek Confirmation of the Plan under Section 1129(b) if one or more Classes of Impaired Claims does not accept or is deemed not to have accepted the Plan.

**10.11    Hearing on Confirmation of the Plan**

Section 1128 of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan.   At that time, the Debtors will present the results of the vote by each impaired Class of Creditors entitled to vote in favor of or in opposition to the Plan. The Bankruptcy Court will consider whether the requirements for confirmation of the Plan under the Bankruptcy Code have been satisfied, as well as any objections to the Plan that are timely filed. Any Creditor may object to the confirmation of the Plan, regardless of whether it is entitled to vote on the Plan.

**ARTICLE XI
MODIFICATIONS AND AMENDMENTS**

The Debtors reserve the right to alter, amend or modify the Plan as contemplated by Section 1127 of the Bankruptcy Code.   The Plan may be modified, before or after Confirmation, without notice or hearing, or on such notice and hearing as the Court deems appropriate, if the Court finds that the proposed modification does not materially and adversely affect the rights of any parties in interest that have not had notice and an opportunity to be heard with regard to the proposed modification.   Without limiting the foregoing, the Plan otherwise may be modified after notice and hearing.   In the event of any modification at or before Confirmation, any votes in favor of the Plan shall be deemed to be votes in favor of the Plan as modified, unless the Court finds that the proposed modification materially and adversely affects the rights of the parties in interest that cast said votes.

**ARTICLE XII
TAX CONSEQUENCES**

Tax consequences resulting from confirmation of the Plan can vary greatly among the various Classes of Creditors and Holders of Interests, or within each Class.   Significant tax

consequences may occur as a result of confirmation of the Plan under the United States Internal Revenue Code and pursuant to state, local, and foreign tax statutes. Because of the various tax issues involved, the differences in the nature of the Claims of various Creditors, the taxpayer status and methods of accounting and prior actions taken by Creditors with respect to their Claims, as well as the possibility that events subsequent to the date hereof could change the tax consequences, this discussion is intended to be general in nature only. No specific tax consequences to any Creditor or Holder of an Interest are represented, implied or warranted. Each Holder of a Claim or Interest should seek professional tax advice, including the evaluation of recently enacted or pending legislation, because recent changes in taxation may be complex and lack authoritative interpretation.

THE PROPONENTS ASSUME NO RESPONSIBILITY FOR THE TAX EFFECT THAT CONSUMMATION OF THE PLAN WILL HAVE ON ANY GIVEN HOLDER OF A CLAIM OR INTEREST. HOLDERS OF CLAIMS OR INTERESTS ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN TO THEIR INDIVIDUAL SITUATION.

The receipt by a Creditor or Interest Holder of cash or property in full or partial payment of its Claim or Interest may be a taxable event. To the extent that a portion of the cash or the fair market value of any property received is attributable to accrued and unpaid interest on a Claim being paid, a Creditor may recognize interest income. A Creditor or Interest Holder may also recognize gain or loss equal to the difference between the sum of the amount of cash received and the adjusted basis in the Claim or Interest for which the Holder receives amounts under the Plan. Such gain or loss may be treated as ordinary or capital depending upon whether the Claim or Interest is a capital asset.

## ARTICLE XIII
## RETENTION OF JURISDICTION

The Bankruptcy Court shall retain jurisdiction, notwithstanding entry of the Confirmation Order and notwithstanding the occurrence of the Effective Date of the Plan, for the following purposes:

(a) to enforce all causes of action which exist on behalf of the Debtors pursuant to the provisions of this Plan or applicable law;

(b) to enter orders and injunctions and restraints to enforce the provisions of the Plan;

(c) to determine claims asserted under Section 507(a)(2) of the Bankruptcy Code, including claims for compensation and reimbursement of expenses accruing prior to the Confirmation Date;

(d) to determine any Disputed Claims or disputes concerning the validity of or the market value of any collateral underlying any Secured Claim;

(e) to enter orders regarding interpretation of the Plan, or any document created in connection with the Plan, or any disputes with respect thereto;

**(f)**  to conduct hearings and to enter orders modifying the Plan as provided herein or in the Bankruptcy Code;

**(g)**  to determine any and all applications, claims, adversary proceedings, and contested or litigated matters pending on the Confirmation Date;

**(h)**  to determine any applications for rejection or assumption of executory contracts or leases, and to determine Claims resulting from rejection of executory contracts and leases;

**(i)**  to allow or disallow, and estimate, liquidate, or determine any Claims against the Debtors arising on or before the Effective Date, including tax claims, but excluding any Claims deemed Allowed by this Plan, and to enter or enforce any order requiring the filing of any such Claim before a particular date; and

**(j)**  to enter orders required for the administration of the Plan, including, but not limited to:

(i)  resolution of disputes pertaining to the amounts of payments under the Plan to Claimants;

(ii)  conducting post-confirmation valuation hearings as required by the Plan or authorized by the Bankruptcy Code; and

(iii)  exercising jurisdiction over any other matter provided for or consistent with the provisions of Chapter 11 of the Bankruptcy Code.

## ARTICLE XIV
## INJUNCTION

Pursuant to sections 105, 1123, 1129 and 1141 of the Bankruptcy Code, in order to preserve and implement the various transactions contemplated by and provided for in the Plan, as of the Effective Date, except as otherwise expressly provided in the Plan or in the Confirmation Order, all Persons or Entities that have held, currently hold or may hold a Claim, Debt, or Liability that is discharged or terminated pursuant to the terms of the Plan are and shall be permanently enjoined and forever barred to the fullest extent permitted by law from taking any of the following actions on account of any such discharged or terminated Claims, Debts, or Liabilities, other than actions brought to enforce any rights or obligations under the Plan or the Plan Documents:   (a) commencing or continuing in any manner any action or other proceeding against the Debtors, the Estates, the Reorganized Debtor, or their respective Property; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors, the Estates, the Reorganized Debtor or their respective Property; (c) creating, perfecting or enforcing any Lien or encumbrance against the Debtors, the Estates, the Reorganized Debtor, or their respective Property; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors, the Estates, or   the Reorganized Debtor; (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order; or (f) interfering with or in any manner whatsoever disturbing the rights and remedies of the Debtors, the Estates or the Reorganized Debtor under the Plan and the Plan Documents and the other documents executed in connection

therewith. The Debtors and the Reorganized Debtor shall have the right to independently seek enforcement of this general injunction provision. This general injunction provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything to the contrary contained herein, the provisions of Article VII, Section 7.02 of the Plan shall not release, or be deemed a release of, any of the Causes of Action which are not expressly released in the Plan.

## ARTICLE XV
## LIMITATION OF LIABILITY

**15.1    Exculpation from Liability**.

**The Debtors, and their current officers, the Professionals for the Debtors (acting in such capacity), the Creditors Committee, and its members, and the Professionals for the Creditors Committee (acting in such capacity), the Reorganized Debtor, and its respective officers, directors and employees, the Professionals for the Reorganized Debtor (acting in such capacity), and the New Value Equity Participants (collectively, the "Exculpated Parties") shall neither have nor incur any liability whatsoever to any Person or Entity for any act taken or omitted to be taken in good faith in connection with or related to the formulation, preparation, dissemination, or confirmation of the Plan, the Disclosure Statement, any Plan Document, or any contract, instrument, release, or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection with the Plan or the Reorganization Case, in each case for the period on and after the Petition Date and through the Effective Date; provided, however, that this exculpation from liability provision shall not be applicable to any liability found by a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party. The rights granted under Article VII, Section 7.03 of the Plan are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Exculpated Parties have or obtain pursuant to any provision of the Bankruptcy Code or other applicable law. In furtherance of the foregoing, the Exculpated Parties shall have the fullest protection afforded under Section 1125(e) of the Bankruptcy Code and all applicable law from liability for violation of any applicable law, rule or regulation governing the solicitation of acceptance or rejection of a plan or the offer, issuance, sale or purchase of securities. This exculpation from liability provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything to the contrary contained herein, the provisions of Article VII, Section 7.03 of the Plan shall not release, or be deemed a release of, any of the Causes of Action.**

**15.2    Release.**

**On the Effective Date, the Exculpated Parties shall be unconditionally and are hereby deemed to be unconditionally released from any and all claims, obligations, suits, judgments, damages, losses, rights, remedies, causes of action, charges, costs, debts, indebtedness, or liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission, transaction, event or other occurrence taking place between the Petition Date and the Effective Date, which is in any way relating to the Debtors, the Reorganization Case, any Property of the Debtors, the business or operations of the Debtors, any Plan Documents, the Plan, or any of the transactions contemplated thereby; provided, however, that this release provision shall not be**

applicable to any liability found by a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party.   The Confirmation Order shall enjoin the prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any such claim, obligation, suit, judgment, damage, loss, right, remedy, cause of action, charge, cost, debt, indebtedness, or liability which arose or accrued during such period or was or could have been asserted against any of the Exculpated Parties, except as otherwise provided in the Plan or in the Confirmation Order.   Each of the Exculpated Parties shall have the right to independently seek enforcement of this release provision.   This release provision is an integral part of the Plan and is essential to its implementation.   Notwithstanding anything to the contrary contained herein, the provisions of Article VII, Section 7.04 of the Plan shall not release, or be deemed a release of, any of the Causes of Action.

**15.3    Barton Doctrine**.

The "Barton Doctrine", *e.g. Barton v. Barbour*, 104 U.S. 126, 26 L.Ed. 672 (1881) (Supreme Court held that a trustee cannot be sued without leave of the bankruptcy court), which prohibits a party from suing either a trustee, the officers of a debtor in possession, or their attorneys, in a non-appointing court for acts done in their official capacity, shall pertain to the provisions of Article VII of the Plan, and shall stand as one of the bases for enforcement of the provisions herein. *See, e.g., Carter v. Rodgers*, 220 F.3d 1249, 1252 (11th Cir. 2000)(" [j]oining the other circuits that have considered this issue, we hold that a debtor must obtain leave of the bankruptcy court before initiating an action in district court when that action is against the trustee or other bankruptcy-court-appointed officer, for acts done in the actor's official capacity"); *Patco Energy Express v. Lambros*, 2009 U.S. App. LEXIS 25771 (11th Cir. 2009) ("[w]here a plaintiff neglects to obtain leave from the appointing court, a suit filed [against a bankruptcy trustee] in another court must be dismissed for lack of subject matter jurisdiction"); *In the Matter of Linton*, 136 F.3d 544, 545 (7th Cir. 1998); *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240-41 (6th Cir. 1993) ("[i]t is well settled that leave of the appointing forum must be obtained by any party wishing to institute an action in a nonappointing forum against a trustee, for acts done in the trustee's official capacity and within the trustee's authority as an officer of the court .... counsel for trustee, court appointed officers who represent the estate, are the functional equivalent of a trustee"); *In re Balboa Improvements, Ltd.*, 99 B.R. 966, 970 (9th Cir. BAP 1989) (holding that permission to sue debtor's attorney for alleged misconduct in the administration of an estate must be obtained from the bankruptcy court).

**15.4    Continuation of Automatic Stay.**

The automatic stay arising out of Section 362(a) of the Bankruptcy Code shall continue in full force and effect until the Consummation Date, and the Debtors, the Estates, and the Reorganized Debtor shall be entitled to all of the protections afforded thereby.   The Court shall have the power to grant such additional and supplemental stays as may be necessary or appropriate to protect and preserve the Assets of the Debtors, the Estates and/or the Reorganized Debtor or to permit the just and orderly administration of the Estates.

**15.5    Release of New Value Equity Participants by Debtors.**

Effective as of the Effective Date, and except as otherwise provided in the Plan or the Confirmation Order, for good and valuable consideration, the adequacy of which is hereby

confirmed, the Debtors, each in its individual capacity and as Debtors in possession, will be deemed to have forever released, and waived the New Value Equity Participants from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities (other than the rights of the Debtors or the Reorganized Debtor to enforce the Plan and the contracts, instruments, releases, and other agreements or documents delivered thereunder), whether for tort, contract, violations of federal or state securities laws, or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence, including actions in connection with indebtedness for money borrowed by the Debtors, taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, or the Plan; provided, however, that (a) no New Value Equity Participant will be released from any Claims, obligations, suits, judgments, debts or Causes of Action arising out of or in connection with indebtedness for money borrowed by any such person from the Debtors; and (b) no Cause of Action against any insurer arising out of or relating to matters for which the Debtors would otherwise be liable or suffer an insurable loss will be released, including without limitation, any Cause of Action against the Debtors' directors and officers liability insurance carrier(s).

**15.6    Release of New Value Equity Participants by Holders of Claims and Interests.**

Effective as of the Effective Date, and except as otherwise provided in the Plan or the Confirmation Order, to the fullest extent permitted under applicable law, in consideration for the obligations of the Persons set forth below under the Plan and, if applicable, the Cash, securities, contracts, releases and other agreements or documents to be delivered in connection with the Plan, each Holder of a Claim or Interest who votes in favor of the Plan or is presumed to have voted in favor of the Plan pursuant to Section 1126(f) of the Bankruptcy Code will be deemed to have forever waived and released (i) the Debtors, (ii) the Reorganized Debtor and (iii) the New Value Equity Participants from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities (other than the rights of such Holders of Allowed Claims under the Plan to enforce the Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered thereunder), whether for tort, contract, violations of federal or state securities laws, or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence, including actions in connection with indebtedness for money borrowed by the Debtors, taking place on or prior to the Effective Date in any way relating to the Debtors, the Case, or the Plan; provided, however, that Article VII, Section 7.11 of the Plan will not release any New Value Equity Participant from any Causes of Action held by a Governmental Unit existing as of the Effective Date based on

an alleged violation of (i) any criminal laws of the United States or any domestic state, city or municipality or (ii) Sections 1104-1109 and 1342(d) of ERISA.

# ARTICLE XVI
# LIQUIDATION ALTERNATIVE

The Debtors have analyzed whether a liquidation of their remaining assets through (i) a Chapter 11 Plan; or (ii) by a Chapter 7 Trustee who is unfamiliar with the Debtors and their business would result in a higher return to the creditors of the Estates than the reorganization that the Debtors have proposed in the Plan.   The Debtors have concluded that with either liquidation the prospect of any payment to unsecured creditors is unlikely and both scenarios would result in a net return to creditors that is considerably lower than the net return to creditors that can realistically be realized through the Plan.

## A.    The Debtors' Tangible and Intangible Assets

The Debtors operate a small, relationship driven business where the real value is intangible, and derived from the relationships and strong professional reputation in the industry.   The Debtors do not have long-term contracts with their customers, but rather have contracts that are typically terminable at will on thirty (30) days' notice, and are not subject to mandatory purchase requirements.   The value of these Debtors reside in the goodwill created over time by consistently providing excellent service to its customers.   The Debtors' other assets consist primarily of cash on hand, accounts receivable and used office furniture and computer equipment.   The Debtors do not own any real property and do not believe that there is any value in their current office leases. As of June 28, 2016, the Debtors' had cash on hand in the approximate amount of $476,000.00, with accounts receivable of $2,730,000.00.   The Debtors estimate that they could liquidate their furniture, fixtures and owned computers for approximately $200,000.00.

## B.    Theoretical Liquidation Under Chapter 11

There is a theoretical scenario under which the Debtors could be sold through a Section 363 sale to an interested investor, which would likely be an industry strategic buyer.   A qualified investment banker could be tasked with marketing the company and bringing it to sale at some price based on a multiple of EBITDA.   It is unlikely that such an auction would be productive, however, because such a significant portion of the Debtors' business, approximately 80%, is concentrated in one customer relationship.   The Debtors marketed the business for sale pre-petition, and in fact, entered into one or more letters of intent for the sale of the business; however, no buyer was willing to consummate the sale due primarily to the high concentration of business with one customer.   The Debtors faced the same challenges in obtaining financing and unless a buyer was fully self-funding the purchase price, the customer concentration issues will likely be an insurmountable hurdle for a buyer to obtain financing.   Consequently, it is highly unlikely that the Debtors would be a viable sale candidate.

And even if the Debtors were able to sell its assets to a third party, it is very likely that the price to be paid by any such person will be significantly lower than the amount of the distributions which would be paid to creditors under the Plan.   Attached hereto as **Exhibit C**, is a preliminary report calculating the fair market value of the Debtors as of October 31, 2016, prepared by the

Debtors' valuation expert, Fountainhead Advisors (the "**FA Valuation Report**"), for purposes of inclusion in this Disclosure Statement to be provided to creditors.   The FA Valuation Report utilizes the Income Approach and Market Approach in analyzing a number of factors affecting the fair market value of the Debtors.   Subject to the conditions described therein, the FA Valuation Report concludes that the fair market, "enterprise" value of the Debtors is $5.3 million.   In order to determine the value of the equity in the Reorganized Debtor being purchased by the New Value Equity Participants, the total debts of the Reorganized Debtor would need to be subtracted from the $5.3 million Enterprise Value.   In this case, the Plan payments being proposed represent the old debt being "assumed" by the Reorganized Debtor (and part of the price being paid for the equity in the Reorganized Debtor by the New Value Equity Participants).   Those total Plan payments are greater than $6.5 million, which far exceeds the enterprise value indicated by the FA Valuation Report.

The Committee has retained Queensgate Corporate Finance as its valuation expert. Queensgate has likewise prepared a preliminary report of the estimated enterprise value of the Debtors.   A copy of the summary page from that report (the "**QG Summary Report**") is attached hereto as **Exhibit D**.  The QG Summary Report shows an estimated enterprise value of the Debtors utilizing different methods and ranging from $10 to $17 million.   Because, unlike the FA Valuation Report, the QG Report does not describe most of its underlying assumptions or identify comparable transactions from which it derives the multiples it uses, the Debtors believes that it is unreliable and greatly overstates the enterprise value of the Debtors.   In fact, as can be seen in the FA Valuation Report, the Debtors received two expressions of interest from strategic purchasers during the year prior to the bankruptcy filing and both of these were less than the $10 million low end value shown in the QG Summary Report.   More importantly, neither of these prospective purchasers elected to proceed with their initial offers.

### C.    Liquidation Under Chapter 7

If these cases are converted to cases under Chapter 7, a trustee ("**Chapter 7 Trustee**") would be appointed or elected to liquidate the remaining assets of the Debtors for distribution to creditors pursuant to Chapter 7.   The Debtors believe that Chapter 7 would result in substantial diminution in the value to be realized by holders of Claims, if any return is realized, because the Secured Claims of Action and BB&T would likely exceed the total liquidation value of the Debtors' Estates.   Additionally, a Chapter 7 Trustee would likely retain new attorneys, accountants and other professionals, who are unfamiliar with the cases and who will also have to learn about the Debtors and their business.   The Chapter 7 Trustee and its professionals would incur substantial fees and expenses which would be entitled to a priority over unsecured creditors. Not only are Creditors holding Allowed Claims likely to receive lesser distributions on account of their Allowed Claims, they are also likely to wait a longer period of time to receive such distributions than they would under the Plan, primarily as a result of the more restrictive distribution procedures under Chapter 7.   Attached hereto as **Exhibit E** is a liquidation analysis comparing the treatment of unsecured creditors under this Plan to a Chapter 7 liquidation alternative.   Included with the liquidation analysis are notes explaining significant underlying assumptions.

In sum, the Debtors believe that the Plan provides for a greater return to creditors than a liquidation under Chapter 11 or 7 of the Bankruptcy Code.

**ARTICLE XVII**
**CONCLUSION**

The Debtors and the Committee urge all Holders of Claims to accept the Plan because they believe the Plan will provide each such Holder more than it would receive pursuant to any alternative plan of liquidation or under Chapter 7 of the Bankruptcy Code. **Accordingly, the Debtors and the Committee urge all eligible members of Voting Classes to submit Ballots in favor of the Plan in accordance with the balloting procedures described herein.** Attached hereto as Exhibit F is a letter from counsel for the Committee further describing the Committee's support for the Plan and urging Creditors to vote in favor of the Plan.

This 10 day of February, 2017.

NEXXLINX CORPORATION, INC., et al.

By:

Alan Quarterman
CEO


J. ROBERT WILLIAMSON
Georgia Bar No. 765214
ASHLEY REYNOLDS RAY
Georgia Bar No. 601559
SCROGGINS & WILLIAMSON, P.C.
One Riverside
4401 Northside Parkway
Suite 450
Atlanta, Georgia 30327
T:     404-893-3880
F:     404-893-3886
E:     rwilliamson@swlawfirm.com
       aray@swlawfirm.com

*Counsel for Nexxlinx Corporation, Inc., et al.*

**EXHIBIT A**

Debtors' consolidated pro forma and financial projections

Summary for Plan and Disclosure Statement
**NexxLinx Corporation (consolidated)**

| | | | | *forecast years* | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 |
| **Total Revenue** | $ 35,702,048 | $ 36,773,109 | $ 37,876,303 | $ 39,012,592 | $ 39,012,592 | $ 39,012,592 | $ 39,012,592 | $ 39,012,592 | $ 39,012,592 |
| **Total COGS** | 27,536,938 | 28,263,215 | 29,097,107 | 29,970,020 | 29,970,020 | 29,970,020 | 29,970,020 | 29,970,020 | 29,970,020 |
| **Gross Profit** | $ 8,165,110 | $ 8,509,894 | $ 8,779,196 | $ 9,042,572 | $ 9,042,572 | $ 9,042,572 | $ 9,042,572 | $ 9,042,572 | $ 9,042,572 |
| GM% | 22.87% | 23.14% | 23.18% | 23.18% | 23.18% | 23.18% | 23.18% | 23.18% | 23.18% |
| **Indirect Expenses** | | | | | | | | | |
| Indirect staffing (plus taxes, benefits, etc. | $ 4,486,364 | $ 4,759,583 | $ 4,902,371 | $ 4,902,371 | $ 4,902,371 | $ 4,902,371 | $ 4,902,371 | $ 4,902,371 | 4,902,371 |
| Business Insurance | 363,888 | $ 397,293 | $ 421,130 | $ 421,130 | $ 421,130 | $ 421,130 | $ 421,130 | $ 421,130 | 421,130 |
| Professional | 709,000 | $ 328,622 | $ 341,766 | $ 341,766 | $ 341,766 | $ 341,766 | $ 341,766 | $ 341,766 | 341,766 |
| Creditor Trust Fees | 90,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Licenses and Related G&A Expenses | 705,659 | $ 465,735 | $ 489,021 | $ 489,021 | $ 489,021 | $ 489,021 | $ 489,021 | $ 489,021 | 489,021 |
| Travel | 185,782 | $ 149,369 | $ 150,116 | $ 150,116 | $ 150,116 | $ 150,116 | $ 150,116 | $ 150,116 | 150,116 |
| Depreciation | 543,963 | $ 150,000 | $ 200,000 | $ 200,000 | $ 200,000 | $ 200,000 | $ 200,000 | $ 200,000 | 200,000 |
| Amortization | - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Debt Service Interest | 675,569 | $ 698,331 | $ 719,280 | $ 719,280 | $ 719,280 | $ 719,280 | $ 719,280 | $ 719,280 | 719,280 |
| Other (Income) Expense | 60,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| **Total Indirect Expenses** | $ 7,820,224 | $ 6,948,932 | $ 7,223,685 | $ 7,223,685 | $ 7,223,685 | $ 7,223,685 | $ 7,223,685 | $ 7,223,685 | 7,223,685 |
| **NET PROFIT(LOSS)** | $ 344,886 | $ 1,560,963 | $ 1,555,511 | $ 1,818,887 | $ 1,818,887 | $ 1,818,887 | $ 1,818,887 | $ 1,818,887 | 1,818,887 |
| | 0.97% | 4.24% | 4.11% | 4.66% | 4.66% | 4.66% | 4.66% | 4.66% | 4.66% |
| **Adjustments** | | | | | | | | | |
| Depreciation | $ 543,963 | $ 150,000 | $ 200,000 | $ 200,000 | $ 200,000 | $ 200,000 | $ 200,000 | $ 200,000 | 200,000 |
| Amortization / Write downs | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| CapX --- FF&E | $ (250,000) | $ (250,000) | $ (250,000) | $ (250,000) | $ (250,000) | $ (250,000) | $ (250,000) | $ (250,000) | (250,000) |
| **Cash Available** | $ 638,849 | $ 1,460,963 | $ 1,505,511 | $ 1,768,887 | $ 1,768,887 | $ 1,768,887 | $ 1,768,887 | $ 1,768,887 | 1,768,887 |
| Cure Payments - Focus | $ (240,000) | $ (240,000) | $ (143,676) | $ - | $ - | $ - | $ - | $ - | - |
| Cure Payments - North Carolina Office Lease | $ (98,010) | $ (32,670) | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Cure Payments - Duluth, GA Office Lease | $ (41,228) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Severance - Maine | $ (41,000) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| **Adjusted Cash Available** | $ 218,611 | $ 1,188,293 | $ 1,361,835 | $ 1,768,887 | $ 1,768,887 | $ 1,768,887 | $ 1,768,887 | $ 1,768,887 | 1,768,887 |
| Creditor Profit 10% | $ (21,861) | $ (118,829) | $ (136,183) | $ (176,889) | $ (176,889) | $ (176,889) | $ (176,889) | $ (176,889) | (176,889) |
| Contingency 15% | $ (32,792) | $ (178,244) | $ (204,275) | $ (265,333) | $ (265,333) | $ (265,333) | $ (265,333) | $ (265,333) | (265,333) |
| Capital Contribution | $ 50,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Refinance Action Capital | $ - | $ - | $ 3,700,000 | $ - | $ - | $ - | $ - | $ - | - |
| **Net Cash Available for Plan Pmts** | $ 213,958 | $ 891,220 | $ 4,721,376 | $ 1,326,665 | $ 1,326,665 | $ 1,326,665 | $ 1,326,665 | $ 1,326,665 | 1,326,665 |
| **Plan Payments** | | | | | | | | | |
| Allowed Priority Taxes | $ (23,400) | $ (23,400) | $ (70,201) | $ - | $ - | $ - | $ - | $ - | - |
| Class 3 - Secured (Action) | $ - | $ - | $ (3,700,000) | $ - | $ - | $ - | $ - | $ - | - |
| Class 4 - Secured (BB&T) | $ (284,262) | $ (265,596) | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Class 5 - Secured (Susquehanna) | $ (26,328) | $ (26,328) | $ (26,328) | $ - | $ - | $ - | $ - | $ - | - |
| Class 6 - Secured (Ascentium) | $ (7,381) | $ (6,766) | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Class 7 - Secured (SHI International) | $ (13,331) | $ (1,111) | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Class 8 - Other Secured | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Class 9 - Unsecured (General) | $ (200,000) | $ (250,000) | $ (400,000) | $ (550,000) | $ (550,000) | $ (550,000) | $ (550,000) | $ (550,000) | (61,794) |
| Class 10 - Unsecured (Convenience) | $ (28,000) | | | | | | | | |
| Class 11 - Equity Interests | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Total Plan Payments | $ (582,702) | $ (573,200) | $ (4,196,529) | $ (550,000) | $ (550,000) | $ (550,000) | $ (550,000) | $ (550,000) | (61,794) |
| **Cash Remaining from Period** | $ (368,744) | $ 318,020 | $ 524,847 | $ 776,665 | $ 776,665 | $ 776,665 | $ 776,665 | $ 776,665 | 1,264,871 |

Assumptions and Notes to Proforma attached to Plan of Reorganization.
NexxLinx Corporation

1. The forecasted financial results in the Proforma include those from the Debtors and the two non-debtor subsidiaries in the UK and Germany.

2. Revenue. The plan assumes 3.6% revenue growth in Year 1, 3% per annum in years 2 through 4 and then remaining constant.  Management believes that these are reasonable assumptions based on all current information available if current contracts are maintained.  Note, however, that the loss of a significant contract will have a material adverse impact on operations and viability.

3. Cost of Goods Sold.  This includes direct staffing (plus associated benefit burden) occupancy costs and telecom.  These are forecast to decrease relative to revenue.

4. Gross Profit. The plan assumes that gross margin will improve over the forecast period to an average in excess of 23.1%.

5. Indirect Expenses.  This includes indirect staffing (plus associated benefit burden), insurance, professional fees, licenses, required business travel, depreciation and interest.  Note two large reductions in expenses: in Years 1 and 2, professional fees are forecast to decrease 35% and 20%, respectively, and travel expenses are forecast to decrease 26% and 20%, respectively.  Note that "licenses and other G&A expenses" includes network system licenses, consulting, outside services, property taxes, bank service and corporate filing fees.

6. Net Income.  In Years 1 through 4, the company maintains positive net income: net margin improves from 1% to 4.7% over the forecast period.  Management believes that this is a reasonable assumption based on all current information available, including decreases in indirect expenses as detailed above.

7. Adjustments to Cash.  There are 3 specific adjustments to cash: depreciation, amortization & write-downs, and capital expenditures.

8. Other adjustments.  This represents other adjustments such as capital contribution, the refinance of Action Capital and cure payments.  Note there is also a contingency for operations of $15,000 to 20,000 per month over the forecast period for Year 2 and thereafter.

9. Net Cash Available.  This represents cash available for plan payments under the proforma after a reasonable reserve for working capital.

10. <u>Allowed Priority Taxes</u>.  These allowed amounts are forecast as paid in full over 3 years with 9 percent interest.

11. <u>Class 3 – Secured (Action)</u>.  This is forecast as paid in full through a refinancing to take place in Year 3.

12. <u>Class 4 – Secured (BB&T)</u>.  This is forecast as paid in full over 2 years with interest at 8.5 percent interest.

13. <u>Class 5 – Secured (Susquehanna)</u>.  This is forecast as paid in full over 3 years.

14. <u>Class 6 – Secured (Ascentium)</u>.  This is forecast to be paid in full over 2 years.

15. <u>Class 7 – Secured (SHI International)</u>.  This is forecast to be paid in full over 2 years.

16. <u>Class 8 – Other Secured</u>.  This is forecast to be paid in full over 2 years.

17. <u>Class 9 – Unsecured (General)</u>.  This is forecast as paid from Year 1 to Year 9 in amounts of $200,000, $250,000, $400,000, $550,000, $550,000 , $550,000 , $550,000, $550,000, and $61,794 (total $3.66 million), respectively. Additionally, for each Year 1 through 9, Class 9 Claimants will receive a profit sharing payment equal to ten percent (10%) of Adjusted Cash Available, which the Debtors estimate will total $1,338,206.

18. <u>Class 10 – Unsecured (Convenience)</u>.  These are forecast as paid in full in Year 1.

19. <u>Class 11 – Equity</u>.  The equity holders have agreed to write off $2.176 million of debt previously advanced to the Debtor through itself and it's affiliated parties.

**EXHIBIT B**

Summary of Loans

**Summary of Loans to NexxLinx Corporation**

# of days per year for interest calculation =                    365


12/31/2014
12/31/2015
12/31/2016

| Date | | Amount | Interest Rate | | Interest per Day | # of days outstanding during 2014 | | Accumulated Interest Expense |
|---|---|---|---|---|---|---|---|---|
| 9/28/2004 | $ | 75,000.00 | 10.00% | $ | 20.55 | 3,746 | $ | 76,972.60 |
| 10/28/2004 | $ | 60,000.00 | 10.00% | $ | 16.44 | 3,716 | $ | 61,084.93 |
| 11/16/2004 | $ | 150,000.00 | 10.00% | $ | 41.10 | 3,697 | $ | 151,931.51 |
| 12/1/2004 | $ | 135,000.00 | 10.00% | $ | 36.99 | 3,682 | $ | 136,183.56 |
| 12/21/2004 | $ | 185,000.00 | 10.00% | $ | 50.68 | 3,662 | $ | 185,608.22 |
| 1/20/2005 | $ | 350,000.00 | 10.00% | $ | 95.89 | 3,632 | $ | 348,273.97 |
| 12/22/2005 | $ | 100,000.00 | 10.00% | $ | 27.40 | 3,296 | $ | 90,301.37 |
| 3/22/2007 | $ | 200,000.00 | 10.00% | $ | 54.79 | 2,841 | $ | 155,671.23 |
| 5/31/2007 | $ | 190,000.00 | 10.00% | $ | 52.05 | 2,771 | $ | 144,243.84 |
| 8/2/2007 | $ | 130,000.00 | 10.00% | $ | 35.62 | 2,708 | $ | 96,449.32 |
| 9/26/2007 | $ | 170,000.00 | 10.00% | $ | 46.58 | 2,653 | $ | 123,564.38 |
| 12/4/2007 | $ | 75,000.00 | 10.00% | $ | 20.55 | 2,584 | $ | 53,095.89 |
| 9/28/2004 | $ | (486,099.94) | 10.00% | $ | (133.18) | 3,746 | $ | (498,885.03) |
| **TOTAL** | **$** | **1,333,900.06** | | | | | $ | 1,124,495.79 |

| Date | | Amount | Interest Rate | | Interest per Day | # of days outstanding during 2015 | | Accumulated Interest Expense |
|---|---|---|---|---|---|---|---|---|
| 2/1/2015 | $ | (671.78) | 4.00% | $ | (0.07) | 333 | $ | (24.52) |
| 5/22/2015 | $ | 116,548.66 | 4.00% | $ | 12.77 | 223 | $ | 2,848.26 |
| 7/24/2015 | $ | 125,827.10 | 4.00% | $ | 13.79 | 160 | $ | 2,206.28 |
| 10/8/2015 | $ | 135,000.00 | 4.00% | $ | 14.79 | 84 | $ | 1,242.74 |
| 10/13/2015 | $ | 305,000.00 | 4.00% | $ | 33.42 | 79 | $ | 2,640.55 |
| 10/15/2015 | $ | 40,000.00 | 4.00% | $ | 4.38 | 77 | $ | 337.53 |
| 10/19/2015 | $ | 120,000.00 | 4.00% | $ | 13.15 | 73 | $ | 960.00 |
| **TOTAL** | **$** | **841,703.98** | | | | | $ | 10,210.85 |
| 12/31/2016 | **$** | **2,175,604.04** | 4.00% | $ | 238.42 | 87,024 | **$** | **1,221,730.80** |

**EXHIBIT C**

Fountainhead Calculation Analysis



3769 N Stratford Road
Atlanta, Georgia 30342
404.254.1300
www.fa-bv.com

November 25, 2016

Mr. Alan Quarterman
Nexxlinx Corporation, Inc.
3565 Piedmont Road
Building 2, Suite 100
Atlanta, GA 30305

**Re:    Calculations Analysis for Nexxlinx Corporation, Inc. for Inclusion in the Disclosure
Statement in the Company's Bankruptcy Case**

Dear Mr. Quarterman:

Fountainhead Advisors, Inc. was retained to provide this summary letter and supporting exhibits
to assist in the calculation of the fair market value of Nexxlinx Corporation, Inc., ("Nexxlinx" or
the "Company") as of October 31, 2016 (the "Valuation Date"). We understand that our analysis
will be used for the purpose of inclusion in the Disclosure Statement in the Company's
bankruptcy case.

Due to time constraints, we have foregone a self-contained, comprehensive report and provided a
restricted use, Calculations analysis and limited report, which is strictly advisory and should only
be used for the stated purpose. Calculations analyses cannot be used for tax, audit, depositions,
expert witness testimony, financial reporting or any other externally-reported valuation purposes.
Please refer to the statement of limiting conditions.

**Standard and Premise of Value**

We valued the Company with the assumption of continued use, as part of a going-concern
business. The standard of value is "fair market value", defined in Revenue Ruling 59-60 as:

> *"the price at which the property would change hands between a willing buyer and
> a willing seller when the former is not under any compulsion to buy and the latter
> is not under any compulsion to sell, both parties having reasonable knowledge of
> relevant facts."*

Tax court decisions frequently state in addition that the hypothetical buyer and seller:

> *"are assumed to be able, as well as willing, to trade and to be well informed
> about the property and concerning the market for such property."*

**Scope of Work**

Based on the business valuation standards set forth by the American Society of Appraisers
("ASA") in *Business Valuation Standards-III,* our analysis is classified as calculations
("Calculations").

The ASA defines calculations as follows:

*"The objective of Calculations is to provide an appropriate indication of value based upon the performance of limited procedures agreed upon by the appraiser and the client."*

Calculations have the following qualities:

- They may be expressed as a single dollar amount or as a range.
- They may be based upon consideration of only limited relevant information.
- The appraiser performs limited information collection and analysis procedures.
- They may be based upon conceptual approaches as agreed upon by the client.

This is a limited appraisal. The Uniform Standards of Professional Appraisal Practice ("USPAP") define "limited appraisal" as the act or process of developing an opinion of value resulting from invoking the Departure Rule.  We have entered into an agreement to perform a service that calls for something less than, or different from, the work that would otherwise be required by the Revenue Ruling 59-60.  As such, this is not a self-contained, comprehensive valuation report.

**Departure Taken -** USPAP notes the report of an appraisal must contain a prominent section that clearly identifies the extent of the appraisal process performed and departures taken. Accordingly, we have relied upon information given to us by the client without independent verification. Normalizing cash flow adjustments for historical income statements were not available; therefore, none were made. We have not undergone the typical level of due diligence on industry and economic research and have not fully documented our research and assumptions in this summary letter. Furthermore, we have not audited, inspected or reviewed the subject company's financial statements and we have not reviewed the details of the Company's ownership.

**Information**

We have relied upon the following information in our determination of value:

> ➢ Audited Financial Statements for the fiscal year ending December 31, 2014;
> ➢ Internally provided financial statements for the fiscal year ending December 31, 2015;
> ➢ Internally provided financial statements for the ten-month period ending October 31, 2016;
> ➢ Plan of Reorganization;
> ➢ Disclosure Statement;
> ➢ Ownership Structure as of the Valuation Date;
> ➢ Review of various industry, financial and economic sources including but not limited to:
>   - Yahoo!Finance
>   - Capital IQ
>   - PrattStats Transaction Report
>   - Mergerstat Control Premium Transaction Study
>   - Federal Reserve Statistical Release
> ➢ Conversations and correspondence with Alan Quarterman and Angela Austin of Nexxlinx; Katie Goodman of GGG Management; and Lee Baynes of Trusted CFO Solutions.

We have not independently verified or formed an opinion on the information provided to us.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Distribution of this letter and report and its associated results, which is to be distributed only in its entirety, is intended and restricted to the owners of Nexxlinx and their advisors in their determination of the fair market value of the Company solely for the purpose of inclusion in the Disclosure Statement in the Company's bankruptcy case. This letter is not to be used with, circulated, quoted or otherwise referred to in whole or in part for any other purpose or to any other party for any purpose without our express written consent.

The approaches and methodologies used in our work are limited in scope and do not comprise a comprehensive valuation report or an examination in accordance with generally accepted accounting principles, the objective of which is an expression of an opinion regarding the fair presentation of financial statements or other financial information, whether historical or prospective, presented in accordance with generally accepted accounting principles.

We express no opinion and accept no responsibility for the accuracy and completeness of the financial information or other data provided to us by others. We assume that the financial and other information provided to us is accurate and complete, and we have relied upon this information in performing our valuation.

If you have any questions concerning this analysis, please contact Meredith Damm at (404) 254-1300.

Very truly yours,

*Fountainhead Advisors*

Fountainhead Advisors, Inc.

## COMPANY OVERVIEW

### Summary and Background

Nexxlinx is a business process and marketing services outsourcing provider that combines skilled professionals, industry knowledge and advanced technology to help our clients create profitable relationships with their customers. The company's professionals design custom solutions for inbound and outbound customer care, telemarketing and data collection, help desk, e-mail processing, live web and voice interaction, and back-end data processing.

Nexxlinx is a Delaware corporation with headquarters in Atlanta, Georgia. Collectively, Nexxlinx (including its subsidiaries) operates customer service call centers in Georgia, North Carolina, New York, and Maine and employs approximately 1100 employees.

Customerlinx, the predecessor to Nexxlinx, was founded in 1998 by a group of individual investors to provide customer-calling services for AT&T. During 2002 and 2003, Customerlinx lost the AT&T relationship as well as another critical client, resulting in significant financial struggles. In 2003, Five Paces Ventures acquired 85% of Customerlinx from SAC Capital Advisors ("SAC") for $2.0 million, with SAC owning the remainder.

In November 2012, the Company's name was changed from Customerlinx to Nexxlinx. Customerlinx sought to grow its business and expand its footprint with several acquisitions in 2005. In 2009, Nexxlinx made its largest investment in NexxPhase, Inc., its wholly owned subsidiary, which was formed to provide an in–the-cloud solution for the operation and applications used in the call center business. Prior to the Internet, call center companies bought large legacy based hardware to operate the functions of the call center. Advances in technology allowed call centers to avoid the cost and inefficiency of these legacy systems by utilizing web-based systems. The Company does not currently own any proprietary cloud software.

In August 2015, Nexxphase was sold to Contact Solutions Inc. ("CSI") in a transaction that provided approximately $2.0 million in net proceeds.

### Customers

Nexxlinx has significant customer concentration. One customer, referred to here as "ABC, Inc." (which was recently acquired by a competitor), currently generates approximately 80% of the Company's annual revenue. Nexxlinx's customer contracts allow any customer to exit the relationship in 30 days. While a company will incur switching costs when moving to a new provider, such as the time and effort required to hire and train a new call center, several customers have recently opted to exit the relationship with Nexxlinx. Furthermore, Nexxlinx's primary contact at ABC, Inc. is leaving his position at the end of the year. Nexxlinx has been introduced to the new contact person and is hopeful that they will continue to enjoy a good relationship; however, Nexxlinx does not yet know how the replacement will perceive the Company's Chapter 11 status.

As previously mentioned, Nexxlinx recently lost two material customers. NCS Pearsons, Inc., ("Pearsons") and Golf Channel Solutions cancelled business with Nexxlinx due to allegations of

poor service, declining call volumes, and concerns about the Company's financial condition. In 2015, NCS Pearson and Golf Channel generated $3.5 million each in revenue.

**Competitors**

The call center market is very fragmented. The Company's primary competitors include: Focus Services, American Support, Qualfon, Results Group, Sykes Enterprises, Convergys, and TeleTech. Nexxlinx's competitive advantage is its long-term relationship with clients.

**Bankruptcy**

The following is a brief summary of the events that led up to Nexxlinx's Chapter 11 filing.

In the spring of 2015, the Company lost a significant customer, NCS Pearsons, Inc., ("Pearsons") due to complaints regarding alleged performance issues. Pearsons refused to pay invoices totaling approximately seven hundred seventy-five thousand dollars ($775,000) in May of 2015 and this nonpayment by Pearsons caused significant cash flow problems for the Company.

Additionally, in May of 2015, a large contract anticipated with Comcast unexpectedly fell through. The Company had increased staff to account for the anticipated additional work.

As a result of these largely unsuccessful ventures, and in the wake of losing one or more large customer, the Company faced increasingly difficult cash flow constraints. Beginning in the summer of 2015, the Company implemented a number of operational changes to address their financial hardships. In July, the Company closed their Austin, Texas facility, which was no longer needed after losing their contract with Pearsons. The Company also downsized their management team, particularly in the sales and marketing and technology groups resulting in a savings of approximately $40,000- $50,000 per month.

Finally, and most significantly, in September, 2015, the Company sold Nexxphase, a wholly owned software platform to CSI for $2.85 million (less the approximate $800,000 the Company owed CSI). The sale proceeds were paid to BB&T and applied against the outstanding indebtedness. While the sale proceeds did not fully extinguish the BB&T debt, the transaction did eliminate approximately $200,000 in monthly losses associated with the operation of the Nexxphase business.

In the late summer and early fall of 2015, the Company cash flow constraints worsened. During the late fall and winter of 2015, the Company continued to make operational adjustments aimed at improving cash flow. The Company terminated the CEO, COO and a number of other senior corporate staff, which resulted in an additional reduction of approximately $80,000 per month. Furthermore, the Company's current CEO, Alan Quarterman, draws a below fair market value salary of $120,000 per year. The Company reworked payment schedules with a number of creditors including BB&T, Century Link, CSI, Pipkins, and VPI to more ably manage cash flow. In February of 2016, the Company reached a settlement with Pearson to accept $250,000 in settlement of a collection suit.

The same month, the Company sub-leased their Atlanta headquarters saving approximately $15,000 per month. In March, the Company closed their main Newburgh, New York facility and consolidated the operations in a much smaller building with an anticipated savings of approximately $60,000 per month.

While implementing these various cost cutting measures, the Company also actively engaged in discussions with potential purchasers. In particular, the Company had meaningful discussions with two potential third party purchasers and entered into a Letter of Intent with one of the parties to explore the possibility of an acquisition. After extensive due diligence, both parties declined to pursue the transaction based principally on concerns regarding customer concentration. This was a similar issue that was raised by potential lenders when the Company sought take-out financing when the BB&T loan matured.

In the first quarter of 2016, the Company generated EBITDA of $787,000 on revenue of $10,456,000. This compares to the forecasted EBITDA and revenue for the same period of $645,00 and $10,655,000, respectively. Over the six-month period from November 2015 to April 2016 the Company had repaid approximately $900,000 -$1,000,000 to various creditors including approximately $350,000 to BB&T, $300,000 to Century Link and $250,000 to CSI. The Company' original budget provided for 2016 forecast revenues of $36.0 million and EBITDA of $2.45 million. Under that forecast, the Company felt they could make a significant dent in repaying some of their legacy obligations. Unfortunately, in March of 2016, the Company's largest customer required that work being outsourced by the Company to a sub-contractor in Costa Rica be brought back to the United States and be performed by the Company domestically. The Company did not have enough trained staffing to fill the void from work previously serviced in Costa Rica; therefore, the Company experienced reduced volumes and therefore realized reduced revenues as they transitioned services from Costa Rica to the Company's facility in Duluth, Georgia. Additionally, the Company realized a 27.0% profit margin on the work, which it sub-contracted to a vendor in Costa Rica, much higher than what they realize on work performed domestically. While the Company believe they will regain the same volumes previously serviced once they have sufficient trained staff, the interim period cost the Company approximately $1 million dollars in lost revenues during April and May of 2016.

The Company is currently negotiating modifications to their agreements with several large customers, which should facilitate improved cash flow; however, the scope and timing of such modifications are uncertain. The relocation of services from Costa Rica to Georgia and the associated increase in overhead, coupled with the other issues facing the Company, proved to be a setback, which they simply could not overcome.

After consultation with their advisors and directors, the Company concluded that it was in their best interest, and the interests of their creditors and employees, to seek protection under Chapter 11 of the Bankruptcy Code.

## VALUATION METHODOLOGY

Three traditional approaches can be used to value an interest in a closely held entity such as Nexxlinx: the income approach, the market approach, and the underlying asset approach.

*Income Approach* - The application of the income approach establishes value by employing methods that capitalize anticipated cash flow by a discount or capitalization rate that reflects the risk of the subject investment. Generally, this can be accomplished by either the discounted cash flow ("DCF") method or the capitalization of earnings method.

*Market Approach* - Value can be determined by the market approach by comparing Nexxlinx to similar businesses that have been sold. Generally, this can be accomplished by 1) a comparison to publicly traded guideline companies (the guideline public company method) 2) an analysis of actual transactions (the guideline transaction method) and/or 3) a comparison to an recent, arms length transaction involving the subject company's equity (the subject company transaction method).

*Underlying Asset Approach* - The underlying asset approach establishes value by netting the fair market value of assets by the liabilities to determine the net worth of the business. The underlying asset approach is used when the income stream generated by a business does not adequately reflect the value of the company or its underlying assets. It is usually reserved for the valuation of holding companies, REITs, and distressed companies that may be facing liquidation and rarely employed when assessing the value of a viable operating entity such as Nexxlinx.

**Accepted Methodology** We considered all three approaches in our analysis of Nexxlinx. Ultimately, we relied upon the DCF method of the income approach and the GLC and SCT methods of the market approach.

**Rejected Methodology** Since Nexxlinx is primarily a service business and therefore the asset base is comprised mostly of intangible assets, the underlying asset approach was not selected for the valuation.

## VALUATION ANALYSIS – DISCOUNTED CASH FLOW METHOD

### Methodology

The DCF method determines value based on the subject company's projected earnings. The foundation of the DCF method is based on the following three factors:

> ➤ Normalized Cash flow projections as provided by company management;
> ➤ Weighted Average Cost of Capital ("WACC"); and
> ➤ Terminal value.

*Cash Flow*

Management provided earnings before taxes ("EBT") projections through 2019. We applied a normalized tax rate and then made the following cash flow adjustments to arrive at normalized debt-free cash flow:

> ➤ Depreciation and amortization; and
> ➤ Cash-free, debt-free working capital levels.

Projected cash flows are presented in Exhibit IV.

*WACC*

We then apply the WACC to the normalized debt-free cash flow. WACC represents the rate of return a buyer would demand to compensate for the risk of acquiring the Company. Nexxlinx is a small company that is currently experiencing operational and financial challenges. In addition, the Company has an enormous revenue concentration with one customer; furthermore, this customer can choose to stop doing business with Nexxlinx within 30 days. Negotiations to sell Nexxlinx to outside third parties have fallen through solely because of this customer concentration. Therefore, it greatly increases the Company's risk and decreases its value. Based on these factors, the estimated WACC is 23% (See Exhibits VI, VII and VIII).

Nexxlinx's estimated WACC of 23% is then applied to the normalized projected cash flows to determine their present value.

*Terminal Value*

We then determine the value of cash flows generated in the period beyond the explicit forecast, or the terminal value. It is typical for the terminal value to represent over fifty percent of the total value of the company.

We used the Gordon Growth model to determine the terminal value. The Gordon Growth model can be defined as follows:

| Terminal Value | = | Debt Free Cash Flow |
| | | (WACC – Long-term Growth Rate) |

| Debt Free Cash Flow | = | the normalized level of debt free cash flow in the first year after the explicit forecast period (grown at the Long-term growth rate). |

The best indicator of the long-term sustainable growth rate is a combination of projected changes in inflation and real growth in GDP, tempered by forecasts of growth for the specific industry in which the subject operates and the expected performance of the subject company. Accordingly, we estimated a long-term growth rate of 3.0% per year.

After using Nexxlinx's cash flow the Company's WACC and long-term growth rate, the terminal value of the Company was estimated and then discounted to PV.

**Summary of Findings – DCF Method**

Because we are using controlling cash flows, the resultant DCF value conclusions are on a controlling, marketable basis. Using the methodology and the assumptions listed above, the resulting fair market value using the DCF method is as follows:

*Summary of Enterprise Value – DCF Method*

| Nexxlinx Corporation, Inc. | Fair Market Value | Exhibit |
|---|---|---|
| Enterprise Value – Controlling, Marketable | $5,090,000 | IV |

## MARKET APPROACH – GUIDELINE COMPANY METHOD

The purpose of the guideline company ("GLC") method is to identify comparable publicly-traded companies and determine their current valuation multiples. After multiples are calculated, a valuation multiple to apply to the subject company is selected based upon a financial benchmarking analysis that compares and contrasts the subject firm with the guideline companies. In addition to the quantitative factors (e.g., historical and prospective growth prospects, liquidity, financial leverage, profitability), qualitative factors (e.g., depth of management, strength of customers, reasonableness of forecast) are also considered in the selection of this pricing multiple. The multiples are then applied to the subject company's fundamental data and correlated to reach an estimate of value for the subject company.

### Selection of Guideline Companies[1]

Guideline companies are those that provide a reasonable basis for comparison to the relative investment characteristics of the entity being valued. Ideally, guideline companies operate in the same industry as the subject company, but if there is insufficient information available for companies in the same industry, it may be necessary to consider companies with an underlying similarity of relevant investment characteristics such as size, markets, products, growth, cyclical variability and other salient factors.

We searched for publicly traded companies engaged in similar lines of business. While there are no pure play GLCs that are identical to Nexxlinx, there are a few that generate a significant portion of their revenue from call center operations and business process outsourcing services.

We analyzed the following publicly traded companies:

1. **SYNNEX Corporation** provides business process services to resellers, retailers, original equipment manufacturers, and financial and insurance institutions in the United States, North and South America, the Asia-Pacific, Europe, and internationally. It operates in two segments, Technology Solutions and Concentrix. The Technology Solutions segment distributes peripherals; information technology systems, including data center server and storage solutions; system components; software; networking/communications/security equipment; consumer electronics; and complementary products. This segment also provides systems design and integration solutions, build-to-order, and configure-to-order assembly capabilities for data center servers, and storage and networking solutions. The Concentrix segment offers a portfolio of strategic solutions and end-to-end business services focused on customer engagement strategy, process optimization, technology innovation, front and back-office automation, and business transformation services. The company also provides logistics services that include outsourced fulfillment, virtual distribution, and direct ship to end-users; financing services comprising net terms, third party leasing, floor plan financing, and letters of credit backed financing and arrangements; marketing services, such as direct mail, external media advertising, reseller product training, targeted telemarketing campaigns, trade shows, trade groups, database analysis, print on demand services, and Web-based marketing; online services; and

---

[1] Source: Yahoo!Finance

technical support services. The company was formerly known as SYNNEX Information Technologies, Inc. and changed its name to SYNNEX Corporation in October 2003. SYNNEX Corporation was founded in 1980 and is headquartered in Fremont, California, provides Internet marketing services to small businesses in North America, South America, and the United Kingdom. The company offers a range of Web services and products that enable small businesses to establish, maintain, promote, and optimize their online presence. It provides domain name registration, transfers, renewals, expiration protection, and privacy services. The company was incorporated in 1999 and is headquartered in Jacksonville, Florida.

2.  **Convergys Corporation** provides customer management services to communications and media, technology, financial services, retail, and healthcare industries in North America and internationally. The company offers solutions across the customer lifecycle, including sales, customer service, technical support, customer retention, and collection services; and solutions in contact center technology comprising multichannel interaction, cross-channel integration framework, real-time decisioning engine, intelligent notification, campaign management, personalized care, personalized selling, agent productivity, and retention solutions. It also provides analytics and consulting solutions, including post-contact surveys, relational loyalty research, customer segmentation and profiling, call elimination analysis, digital channel optimization, and integrated contact center analytics solutions, as well as analysis of customer effort. The company operates approximately 130 contact centers and 92,900 production workstations. Convergys Corporation was founded in 1998 and is headquartered in Cincinnati, Ohio.

3.  **Sykes Enterprises, Incorporated**, together with its subsidiaries, provides outsourced customer contact management solutions and services in the business process outsourcing arena. Its customer care services include product information requests, describing product features, activating customer accounts, resolving complaints, cross-selling/up-selling, handling billing inquiries, changing addresses, claims handling, ordering/reservations, prequalification and warranty management, providing health information, and roadside assistance. The company's technical support services comprise handling inquiries regarding hardware, software, communications services, communications equipment, Internet access technology, and Internet portal usage; and customer acquisition services consist of inbound and outbound up-selling of its clients' products and services. It also provides technical staffing services and outsourced corporate help desk services; and fulfillment services, such as order and payment processing, inventory control, product delivery, and product returns handling. The company offers its outsourced customer contact management services through phone, e-mail, social media, text messaging, chat, and digital self-service support. Sykes Enterprises, Incorporated provides its services to companies, medium-sized businesses, and public institutions in the communications, financial services, technology/consumer, transportation and leisure, healthcare, and other industry verticals. It operates in the United States, Canada, Latin America, Australia, the Asia Pacific Rim, Europe, the Middle East, and Africa. Sykes Enterprises, Incorporated was founded in 1977 and is headquartered in Tampa, Florida.

4.  **TeleTech Holdings, Inc.** provides customer engagement management solutions in the United States, the Philippines, Latin America, Europe, the Middle East, Africa, the Asia Pacific, and Canada. It operates through four segments: Customer Management Services, Customer Growth Services, Customer Technology Services, and Customer Strategy Services. The Customer Management Services segment offers customer experience delivery solutions, which integrate technology with customer experience professionals to

optimize the customer experience across various channels and stages of the customer lifecycle from an onshore, offshore, or work-from-home environment. The Customer Growth Services segment provides technology-enabled sales and marketing solutions, including sales advisory, search engine optimization, digital demand generation, and lead qualification services, as well as acquisition sales, growth, and retention services. The Customer Technology Services segment offers operational and design consulting, systems integration, and cloud and on premise managed services, as well as designs, delivers, and maintains multichannel customer engagement platforms. The Customer Strategy Services segment provides the customer experience strategy, customer intelligence analytics, system and operational process optimization, and culture development and knowledge management services. The company serves automotive, communication, financial services, government, healthcare, logistics, media and entertainment, retail, technology, travel, and transportation industries. TeleTech Holdings, Inc. was founded in 1982 and is headquartered in Englewood, Colorado.

**Methodology and Summary of Findings – Guideline Company Method**

A brief financial analysis was performed on the GLCs in order to develop valuation multiples that could be applied to the same financial metrics of Nexxlinx. We computed multiples of MVIC to Forward Revenue and EBITDA for Year 1 (2016) and Year 2 (2017). (See Exhibit X-A).

Multiples were selected for application to Nexxlinx based upon a consideration of growth prospects, risk, and profitability relative to the GLCs. As shown in Exhibit X-B, we note that all of the GLCs are larger, more profitable, and more diversified than Nexxlinx. In addition, Nexxlinx's growth prospects are much lower than the GLC's. Finally, Nexxlinx has enormous customer concentration where the GLC's do not. Therefore, we selected multiples at a discount to the lowest GLC multiple. We used the implied Year 1 Forward multiple from the Subject Company Transaction Method to determine the appropriate discount to apply to the GLC multiple.

We applied the selected valuation multiples to Nexxlinx's relevant financial metrics. Since the GLC method yields a value on a minority basis, we applied a control premium of 10% to the results. While control premiums can range from 0% - 40%, we already adjusted the cash flows that were applied to the multiples to reflect a controlling basis; therefore, only a small premium is necessary.

The resulting fair market value using the guideline company method is as follows:

| Summary of Enterprise Value – GLC Method | | |
|---|---|---|
| Nexxlinx Corporation, Inc. | Fair Market Value | Exhibit |
| Enterprise Value – Controlling, Marketable | $5,690,000 | X-A |

## VALUATION ANALYSIS – GUIDELINE TRANSACTION METHOD

The guideline transaction ("GLT") method derives indications of value from prices at which entire companies or operating units of companies have been sold. The methodology of the transaction analysis is the same as the GLC analysis in that it relates the price at which transactions took place to fundamental financial variables in order to determine valuation multiples.

### Selection of Guideline Transactions

In order to find transactions involving companies similar to Nexxlinx, we searched for acquisitions in Pratt Stats Private Company Transaction Database and Capital IQ. Because Nexxlinx operates in a niche market, we had to broaden our search in order to find transactions. We found less than five transactions involving call centers and/or business process outsourcing.

### Methodology and Summary of Findings – Comparable Transaction Method

Because we found very few transactions, many of which were dated with varying multiples, we did not employ the GLT method.

## VALUATION ANALYSIS – SUBJECT COMPANY TRANSACTION METHOD

The Subject Company Transaction Method ("SCT") derives indications of value from a recent, arms length transaction involving the subject company. The methodology is also the same as the GLC analysis in that it relates the price at which the transaction(s) or offers took place to fundamental financial variables, such as revenue or EBITDA in order to determine valuation multiples. These multiples are then applied to the Company's current financial variable in order to determine current value.

**Purchase Proposal #1**

On November 3, 2015, Nexxlinx received a proposal letter from a strategic buyer and competitor, ("Buyer #1"), for the purchase of the Company. The terms included a purchase price of $9,750,000, excluding cash and subject to a working capital adjustment. Nexxlinx would be responsible for payment of the Company's debts.

At the time, Nexxlinx's 2015 projected revenue was approximately $46.9 million; therefore the implied revenue multiple from this transaction was .2X Forward Year 1 Revenue. Since EBITDA was negative, an implied EBITDA multiple was not available.

Eventually, the Buyer #1 purchase proposal was terminated due to concerns about Nexxlinx's customer concentration. Since Buyer #1 was not willing to acquire Nexxlinx at a .2x Forward Year 1 multiple, this multiple represents a cap on Nexxlinx's value.

**Purchase Proposal #2**

On November 23, 2015, a second strategic buyer and competitor ("Buyer #2") sent a purchase proposal letter to purchase Nexxlinx for $7,000,000 plus 25% of the equity of the combined company (Nexxlinx plus Buyer #2). The $7 million would be reduced by the assumption of any of Nexxlinx's liabilities and debt. The Buyer #2 proposal also excluded the Texas operations, which contributed approximately $2.5 million in revenue.

According to Management, at the time of the offer, the combined company had $3 million in EBITDA and $18 million in debt. Therefore, based on the EBITDA multiples in the call center industry, the combined company would have no equity value; we presume that the 25% was used an equity kicker which was an incentive for the combined management team to perform beyond expectations.

Therefore, the $7 million upfront payment is a good indication of Nexxlinx's total enterprise value as perceived by Buyer #2, an outside, arms-length third party. At the time, Nexxlinx's 2015 projected revenue, net of the Texas revenue, was approximately $44.4 million; therefore the implied revenue multiple from this transaction was .16X Forward Year 1 Revenue.

Eventually, the Buyer #2 offer was also terminated due to concerns about Nexxlinx's customer concentration. Since Buyer #2 was not willing to acquire Nexxlinx at a .16x Forward Year 1 multiple, this represents a reasonable, if not high, value for Nexxlinx.

In Exhibit IX, we determined the fair market value of Nexxlinx by using the subject company multiple of .16x Forward Year 1 Revenue as of the Valuation Date. The resulting fair market value using the Subject Company Transaction Method is as follows:

### *Summary of Enterprise Value – SCT Method*

| Nexxlinx Corporation, Inc. | Fair Market Value | Exhibit |
|---|---|---|
| Enterprise Value – Controlling, Marketable | $5,500,000 | IX |

## CONCLUSION OF VALUE

We employed the income approach and the market approach to determine the fair market value of Nexxlinx. We assigned considerably less weight to the GLC Method due to the fundamental differences between the public companies and Nexxlinx. We gave the most consideration to the Subject Company Transaction Method and the Discounted Cash Flow method.

We are valuing a total enterprise value of the Company (the value to all debt and equity holders). In order to determine equity value, debt would be subtracted from the enterprise value.

Based on our analysis, we determined that the fair market value of Nexxlinx Corporation, Inc. for the purpose of inclusion in the Disclosure Statement in the Company's bankruptcy case, as of October 31, 2016 is estimated to be:

**$5,300,000**
**Enterprise Value**
**Controlling, Marketable Basis**
**(See Exhibit I)**

## ASSUMPTIONS AND LIMITING CONDITIONS

The primary assumptions and limiting conditions pertaining to the value estimate conclusion(s) stated in this report are summarized below. Other assumptions are cited elsewhere in this report.

As agreed upon with the client prior to the preparation of this appraisal, unless otherwise indicated, this is a Calculations Analysis because it invokes the Departure Provision of the Uniform Standards of Professional Appraisal Practice ("USPAP"). As such, information pertinent to the valuation may not have been considered and/or the full valuation process has not been applied.

Unless otherwise indicated, this is a Calculations Analysis, which is intended to comply with the reporting requirements of Standard 10 of USPAP. As such, it might not include full discussions of the date, reasoning and analyses that were used in the appraisal process to develop the opinion of value.

The valuation may not be used in conjunction with any other valuation or study. The value conclusion(s) stated in this valuation is based on the program of utilization described in the report, and may not be separated into parts. The valuation was prepared solely for the purpose, function and party so identified in the report. The valuation report may not be reproduced, in whole or in part, and the findings of the report may not be utilized by a third party for any purpose, without the express written consent of Fountainhead Advisors.

The analyses, opinions, and conclusions presented in this report apply to this engagement only and may not be used out of the context presented herein. This report is valid only for the effective date(s) specified herein and only for the purpose(s) specified herein.

No change of any item in any of the valuation report shall be made by anyone other than Fountainhead Advisors and we shall have no responsibility for any such unauthorized change.

The working papers for this engagement are being retained in our files and are available for your reference. We would be available to support our valuation conclusion(s) should this be required. Those services would be performed for an additional fee.

Neither all nor any part of the contents of this report shall be disseminated or referred to the public through advertising, public relations, news or sales media, or any other public means of communication, or referenced in any publication, including any private or public offerings, including but not limited to those filed with the Securities and Exchange Commission or other governmental agency, without the prior written consent and approval of Fountainhead Advisors.

Management is assumed to be competent, and the ownership to be in responsible hands, unless noted otherwise in this report. The quality of business management can have a direct effect on the viability and value of the business.

We assume that there is full compliance with all applicable federal, state, and local regulations and laws unless the lack of compliance is stated, defined, and considered in the valuation report.

Any decision to purchase, sell or transfer any interest or asset in the business entity shall be your sole responsibility, as well as the structure to be utilized and the price to be accepted. It is assumed that any transfer of the property takes place as of the Valuation Date.

The selection of the price to be accepted requires consideration of factors beyond the information we will provide or have provided. An actual transaction involving the subject business or asset might be concluded at a higher value or at a lower value, depending upon the circumstances of the transaction and the business, and the knowledge and motivations of the buyers and sellers at that time.

No investigation of title to the property has been made, and the owner's claim to the property has been assumed valid. The subject assets, properties, or business interests are appraised free and clear of any or all liens or encumbrances unless otherwise stated. We assume no hidden or unapparent conditions regarding the subject assets, properties, or business interests.

Unless otherwise stated in the appraisal, the valuation analysis has not considered or incorporated the potential economic gain or loss resulting from contingent assets, liabilities or events existing as of the Valuation Date.

All recommendations as to fair market value are presented as the Valuator's conclusion based on the facts and data set forth in this report. All facts and data set forth in our letter report are true and accurate to the best of the Valuator's knowledge and belief.

During the course of the valuation, we have considered information provided by management and other third parties. The information furnished by others is believed to be reliable. However, we issue no warranty or other form of assurance regarding its accuracy.

Any projections of future events described in this report represent the general expectancy concerning such events as of the Valuation Date. These future events may or may not occur as anticipated, and actual operating results may vary from those described in our report.

This valuation study is utilized solely for its intended purpose and should not be used for any other purpose or distributed to third parties, other than appropriate legal and tax authorities, in whole or in part, without the express written consent of Fountainhead Advisors.

No special subsoil or toxic inspection or engineering studies were requested or conducted. Our report does not take into consideration the existence of any toxic, hazardous, or contaminated substances or materials and the cost of encapsulation treatment or removal of such material, if any. If there is concern over the existence of such conditions and the cost of treatment, a qualified engineer or contractor should be consulted.

We have no responsibility or obligation to update this report for events or circumstances occurring subsequent to the date of this report.

Our report is based on historical and/or prospective financial information provided to us by management and other third parties. This information has not been audited, reviewed or compiled by us, nor have we subjected it to any type of audit, review or compilation procedures, nor have we audited, reviewed or compiled the books and records of the subject Company. Had we audited, reviewed or compiled the underlying data, matters may have come to our attention which would have resulted in our using amounts which differ from those provided; accordingly, we take no responsibility for the underlying data presented or relied upon in this report.

Our valuation judgment, shown herein, pertains only to the subject business, the stated value standard (fair market value), as at the stated Valuation Date, and only for the stated valuation purpose and scope (Calculations).

In all matters that may be potentially challenged by a Court, Internal Revenue Service or Securities and Exchange Commission we do not take responsibility for the degree of reasonableness of contrary positions that others may choose to take, nor for the costs or fees that may be incurred in the defense of our recommendations against challenge(s). We will, however, retain our supporting work papers for your matter(s), and will be available to assist in active defense of our professional positions taken, at our then current rates, plus direct expenses at actual, and according to our then current Standard Professional Agreement.

## MEREDITH KESSINGER DAMM, ASA

Ms. Damm is the President and Founder of Fountainhead Advisors, Inc. She has twenty years of experience valuing businesses for the purposes of mergers and acquisitions, gift and estate tax planning, litigation, taxation and financial reporting. Prior to founding Fountainhead Advisors, Ms. Damm was a Senior Manager and Director at a boutique business valuation firm. In addition, she was a Corporate Finance Specialist for Wachovia where she advised companies on financing strategies and an Associate in the Corporate Finance Group of PriceWaterhouseCoopers, a "Big 4" accounting and consulting firm.

Ms. Damm received an MBA in finance from Georgia State University and a BS in marketing from Birmingham-Southern College. She is an Accredited Senior Appraiser ("ASA") in business valuation with the American Society of Appraisers. She is certified by the American Institute of Certified Public Accountants' ("AICPA") business valuation certification program.

Ms. Damm is also a speaker on business valuation topics for CPE and CLE seminars and has authored several business valuation articles designed to educate clients and client advisors about pertinent valuation issues. These articles include: "Selling A High Tech Company", "Considering ESOP's as a Liquidity Option", "Proactive Estate Planning", and "Will E-Commerce Obsolete the Mall?"  She also co-authored a national business valuation course (NBV6) sponsored by the AICPA titled "*Estate and Gift Tax, Mergers and Acquisitions - Case Study.*"

In 2014, Fountainhead Advisors was named Georgia's "Business Valuation Firm of the Year – 2013" and the "2014 Fortune 500 Valuation Firm of the Year – USA "by *Acquisition International Magazine.*

**Professional Involvement & Certifications:**

- American Society of Appraisers – Senior Member

- Planning Committee for the Atlanta Women's Foundation

- Grant Making Committee for the Atlanta Women's Foundation

- The Women's Finance Exchange - Board of Directors member and Membership Committee

- The Financial Network - Founding member

- Atlanta Women in Transaction Services

- Steering Committee for the Georgia Association for Women Lawyers' annual conference

- Robinson MBA Alumni Group

- The Entrepreneurship Institute – Advisory Board for the President's Forum

**Nexxlinx Corporation, Inc.**                                                                        **Exhibit I**

ASC 350 Summary of Indicated Value - Comparison to Carrying Value

Valuation Date: October 31, 2016

| Methodology | Fair Market Value | Weighting |
|---|---|---|
| **Income Approach** | | |
| Discounted Cash Flow (DCF) Method  (1) | $5,090,000 | 50.0% |
| **Market Approach** | | |
| Subject Company Transaction (SCT) Method (2) | $5,500,000 | 40.0% |
| Guideline Public Company (GPC) Method (3) | $5,690,000 | 10.0% |
| **Enterprise - Fair Market Value** | $5,300,000 | |

Notes:

(1) See Exhibit IV

(2) See Exhibit IX

(3) See Exhibit X

Exhibit II

Nexxlinx Corporation, Inc.
Historical Balance Sheets - Enterprise Level

| | 2014 | % | 2015 | % | October 31, 2016 | % |
|---|---|---|---|---|---|---|
| **Assets** | | | | | | |
| **Current Assets** | | | | | | |
| Cash and Cash Equivalents | 5,948 | 0.0% | 413,872 | 2.2% | (611,601) | -11.5% |
| Accounts Receivable | 6,876,376 | 24.0% | 3,990,050 | 21.4% | 4,282,366 | 80.7% |
| Other Receivables - Unbilled Revenue | 41,608 | 0.1% | 1,047,681 | 5.6% | 576,393 | 10.9% |
| Total Intercompany Receivables | - | 0.0% | - | 0.0% | - | 0.0% |
| Other current assets | 53,834 | 0.2% | 384,454 | 2.1% | 521,868 | 9.8% |
| Other current assets - tax | - | 0.0% | - | 0.0% | - | 0.0% |
| Total Current Assets | 6,977,766 | 24.3% | 5,836,057 | 31.3% | 4,769,027 | 89.9% |
| **Long Term Assets** | | | | | | |
| Fixed Assets, Net | 1,925,909 | 6.7% | 923,418 | 5.0% | 505,630 | 9.5% |
| Intangible Assets | - | 0.0% | - | 0.0% | - | 0.0% |
| Goodwill | 13,721,644 | 47.9% | 9,441,277 | 50.7% | - | 0.0% |
| Note Receivable - related party | 2,306,235 | 8.0% | 108,727 | 0.6% | - | 0.0% |
| Interest Receivable - related party | 80,290 | 0.3% | 2,309,838 | 12.4% | - | 0.0% |
| Investment in JV's | 28,914 | 0.1% | 80,290 | 0.4% | 28,914 | 0.5% |
| Other Assets | - | 0.0% | 28,914 | 0.2% | - | 0.0% |
| Total Long Term Assets | 21,678,660 | 75.7% | 12,783,738 | 68.7% | 534,544 | 10.1% |
| **Total Assets** | 28,656,426 | 100.0% | 18,619,795 | 100.0% | 5,303,570 | 100.0% |
| | | | | | | |
| **Liabilities & Equity** | | | | | | |
| **Current Liabilities** | | | | | | |
| Accounts Payable - pre-petition | 3,403,646 | 11.9% | 3,500,084 | 18.8% | 4,826,853 | 91.0% |
| Accounts Payable - other | - | 0.0% | 548,109 | 2.9% | 917,700 | 17.3% |
| Payroll Payable | 2,743,256 | 9.6% | 592,932 | 3.2% | 495,641 | 9.3% |
| Intercompany Liabilities | 400,000 | 1.4% | - | 0.0% | - | 0.0% |
| Current debt (CSI, BB&T, Action Capital) | 5,938,751 | 20.7% | 5,285,639 | 28.4% | 3,188,014 | 60.1% |
| Other Current Liabilities | 443,930 | 1.5% | 1,910,883 | 10.3% | 1,678,750 | 31.7% |
| Total Current Liabilities | 12,929,583 | 45.1% | 11,837,648 | 63.6% | 11,106,958 | 209.4% |
| **Long Term Liabilities** | | | | | | |
| Notes Payable, Long Term | 1,356,297 | 4.7% | 356,439 | 1.9% | - | 0.0% |
| Long-term debt and capital leases | 748,321 | 2.6% | 2,644,639 | 14.2% | 2,612,433 | 49.3% |
| Other Long Term Liabilities | 4,222,225 | 14.7% | 691,244 | 3.7% | 687,593 | 13.0% |
| Total Long Term Liabilities | 6,326,843 | 22.1% | 3,692,322 | 19.8% | 3,300,025 | 62.2% |
| **Total Liabilities** | 19,256,426 | 67.2% | 15,529,970 | 83.4% | 14,406,983 | 271.6% |

Exhibit II

Nexxlinx Corporation, Inc.
Historical Balance Sheets – Enterprise Level

| | 2014 | % | 2015 | % | October 31, 2016 | % |
|---|---|---|---|---|---|---|
| **Stockholder's Equity** | | | | | | |
| Common Stock | 121,815 | 0.4% | 121,815 | 0.7% | 121,815 | 2.3% |
| Capital Contributions by NXL | - | 0.0% | 428,736 | 2.3% | 428,736 | 8.1% |
| Additional PIC | 36,369,734 | 126.9% | 36,369,734 | 195.3% | 36,369,734 | 685.8% |
| Retained Earnings | (27,091,549) | -94.5% | (27,520,287) | -147.8% | (33,830,461) | -637.9% |
| Net Income | - | 0.0% | (6,310,174) | -33.9% | (12,203,797) | -230.1% |
| Total Stockholders' Equity | 9,400,000 | 32.8% | 3,089,824 | 16.6% | (9,113,972) | -171.8% |
| Total Liability and Stockholders' Equity | 28,656,426 | 100.0% | 18,619,794 | 100.0% | 5,293,010 | 99.8% |
| | | | | | | |
| **Balance Sheet Analysis:** | | | | | | |
| Carrying Value | **32,662,191** | | **18,862,879** | | **4,256,400** | |
| Total Debt | 8,043,369 | | 8,286,718 | | 5,800,447 | |
| Net Debt (Debt less cash) (1) | 8,037,421 | | 7,872,846 | | 5,800,447 | |
| | | | | | | |
| Debt-Free, Cash Free Working Capital | 380,986 | | (1,129,824) | | (2,538,316) | |
| DFCFWC/Revenue | 0.8% | | -2.4% | | -8.6% | |

Notes:
(1) We assume that the Company will not continue to carry a negative cash balance and it will normalize at $0.

**Nexxlinx Corporation, Inc.**
Historical Income Statements

Exhibit III-A

| | December 31, 2014 | December 31, 2015 | 10 Mos. Ending 31-Oct-16 | 12/31/14 % | 12/31/15 % | 10/31/16 % |
|---|---|---|---|---|---|---|
| Revenue Growth | | -7.6% | | | | |
| Total Revenue | $50,730,384 | $46,870,610 | $29,512,419 | 100.0% | 100.0% | 100.0% |
| Cost of Revenues | 26,433,366 | 29,899,738 | 19,563,664 | 52.1% | 63.8% | 66.3% |
| Gross Profit | 24,297,018 | 16,970,873 | 9,948,755 | 47.9% | 36.2% | 33.7% |
| **Operating Expenses** | | | | | | |
| Salaries | 8,834,183 | 9,534,449 | 4,293,684 | 17.4% | 20.3% | 14.5% |
| Payroll taxes and other benefits | 2,959,861 | 1,275,757 | 1,122,676 | 5.8% | 2.7% | 3.8% |
| Rent | 2,146,546 | 4,248,119 | 1,306,035 | 4.2% | 9.1% | 4.4% |
| Outside services | 1,243,457 | 658,572 | 813,161 | 2.5% | 1.4% | 2.8% |
| Licensing and software fees | 965,468 | 1,751,061 | 347,659 | 1.9% | 3.7% | 1.2% |
| Insurance | 1,009,551 | 148,654 | 92,781 | 2.0% | 0.3% | 0.3% |
| Telephone and internet | 1,806,242 | 387,319 | 277,941 | 3.6% | 0.8% | 0.9% |
| Other (1) | 13,378,501 | 3,477,921 | 13,026,205 | 26.4% | 7.4% | 44.1% |
| Total Operating Expenses (1) | 32,343,809 | 21,481,852 | 21,280,143 | 63.8% | 45.8% | 72.1% |
| EBITDA | (8,046,791) | (4,510,980) | (11,331,388) | -15.9% | -9.6% | -38.4% |
| Depreciation and amortization | 1,518,222 | 1,405,413 | 457,378 | 3.0% | 3.0% | 1.5% |
| EBIT | (9,565,013) | (5,916,392) | (11,788,766) | -18.9% | -12.6% | -39.9% |
| **Other (Income) Expense** | | | | | | |
| Losses from JV | 1,321,843 | - | - | 2.6% | 0.0% | 0.0% |
| Interest Expense | 582,502 | 393,782 | 415,328 | 1.1% | 0.8% | 1.4% |
| Other (Income) Expense | (36,941) | - | - | -0.1% | 0.0% | 0.0% |
| Total Other Expense, Net | 1,867,404 | 393,782 | 415,328 | 3.7% | 0.8% | 1.4% |
| (Loss) Income before provision for income taxes | (11,432,417) | (6,310,174) | (12,204,094) | -22.5% | -13.5% | -41.4% |
| Provision for Income Taxes | - | - | - | 0.0% | 0.0% | 0.0% |
| Net (Loss) Income | ($11,432,417) | ($6,310,174) | ($12,204,094) | -22.5% | -13.5% | -41.4% |

Notes:
(1) Includes $8,448,692 in goodwill impairment in 2014
    No explanation was given for the 2015 Other expense

Exhibit III-B

**Nexlinx Corporation, Inc.**
Proforma Historical Income Statements (without Nexxphase and TX operations)

### Dollar figures

| | ACTUAL | | | PROJECTED | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | December 31, 2015 | 10 Mos. Ending 31-Oct-16 | 2 Mos. Ending 31-Dec-16 | 2016 | 2017 | 2018 | 2019 |
| Revenue Growth | | | | | | | |
| *Revenue Growth* | | | | -9.7% | 3.0% | 3.0% | 3.0% |
| Total Revenue (1) | $38,018,869 | $29,512,419 | $4,833,286 | $34,345,705 | $35,376,076 | $36,437,358 | $37,530,479 |
| Cost of Goods Sold (2) | 24,346,767 | 19,563,664 | 3,702,218 | 23,265,882 | 26,384,443 | 27,060,711 | 27,872,533 |
| Gross Profit | 13,672,102 | 9,948,755 | 1,131,068 | 11,079,823 | 8,991,633 | 9,376,647 | 9,657,946 |
| Operating Expenses | | | | | | | |
| Salaries, Payroll taxes and benefits | 8,604,127 | 5,416,361 | 815,713 | 6,232,074 | 5,718,540 | 5,890,096 | 6,066,799 |
| Rent | - | 1,306,035 | - | 1,306,035 | | | |
| Outside services | 630,378 | 813,161 | 73,167 | 886,328 | 350,158 | 360,663 | 375,090 |
| Licensing and software fees | 1,329,206 | 347,659 | 128,978 | 476,637 | 761,689 | 815,007 | 855,757 |
| Insurance | 148,654 | 92,781 | 48,990 | 141,771 | 161,672 | 171,372 | 181,655 |
| Telephone and internet | - | 277,941 | - | 277,941 | | | |
| Other | 5,180,502 | 13,026,205 | 101,719 | 13,127,924 | 210,808 | 247,427 | 248,664 |
| Total Operating Expenses (2) | 15,892,867 | 21,280,143 | 1,168,567 | 22,448,710 | 7,202,867 | 7,484,565 | 7,727,964 |
| EBITDA | (2,220,764) | (11,331,388) | (37,499) | (11,368,887) | 1,658,766 | 1,762,082 | 1,799,982 |

### Percentages

| | ACTUAL | | PROJECTED | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | % | % | 2 Mos. Ending 31-Dec-16 | 2016 | 2017 | 2018 | 2019 |
| Total Revenue (1) | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of Goods Sold (2) | 64.0% | 66.3% | 76.6% | 67.7% | 74.6% | 74.3% | 74.3% |
| Gross Profit | 36.0% | 33.7% | 23.4% | 32.3% | 25.4% | 25.7% | 25.7% |
| Salaries, Payroll taxes and benefits | 22.6% | 18.4% | 16.9% | 18.1% | 16.2% | 16.2% | 16.2% |
| Rent | 0.0% | 4.4% | 0.0% | 3.8% | 0.0% | 0.0% | 0.0% |
| Outside services | 1.7% | 2.8% | 1.5% | 2.6% | 1.0% | 1.0% | 1.0% |
| Licensing and software fees | 3.5% | 1.2% | 2.7% | 1.4% | 2.2% | 2.2% | 2.3% |
| Insurance | 0.4% | 0.3% | 1.0% | 0.4% | 0.5% | 0.5% | 0.5% |
| Telephone and internet | 0.0% | 0.9% | 0.0% | 0.8% | 0.0% | 0.0% | 0.0% |
| Other | 13.6% | 44.1% | 2.1% | 38.2% | 0.6% | 0.7% | 0.7% |
| Total Operating Expenses (2) | 41.8% | 72.1% | 24.2% | 65.4% | 20.4% | 20.5% | 20.6% |
| EBITDA | -5.8% | -38.4% | -0.8% | -33.1% | 4.7% | 4.8% | 4.8% |

Notes:

(1) 2016 Revenue decline due to the loss of Golf Channel and NCS Pearson, which accounted for $3 - $4 million in revenue per year
    Management plans to replace the revenue from these customers in 2017 AND grow remaining customer revenue by 3%.

(2) Several costs were reclassified from operating expenses to COGS making it appear that projected COGS is higher while projected Opex is lower.

Nexline Corporation, Inc.

Income Approach – Discounted Cash Flow Method: Enterprise Level

Valuation Date: October 31, 2016

Exhibit IV

| | (Projected) For the 2 Mos. Ending Dec. 31, 2016 | Projected For the Fiscal Year Ending Dec. 31st 2017 | 2018 | 2019 | % | % | % | % |
|---|---|---|---|---|---|---|---|---|
| *Revenue Growth* | | 3.0% | 3.0% | 3.0% | | | | |
| Total Revenue | $4,833,286 | $35,376,376 | $36,437,358 | $37,530,479 | 100.0% | 100.0% | 100.0% | 100.0% |
| Total Cost of Goods Sold (COGS) | 3,702,218 | 26,384,443 | 27,060,711 | 27,872,533 | 76.6% | 74.6% | 74.3% | 74.3% |
| Gross Profit | 1,131,068 | 8,991,933 | 9,376,647 | 9,657,946 | 23.4% | 25.4% | 25.7% | 25.7% |
| *Operating Expenses* | | | | | | | | |
| Indirect staffing (plus taxes, benefits, etc) | 815,713 | 5,718,540 | 5,890,096 | 6,066,799 | 16.9% | 16.2% | 16.2% | 16.2% |
| Business Insurance | 48,990 | 161,672 | 171,372 | 181,655 | 1.0% | 0.5% | 0.5% | 0.5% |
| Professional | 73,167 | 350,158 | 360,663 | 375,090 | 1.5% | 1.0% | 1.0% | 1.0% |
| Licenses and Related G&A Expenses | 128,978 | 761,689 | 815,007 | 855,757 | 2.7% | 2.2% | 2.2% | 2.3% |
| Travel | 81,719 | 246,196 | 247,427 | 248,664 | 1.7% | 0.7% | 0.7% | 0.7% |
| Other (Income) Expense | 20,000 | (35,388) | - | - | 0.4% | -0.1% | 0.0% | 0.0% |
| Total Operating Expenses | 1,168,567 | 7,202,867 | 7,484,565 | 7,727,964 | 24.2% | 20.4% | 20.5% | 20.6% |
| Operating profit before adjustment for CEO salary | (37,499) | 1,788,766 | 1,892,082 | 1,929,982 | -0.8% | 5.1% | 5.2% | 5.1% |
| Less: CEO Salary, ($120,000 (current salary) and $250,000 (FMV sal) | (130,000) | (130,000) | (130,000) | (130,000) | -2.7% | -0.4% | -0.4% | -0.3% |
| EBITDA | (167,499) | 1,658,766 | 1,762,082 | 1,799,982 | -3.5% | 4.7% | 4.8% | 4.8% |
| Depreciation | 91,414 | 464,154 | 150,000 | 250,000 | 1.9% | 1.3% | 0.4% | 0.7% |
| EBIT | (258,913) | 1,194,612 | 1,612,082 | 1,549,982 | -5.4% | 3.4% | 4.4% | 4.1% |
| Taxes (1) | (103,565) | 477,845 | 644,833 | 619,993 | -2.1% | 1.4% | 1.8% | 1.7% |
| Net Earnings After Tax | (155,348) | 716,767 | 967,249 | 929,989 | -3.2% | 2.0% | 2.7% | 2.5% |
| *Effective tax rate* | 40% | 40% | 40% | 40% | | | | |
| *Plus:* | | | | | | | | |
| Depreciation Expense | 91,414 | 464,154 | 150,000 | 250,000 | | | | |
| *Less:* | | | | | | | | |
| (Increases) Decreases in DFCFPR | 181,488 | (113,706) | 149,850 | 159,588 | | | | |
| *UH FWC Revenue* | -3.5% | 0.3% | -0.4% | -0.4% | | | | |
| Capital Expenditures | - | (250,000) | (250,000) | (250,000) | | | | |
| Debt-Free Cash Flow (DFCF) | 117,554 | 817,215 | 1,017,099 | 1,089,577 | | | | |
| Periods to Discount | 0.08 | 0.67 | 1.67 | 2.67 | | | | |
| Present Value (PV) Factor With WACC (2)   33% | 0.9929 | 0.8711 | 0.7082 | 0.5758 | | | | |
| | 118,544 | 711,869 | 720,313 | 627,335 | | | | |

**Fair Value Calculation:**

| | |
|---|---|
| Sum of PV of Yearly Cash Flows | $2,175,077 |
| Plus Perpetuity Value | $2,913,169 |
| Plus Cash | $0 |
| Plus PV of NOL Carryforward (3) | $0 |
| PV of Cash Flows & Perpetuity Value | $5,088,247 |
| **Fair Market Value - Controlling, Marketable Basis - DCF Method** | **$5,090,000** |

**Terminal Year Calculation:**

| | |
|---|---|
| Final Year DFCF Grown at 3% | $1,122,265 |
| WACC = | 23.0% |
| Long Term Growth (g)= | 3.0% |
| Capitalization Rate: (WACC-g)= | 20.0% |
| Value in Terminal Year | $5,611,323 |
| Periods to Discount | 3.17 |
| Present Value Factor | 0.5192 |
| Present Value of Terminal Year | $2,913,169 |
| Implied Year 4 EBITDA Multiple | 3.12 |

Notes:
(1) Blended Federal and State Tax Rate
(2) See Exhibits VI - VII
(3) This Company has no equity value; therefore, the application of the NOL is limited due to Section 382 limitations based on total equity value (See Exhibit V for calculation)

Exhibit V

**Nexxlinx Corporation, Inc.**
Income Approach - Future Net Operating Losses
Valuation Date: October 31, 2016

**Assumptions:**

| | | |
|---|---|---|
| Estimated Net Operating Losses as of the Valuation Date | $6,320,631 | |
| IRC Section 382 Limitation on NOL Carryovers | 1.82% | Highest of Fed LT Tax Exempt Rate for Oct 2016 and preceding two m |
| | | |
| Fair Market Value of Equity (1) | $0 | Source: _Index of Applicable Federal Rate Rulings_ |
| Tax Rate | 40.0% | |
| Discount Rate | 23.0% | |

| Fiscal Year 10/31/2016 | 12/31/16 | 2017 | 2017 | 2017 | 2017 | 2017 | 2017 | 2017 |
|---|---|---|---|---|---|---|---|---|
| *Forecast Period* | *1* | *2* | *3* | *4* | *5* | *6* | *7* | |
| Opening NOLs | 6,320,631 | 6,320,631 | 6,320,631 | 6,320,631 | 6,320,631 | 6,320,631 | 6,320,631 | |
| 382 Limitations | - | - | - | - | - | - | - | |
| Utilized NOLs | - | - | - | - | - | - | - | |
| Closing NOLs | 6,320,631 | 6,320,631 | 6,320,631 | 6,320,631 | 6,320,631 | 6,320,631 | 6,320,631 | |
| | | | | | | | | |
| Tax Savings | - | - | - | - | - | - | - | |
| Partial Period Adjustment | 0.17 | 0.67 | 1.67 | 2.67 | 3.67 | 4.67 | 5.67 | |
| Discount Period | 0.08 | 0.8711 | 0.7082 | 0.5758 | 0.4681 | 0.3806 | 0.3094 | |
| Discount Factor | 0.9829 | | | | | | | |
| Present Value of Tax Savings | - | - | - | - | - | - | - | |
| | | | | | | | | |
| Total Savings | - | | | | | | | |

**Exhibit VI**

**Nexxlinx Corporation, Inc.**
Weighted Average Cost of Capital Development
Capital Asset Pricing Model - Part 1
Valuation Date: October 31, 2016
*($ in millions)*

| Guideline Company (GLC) | Ticker | MVIC (1) | Book Value of Debt to MVIC | Market Value of Equity to MVIC | Effective Tax Rate | Levered Beta (2) | Unlevered Beta |
|---|---|---|---|---|---|---|---|
| Synnex Corporation | SNX | $4,054.0 | 16.9% | 83.1% | 40.0% | 1.14 | 1.02 |
| Convergys Corporation | CVG | $3,011.0 | 9.3% | 90.7% | 40.0% | 0.98 | 0.92 |
| Sykes Enterprises | SYKE | $1,129.0 | 19.4% | 80.6% | 40.0% | 0.85 | 0.74 |
| Teletech Holdings | TTEC | $1,330.0 | 9.2% | 90.8% | 40.0% | 0.89 | 0.84 |
| | | | | | | | |
| Guideline Company Minimum | | $1,129.0 | 9.2% | 80.6% | 40.0% | 0.85 | 0.74 |
| Guideline Company Average | | $2,381.0 | 13.7% | 86.3% | 40.0% | 0.97 | 0.88 |
| Guideline Company Median | | $2,170.5 | 13.1% | 86.9% | 40.0% | 0.94 | 0.88 |
| Guideline Company Maximum | | $4,054.0 | 19.4% | 90.8% | 40.0% | 1.14 | 1.02 |
| | | | | | | | |
| Selected Data for Subject Company (3) | | -- | 20.0% | 80.0% | 40.0% | -- | 0.90 |

Notes:
Source of data: Capital IQ
MVIC = Market Value of Invested Capital, net of cash.
(1) Reflects stock price as of the Valuation Date and debt, preferred stock and shares outstanding as of the most recent quarter for which data was available.
(2) 5 Year Beta; adjusted with Marshall Blume formula (Ba = 0.371 + 0.635Bh). Betas indicated with "N/A" have not been public for 5 years.
(3) Selected capital structure reflects consideration of the subject company's capital structure, the optimal structure of a fair market value buyer, and that of the guideline companies.
    Selected unlevered beta is based on consideration of the median guideline company data.

**Exhibit VII**

**Nexxlinx Corporation, Inc.**
Weighted Average Cost of Capital Development
Capital Asset Pricing Model - Part 2
Valuation Date: October 31, 2016

### After-Tax Weighted Average Cost of Capital

| Capital Structure | % of Total | After-Tax Cost | Weighted Cost |
|---|---|---|---|
| Equity | 80.0% | 27.44% | 21.95% |
| Debt | 20.0% | 5.10% | 1.02% |
| | | Indicated WACC = | 23.0% |

### Cost of Equity

| | |
|---|---|
| Unlevered Beta Using Selected Data for Subject Company | 0.90 |
| Relevered Beta Using Selected Data for Subject Company (1) | 1.04 |
| Multiplied by: Equity Risk Premium (2) | 6.90% |
| | |
| Company Equity Risk Premium | 7.14% |
| Plus: Small Stock Risk Premium (3) | 5.60% |
| Plus: Additional Risk Premium (4) | 12.50% |
| Plus: Risk-Free Rate (5) | 2.20% |
| | |
| **After-Tax Cost of Equity =** | **27.44%** |

### Cost of Debt

| | |
|---|---|
| Pre-Tax Cost of Debt (6) | 8.50% |
| Tax Rate | 40.00% |
| **After-Tax Cost of Debt =** | **5.10%** |

Notes:
(1) Relevered using the selected capital structure and tax rate for the Company.
(2) Source: 2016 Valuation Handbook - Duff & Phelps - Recommended Equity Risk Premium (considering normalized RFR)
(3) Source: 2016 Valuation Handbook - Duff & Phelps - Size Premium (Return in Excess of CAPM) Estimation
    for 10th decile portfolio.
(4) Reflects the additional risk estimated to be associated with the Company (forecast risk, customer concentration risk, leverage)eta)
(5) 20-Year Treasury Bond as of the Valuation Date as reported in the Federal Reserve Statistical Release.
(6) Represents the Company's BB&T borrowing rate as of the Valuation Date.

**Exhibit VIII**

**Nexxlinx Corporation, Inc.**
**Weighted Average Cost of Capital Development**
**Build-up Method**
**Valuation Date: October 31, 2016**

## Cost of Equity:

| | | |
|---|---|---|
| Risk-Free Rate | 2.20% | (1) |
| Return in Excess of Risk-Free Rate | 6.90% | (2) |
| Small Company Premium | 5.60% | (3) |
| Company Specific Risk Premium | 12.50% | (4) |
| **After-Tax Cost of Equity =** | **27.20%** | |

## After Tax Cost of Debt:

| | | |
|---|---|---|
| Borrowing Rate | 8.50% | (5) |
| Tax Rate | 40.00% | (6) |
| **After-Tax Cost of Debt =** | **5.10%** | |

## After-Tax Weighted Average Cost of Capital (WACC):

| Capital Structure (7) | % of Total | After-Tax Cost | Weighted Cost |
|---|---|---|---|
| Debt | 20% | 5.10% | 1.02% |
| Equity | 80% | 27.20% | 21.76% |
| | **Indicated WACC =** | | **22.8%** |

## Notes:

(1) 20-Year Treasury Bond as of the Valuation Date as reported in the Federal Reserve Statistical Release.

(2) Source:  2016 Valuation Handbook - Duff & Phelps - Long-Horizon Equity Risk Premium, S&P 500 benchmark;

(3) Source:  2016 Valuation Handbook - Duff & Phelps - Size Premium (Return in Excess of CAPM) Estimation
for 10b decile portfolio of the NYSE/AMEX/NASDAQ.

(4) Reflects additional risk associated with the Company including customer concentration, projection risk, etc.

(5) Company's Working Capital LOC (Bank of N. Georgia) interest rate as of the Valuation Date.

(6) Estimated effective corporate tax rate.

(7) Capital structure is based on the subject company, GLCs and an optimal capital structure.

Exhibit IX

**Nexxlinx Corporation, Inc.**
Subject Company Transaction Method
Valuation Date: October 31, 2016

| | 11/3/2015 Fair Market Value - Buyer #1 | 11/23/2015 Fair Market Value - Buyer #2 | 10/31/2016 Fair Market Value |
|---|---|---|---|
| LOI Purchase Price | $9,750,000 | $7,000,000 | |
| Forward Revenue - Yr 1 at the time of the LOI (1) | $46,900,000 | $44,400,000 | |
| Implied Revenue Multiple (2) | 0.20 | 0.16 | 0.16 |
| Forward Yr 1 Revenue '16 | $34,345,705 | $35,376,076 | $34,345,705 |
| **Implied Valuation Cap Using Implied Revenue Multiple from LOI** | | | $5,500,000 |
| Plus: Cash Balance | | | $0 |
| **Fair Market Value - Controlling, Marketable Basis - Subject Company Transaction Method (Rounded)** | | | $5,500,000 |

**Notes:**

(1) The AMS offer did not include the Texas operations, which contributed approximately $2.5 million in revenue

(2) EBITDA was negative at the time of the LOI; therefore an implied EBITDA multiple was not available.

Nexilinx Corporation, Inc.

Market Approach - Guideline Public Company Method

Valuation Date: October 31, 2016

Exhibit X-A

| Guideline Company (GLC) | Forward Revenue ('16) | Forward EBITDA ('16) | Market Value of Invested Capital/ Forward Revenue ('17) | Forward EBITDA ('17) |
|---|---|---|---|---|
| Synnex Corporation | 0.30 | 9.40 | 0.30 | 8.40 |
| Convergys Corporation | 1.00 | 7.90 | 1.00 | 7.30 |
| Sykes Enterprises | 0.80 | 7.20 | 0.70 | 6.10 |
| Teletech Holdings | 1.10 | 6.10 | 1.10 | 8.00 |
| | | | | |
| Minimum | 0.30 | 6.10 | 0.30 | 6.10 |
| Median | 0.90 | 7.55 | 0.85 | 7.65 |
| Mean | 0.80 | 7.65 | 0.78 | 7.45 |
| Maximum | 1.10 | 9.40 | 1.10 | 8.40 |
| | | | | |
| Minimum Multiple | 0.30 | 6.10 | 0.30 | 6.10 |
| Discount (1) @ 50% | 0.15 | 3.05 | 0.15 | 3.05 |
| | | | | |
| **Selected Multiple** | **0.15** | **3.05** | **0.15** | **3.05** |
| | | | | |
| Subject Co Financial Input | $34,345,705 | negative | $35,376,076 | $1,658,766 |
| Implied Fair Market Value | $5,151,856 | nmf | $5,306,411 | $5,059,237 |
| Multiple Weighting | 40.0% | 0% | 30% | 30% |

Fair Market Value Before Cash (Rounded)    $5,170,000

Plus: Cash    $0

Fair Market Value - Minority, Marketable Basis    $5,170,000

Plus: Control Premium @    10%    $517,000

**Fair Market Value Controlling, Marketable Basis - GLC Method (Rounded)    $5,690,000**

Notes:

Multiples that are more than 2x the standard deviation are excluded and indicated by "—"

MVIC is calculated net of cash

(1) Approprite discount was determined by the implied Forward Revenue multiple from the Qualfor

Exhibit X-B

Nexxlinx Corporation, Inc.
Last Twelve Months Ratio Analysis
Valuation Date: October 31, 2016

| Company Name: Ticker: Latest Twelve Month Ending: | Nexxlinx 10/31/2016 | Nexxlinx Ranking | Synnex Corporation SNX 08/31/16 | Convergys Corporation CVG 06/30/16 | Sykes Enterprises SYKE 06/30/16 | Teletech Holdings TTEC 06/30/16 | Guideline Companies Median | Guideline Companies Average |
|---|---|---|---|---|---|---|---|---|
| **SIZE ($ in millions)** | | | | | | | | |
| Revenue | $34.3 | 5th | 13,725 | 2,908 | 1,340 | 1,269 | $2,124 | $4,810 |
| Assets | $5.3 | 5th | 4,822 | 2,358 | 1,219 | 822 | $1,788 | $2,305 |
| **Projected Revenue Growth** | | | | | | | | |
| 2016 | -26.7% | 5th | 5.4% | -0.8% | 13.7% | -0.7% | 2.4% | 4.4% |
| 2017 | -3.0% | 5th | 6.0% | 3.1% | 6.7% | 4.8% | 5.4% | 5.2% |
| **LIQUIDITY RATIOS** | | | | | | | | |
| Cash & Equivalents / Total Assets | 0.00 | 5th | 0.05 | 0.11 | 0.22 | 0.07 | 0.09 | 0.11 |
| Current Ratio | 0.37 | 5th | 1.71 | 2.66 | 3.18 | 2.23 | 2.45 | 2.45 |
| **WORKING CAPITAL RATIOS** | | | | | | | | |
| Debt-Free Working Capital (% of Revenue) | -2.4% | 1st | 10.7% | 9.6% | 11.8% | 12.3% | 11.3% | 11.1% |
| **LEVERAGE RATIOS** | | | | | | | | |
| Debt / Book Capital | -0.64 | 5th | 0.30 | 0.19 | 0.28 | 0.24 | 0.26 | 0.25 |
| Debt / Assets | 1.09 | 5th | 0.17 | 0.13 | 0.22 | 0.16 | 0.17 | 0.17 |
| Assets / Equity | -0.58 | 5th | 2.49 | 1.82 | 1.56 | 1.92 | 1.87 | 1.95 |
| Long-Term Debt / Equity | -0.29 | 5th | 0.11 | 0.18 | 0.14 | 0.30 | 0.16 | 0.19 |
| **PROFITABILITY RATIOS** | | | | | | | | |
| EBITDA Margin | -38.4% | 5th% | 3.5% | 13.3% | 11.3% | 11.9% | 11.6% | 10.0% |

**EXHIBIT D**

Queensgate Summary

**The Official Committee of Unsecured Creditors of Nexxlinx Corp. et al.**

*Valuation of the Enterprise Value of Nexxlinx Corp.*

Football Field of Value Indications

Draft - For Discussion Purposes Only - Attorney-Client Privilege

*Dollars in thousands, except per share figures*

Exhibit



| Methodology | Enterprise Value Indications (rounded) |
|---|---|
| Market Multiple NFY Revenue | |
| Market Multiple NFY+1 Revenue | |
| Market Multiple NFY+1 EBITDA | |
| Market Transaction Revenue | |
| Market Transaction EBITDA | |
| Income Approach | |

Plan: $6.5 M[1]

Enterprise Value

**NOTE: Enterprise Value Indications do not include the value of claims against insiders or third parties which could further enhance unsecured creditor recoveries.**

*Footnotes:*

*NFY= Next fiscal year*

*(1) Plan figure includes $5.788 million total distributions to creditors as stated in the Plan as well $720,000 of cure payments to Focus.*

QUEENSGATE CORPORATE FINANCE

© BY QUEENSGATE CORPORATE FINANCE LLC. ALL RIGHTS RESERVED.

**EXHIBIT E**


Liquidation Analysis

**NexxLinx Liquidation Analysis**

**Liquidation Analysis**

| | Estimated Book Value at 12/31/16 | Potential Recovery Under Chapter 7 Conversion | | | | Chapter 11 Proposed Plan | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Lower | | Higher | | | |
| | | ($) | (%) | ($) | (%) | ($) | (%) |
| **Current Assets** | | | | | | | |
| Cash | $ 100,000 | $ 100,000 | 100% | $ 100,000 | 100% | | |
| Accounts Receivables, net | $ 3,500,000 | $ 2,450,000 | 70% | $ 2,800,000 | 80% | | |
| Other Receivable | $ 693,077 | $ 346,538 | 50% | $ 485,154 | 70% | | |
| ST JV Receivables | $ - | $ - | 50% | $ - | 70% | | |
| Prepaids and Other Current Assets | $ 601,512 | $ - | 0% | $ 60,151 | 10% | | |
| Leases Fixed Asset, net | $ - | $ - | | $ - | | | |
| Non-Leased Fixed Assets | $ - | $ - | | $ - | | | |
| Goodwill | $ - | $ - | 0% | $ - | 0% | | |
| JV Receivables | $ - | $ - | 0% | $ - | 0% | | |
| Interest Receivable - Related Party | $ - | $ - | 0% | $ - | 0% | | |
| Investment in JV's | $ 28,914 | $ - | 0% | $ 28,914 | 100% | | |
| Total Assets | $ 4,923,503 | $ 2,896,538 | 59% | $ 3,474,219 | 71% | | |
| | | | | | | | |
| Net Estimated liquidation Proceeds | | $ 2,896,538 | | $ 3,474,219 | | | |
| | | | | | | | |
| **Secured Claims** | | | | | | | |
| Class 3, Allowed Secured Claims - Action Capital (4) | $ 3,700,000 | $ 2,896,538 | 78% | $ 3,474,219 | 94% | $ 3,500,000 | 100% |
| Class 4, Allowed Secured Claims - BB&T | $ 536,000 | $ - | 0% | $ - | 0% | $ 536,000 | 100% |
| Class 5, Other Allowed Secured Claims - Capital Leases | $ 590,000 | $ - | 0% | $ - | 0% | $ 206,674 | 35% |
| Total Secured Claims | $ 4,826,000 | 2,896,538 | 53% | $ 3,474,219 | 75% | $ 4,242,674 | 92% |
| | | | | | | | |
| **Administrative, Priority and Other Claims** | | | | | | | |
| Chapter 7 Professional Fees | $ 100,000 | $ - | 0% | $ - | 0% | $ - | 0% |
| Chapter 7 Trustee Fees | $ 75,000 | $ - | 0% | $ - | 0% | $ - | 0% |
| Class 1, Allowed Priority Claims | $ - | $ - | 0% | $ - | 0% | $ - | 0% |
| Allowed Priority Taxes | $ 117,000 | $ - | 0% | $ - | 0% | $ 117,000 | 100% |
| Class 2, Allowed Post Petition Trade Claims | $ 500,000 | $ - | 0% | $ - | 0 | $ - | 0 |
| Total Administrative, Priority and Other Claims | $ 792,000 | $ - | | $ - | | $ 117,000 | |
| | | | | | | | |
| **Unsecured Claims** | | | | | | | |
| Class 9, Allowed Unsecured Claims - Non-insider (3) | $ 6,500,000 | $ - | 0% | $ - | 0% | $ 1,400,000 | 22% |
| Class 9, Allowed Unsecured Claims - Insider | $ 2,175,000 | $ - | 0% | $ - | 0% | | |
| Class 10, Allowed Convenience Claims | $ 10,000 | $ - | 0% | $ - | 0% | $ 28,000 | 20% |
| Total Unsecured Claims | $ 8,685,000 | $ - | 0% | $ - | 0% | $ 1,428,000 | |
| | | | | | | | |
| **Total Claims** | $ 14,303,000 | | | | | | |
| **Total Distribution to Creditors** | | $ 2,896,538 | | $ 3,474,219 | | $ 5,787,674 | |

1 - Liquidation date is assumed to be the Plan Confirmation

2 - The information in this table is preliminary and the Debtors reserve all rights with respect to any asserted claim

3 - The scheduled and filed claims exceed the amount listed; however, the Debtors estimate that the total allowed claims after resolution of objections and disputed claims will range from $6,500,000 to $10,000,000 exclusive of insider claims which are being waived under the plan. The Debtors believe that the actual figure will be closer to the low end of the range.

4 - This is advances on accounts receivable and other receivables

# Notes to Liquidation Analysis

Except where noted, the asset and liability values are assumed to be consistent with the latest available financial data and assumptions as to values on or around 12/31/16. The combined balance sheet was adjusted to eliminate intercompany balances as well as to reflect the commencement of a hypothetical liquidation on Plan Confirmation. In addition, amounts from the Disclosure Statement have been utilized.

## (1) *Cash*

The Debtors' Cash balance is assumed to be $100,000 as of the time of conversion to Chapter 7 liquidation.

## (2) *Accounts Receivable*

Accounts Receivable primarily consist of trade receivables. It is assumed that a Chapter 7 trustee would retain certain existing staff of the Debtors to lead an aggressive collection effort for the outstanding accounts receivable of the Debtors. The Debtors' has very few customers and accounts receivable have historically exhibited low loss rates. Company management believes that in the case of liquidation, the Debtors would be able to collect 70% - 80% of outstanding receivables. Recovery percentages were discounted to reflect potential liquidated damages Claims from customers.

## (3) *Other Receivable*

Other Receivable consists mainly of unbilled receivables. Unbilled receivables are recorded for two customers, the majority being attributed to one large customer. The amount of unbilled receivables is primarily determined by the detailed daily call records for each customer. This data is automatically captured by the switch. Recovery of unbilled receivables in Chapter 7 liquidation is assumed to have rates varying from 50% to 70%.

## (4) *Prepaid and Other Current Assets*

The Prepaid and Other Current Assets account is mostly comprised of deposits on real estate & utilities. While there may be some recovery from utilities, recovery from real estate is not likely because payments on many of the leased facilities are in arrears at the time of the filing. Company management believes that in the case of liquidation, Prepaid and Other Current Assets are assumed to have a recovery rate of 0% to 10%.

## (5) *Fixed Assets, Net*

Fixed Assets Net of depreciation consists primarily of: (i) capital leases for call center infrastructure items, (ii) owned computer equipment & software (iii) leasehold improvements and (iv) software. Company management believes that in the case of liquidation, the capital leases recoveries would first be applied to debt associated with the leases and are not treated as a component of the general recovery pool. Recovery amounts for other categories is almost incidental, so recoveries for all fixed assets are treated as accruing to the capital lease debt.

*(6)  Investment in JV*

The investment in JV refers to the 20% ownership interest in SaviLinx, which is located in Maine. NexxLinx no longer conducts business with SaviLinx and the main shareholder may be interested in purchasing NexxLinx's ownership interest. The realizable value on this investment is estimated at between $25,000 to $30,000.

*(7)  Chapter 7 Trustee Fees*

This amount represents the preliminary estimated Chapter 7 trustee costs.  The Chapter 7 trustee fees are calculated based upon the statutory scale set forth in section 326(a) of the Bankruptcy Code, which provides for fees equal to 25% of the first $5,000 of distributions; 10% of the next $45,000 of distributions; 5% of the next $950,000 of distributions; and 3% of distributions in excess of $1,000,000.  For parsimony, trustee fees are assumed at $75,000 in this analysis.

*(8)  Chapter 7 Trustee's Professional Fees*

It is assumed that the Chapter 7 trustee will hire legal, financial, accounting and tax advisors to assist in the administration of the Chapter 7 liquidation.   The Debtors have assumed $100,000 in professional fees and operating expenses necessary to conduct the Chapter 7 liquidation.

*(9)  Administrative Claims*

This liquidation analysis assumes Administrative Claims have been significantly paid current during the Bankruptcy Case, with $500,000 being unpaid at the termination of the case.  These will consist primarily of trade claims incurred in the normal course of business.

**EXHIBIT F**

Letter from Committee in Support of Plan



BRYAN CAVE LLP  One Atlantic Center, 14th Floor, 1201 W. Peachtree Street, N.W., Atlanta, GA 30309-3471

T: 404 572 6600  F: 404 572 6999  **bryancave.com**

MARK DUEDALL
DIRECT DIAL: 404-572-6611
FAX: 404-420-0611
E-MAIL: MARK.DUEDALL@BRYANCAVE.COM

LEAH FIORENZA
DIRECT DIAL: 404-572-6925
FAX: 404-420-0925
E-MAIL: LEAH.FIORENZA@bryancave.com

February 10, 2017

TO:  ALL HOLDERS OF CLASS 9 UNSECURED CLAIMS AND CLASS 10 CONVENIENCE CLASS CLAIMS AGAINST NEXXLINX CORPORATION, INC. AND ITS AFFILIATED DEBTORS

RE:  THE COMMITTEE'S SUPPORT OF THE DEBTORS' PLAN, AND REQUEST THAT YOU VOTE IN FAVOR OF THE PLAN

Bryan Cave, LLP is counsel to the Official Committee of Unsecured Creditors (the "***Committee***") of Nexxlinx Corporation, Inc. and its affiliated debtors (the "***Debtors***"). The Committee was appointed on July 11, 2016 and acts as a fiduciary for the interests of all unsecured creditors in the Debtors' Chapter 11 cases.

The Debtors have filed, and are seeking your votes in favor of, their Second Amended Chapter 11 Plan of Reorganization (the "***Plan***"). The Committee has been actively involved in negotiating key provisions of the Plan, investigating Plan alternatives, negotiating with the Debtors over improved recoveries for holders of Unsecured Claims, and taking other actions to ensure that holders of Unsecured Claims and Convenience Class Claims receive the greatest possible recovery under the Plan.

***As a result of these actions, and the substantial and material improvements to the Plan agreed to by the Debtors, the Committee is confident that the Plan represents the best viable option to maximize the return to holders of Unsecured Claims and Convenience Class Claims. As such, the Committee has agreed to support the Plan, its members have agreed to support and vote in favor of the Plan, and the Committee urges holders of Unsecured Claims and Convenience Class Claims to vote in favor of the Plan.***

While you are encouraged to review the enclosed Plan and Disclosure Statement, and discuss it with your legal and/or financial advisors, the Committee would note certain of the following key provisions of the Plan which support the expected recoveries by holders of Unsecured Claims and Convenience Class Claims:

1.  The Plan calls for **mandatory** cash payments over time by the Debtors, which cannot be deferred based on revenues, results, profits, losses, or any subjective factors.

2.      If the Debtors are profitable, the Plan also calls for additional "Creditor Profit Sharing Payments," which will accelerate the total of all payments to holders of Class 9 Unsecured Claims.

3.      The total payments to be made by the Debtors to all creditors are in the range of the entire value of the Debtors' enterprise (or **more** than such value, according to the Debtors' valuation expert). This illustrates that creditors are obtaining at or near what they could recover in any other sale or reorganization process.

4.      If for some reason the Debtors do not make the mandatory cash payments, the Plan incorporates, through the Stock Pledge Agreement, a mechanism for creditors to promptly obtain a controlling equity interest in the Debtors, thus obtaining control of future events.

5.      The Plan includes post-confirmation creditor oversight and ensures that insider compensation is appropriate or based solely on actual future profits, and other provisions that allow for future oversight and monitoring.

6.      The Plan reserves the claims resolution process to the Creditor's Trust, which will be run by an independent party and will report to a subcommittee of holders of Unsecured Claims. Thus, creditors will control their own claims resolution process, which will include the decision to pursue any avoidance actions.

7.      The Plan reserves substantial additional non-operating assets, causes of action, and other miscellaneous assets to the Creditor's Trust, which could further enhance the returns to holders of Class 9 Unsecured Claims.

To conclude, the Committee has worked very hard with the Debtors to create a Plan structure that maximizes the recovery to holders of Unsecured Claims and Convenience Class Claims. The Committee believes that the Plan aligns the interests of the Reorganized Debtor with the interests of holders of Unsecured Claims and Convenience Class Claims, which is essential for any plan that pays creditors over time.

**AS SUCH AND TO REITERATE, THE COMMITTEE BELIEVES THAT THE PLAN IS IN THE BEST INTEREST OF HOLDERS OF CLASS 9 UNSECURED CLAIMS AND CLASS 10 CONVENIENCE CLASS CLAIMS AND URGES YOU TO VOTE IN FAVOR OF THE PLAN.**

It is important that you vote on the Plan by completing and mailing your ballot according to the instructions set forth on the ballot. **In order to be counted, your vote must be received at the address indicated on the ballot by no later than March 15, 2017.** A hearing to confirm the Plan is scheduled for 9:30 a.m. Eastern Time on March 17, 2017.

This letter is not intended or offered as legal advice as to any specific claim or the treatment of such specific claim under the Plan. It has been prepared for educational and informational purposes only. By this letter, the Committee as a whole is expressing its support

for the Plan.  This letter does not purport to reflect the views of the Bankruptcy Court and does not constitute findings of facts or conclusions of law endorsed by the Bankruptcy Court.

If you have any questions regarding voting procedures or otherwise, please contact counsel to the Committee, Mark I. Duedall at (404) 572-6611 or Leah Fiorenza McNeill at (404) 572-6925.

Very truly yours,

Mark I. Duedall (Ga. Bar No. 231770)
Leah Fiorenza McNeill (Ga. Bar 940554)
BRYAN CAVE LLP
One Atlantic Center - Fourteenth Floor
1201 W. Peachtree Street, NW
Atlanta, Georgia  30309-3471
Telephone:    (404) 572-6600
Facsimile:    (404) 572-6999
Email: Mark.Duedall@bryancave.com
Email: Leah.Fiorenza@bryancave.com

*Counsel to the Official Committee of Unsecured Creditors of NexxLinx Corporation, Inc. and its affiliated debtors*

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a true and correct copy of the attached **Second Amended Disclosure Statement To Accompany Debtors' Second Amended Plan of Reorganization** by causing it to be deposited in the United States Mail in a properly addressed envelope with adequate postage affixed thereon to the following:

Lindsay P.S. Kolba
OFFICE OF THE UNITED STATES TRUSTEE
Suite 362, Richard B. Russell Building
75 Ted Turner Drive, SW
Atlanta, GA   30303

This 10 day of February, 2017.

Respectfully submitted,

SCROGGINS & WILLIAMSON, P.C.

J. ROBERT WILLIAMSON
Georgia Bar No. 765214
ASHLEY REYNOLDS RAY
Georgia Bar No. 601559
One Riverside
4401 Northside Parkway
Suite 450
Atlanta, Georgia 30327
T:      404-893-3880
F:      404-893-3886
E:      rwilliamson@swlawfirm.com
        aray@swlawfirm.com

*Counsel for Nexxlinx Corporation, Inc., et al.*